IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACCENTURE GLOBAL SERVICES GMBH and ACCENTURE LLP<br>Plaintiffs, | )<br>)<br>) |
| | ) |
| v. | ) Civ. No. 07-826-SLR |
| | ) |
| GUIDEWIRE SOFTWARE INC., | ) |
| | ) |
| Defendant. | ) |

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: James Pooley, Esquire, L. Scott Oliver, Esquire, Diana Luo, Esquire, Ruchika Agrawal, Esquire, and Matthew Chen, Esquire, of Morrison & Foerster LLP, Palo Alto, California.

Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Daralyn J. Durie, Esquire, Clement S. Roberts, Esquire, Matthias Kamber, Esquire, and JuNelle Harris, Esquire, of Keker & Van Nest LLP, San Francisco, California.

**MEMORANDUM OPINION**

Dated: October 8, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiffs Accenture Global Service GmbH and Accenture LLP (collectively, "Accenture" or "plaintiffs") brought this action against defendant Guidewire Software Inc. ("Guidewire") on December 18, 2007. (D.I. 1) Accenture asserts that Guidewire has infringed U.S. Patent No. 7,013,284 ("the '284 patent"), describing a computer program for developing component-based software capable of performing tasks relating to insurance transactions (such as claims processing). Accenture also asserts claims for trade secret misappropriation, unfair competition and deceptive trade practices in violation of the Delaware Uniform Deceptive Trade Practices Act ("DTPA"), 6 Del. C. §§ 2531 *et seq.*, common law unfair competition, and tortious interference with business relations. (D.I. 1) Guidewire asserts several affirmative defenses: patent invalidity, unenforceability, failure to mark, unclean hands, and patent misuse. (D.I. 10) Guidewire also brings counterclaims for declaratory judgments of non-infringement, invalidity, and unenforceability, breach of contract, as well as claims of bad faith litigation as proscribed by Section 43(a) of the Lanham Act, sections 2532(a)(5), (8), & (12) of the DPTA, and the common law of unfair competition. (*Id.*) Presently before the court are: (1) Guidewire's motion to dismiss Accenture's state law claims and trade secret misappropriation claims (D.I. 11); and (2) Accenture's motion to dismiss or, in the alternative, to bifurcate and stay Guidewire's counterclaims V, VI, and VII (the "bad faith litigation" counterclaims) (D.I. 20). For the reasons that follow, the court grants both motions.

## II. BACKGROUND

### A. The Parties

Accenture and Guidewire are competitors in the consulting and technology services industry. Among other things, the parties provide computer software and consulting services to help design tools to aid insurance companies in their management and processing of information. Accenture provides the "Accenture Claim Components Solution" ("ACCS") product suite and associated services; Guidewire's insurance claims management product is called "Guidewire Insurance Suite," which consists of "Guidewire ClaimCenter," "Guidewire PolicyCenter," and "Guidewire BillingCenter" platforms. (D.I. 1 at ¶¶ 7, 11; D.I. 10 at ¶¶ 53, 58)

According to Accenture, the ACCS tools and services are the result of significant investment by Accenture beginning in 1996, when Accenture began "amass[ing] a large body of knowledge on techniques that work well in claims management, as well as techniques that do not work well." (D.I. 1 at ¶¶ 11, 15) Accenture shared the costs of the development of ACCS with St. Paul Insurance Company beginning in 1997, and won a contract with Reliance Insurance in 1998. (*Id.* at ¶ 15) The ACCS product required "substantial development, tuning, customization and integration with each client's financial systems." (*Id.* at ¶ 17) Accenture filed the application for what became the '284 patent on May 4, 1999. Thereafter, Accenture sold the ACCS product to other companies such as Allstate and Chubb. (*Id.* at ¶ 19) "With the exception of trade secrets that [were] disclosed [to the PTO]," Accenture considers all of the information "relating to the design, coding, and implementation of a claims management system" to

be its trade secrets, which it avers are "not generally known, are maintained in confidence by Accenture's employees, and are maintained in confidence by others who need to know them and who have been entrusted with them according to express and implied agreements." (*Id.* at ¶¶ 15-16)  As stated, excluded from this definition is any trade secrets that Accenture disclosed to the PTO. (*Id.* at ¶ 15)

In 2000, CNA Insurance ("CNA") requested an "assessment" from Accenture, which entailed several months of studying CNA's business and developing a plan for implementing ACCS.[1] (*Id.* at ¶ 21)  Accenture states that its assessment exceeded 150 pages when completed, contained "everything from specifics of how the [ACCS] system would integrate into CNA's legacy financial system, to how the business logic should be programmed, to sample screen displays," and was subject to a non-disclosure agreement. (*Id.* at ¶ 21)  Accenture worked with CNA from 2000 to 2002.  In late 2002, Accenture installed ACCS on computers at CNA for testing purposes. (*Id.* at ¶ 22)  In early 2003, CNA informed Accenture that an unnamed competitor would jointly develop a system with CNA for \$10 million less than Accenture; Accenture subsequently learned this competitor was Guidewire, a smaller company about which it had learned while working with CNA in late 2002. (*Id.* at ¶¶ 22-23)  Accenture states that "Guidewire seemed to have a surprisingly quick development trajectory, particularly in light of its small size and relatively light experience in the insurance market." (*Id.* at ¶ 24)

The '284 patent issued in March 2006.  Between this date and December 18,

---

[1]Accenture states that CNA purchased an ACCS system from Accenture in the late 1990s. (D.I. 1 at ¶ 20)  It is unclear how this first system differed from that which was the subject of the assessment in 2000.

3

2007 – the date on which Accenture filed the complaint in the present action –
Accenture and Guidewire had a working relationship. The parties entered into a non-
disclosure agreement ("NDA") on November 30, 2006, relating to discussions with
Sentry Insurance ("Sentry").[2] (D.I. 10 at ¶ 66; D.I. 19 at ¶ 66) According to Guidewire,
Sentry wanted Guidewire to interface its PolicyCenter product to a data warehouse
maintained by Accenture. (D.I. 10 at ¶ 66) Under the NDA, Accenture and Guidewire
were permitted access to each other's confidential information, only as it related to
providing services to Sentry.

Accenture and Guidewire entered into another NDA on August 17, 2007. This
NDA related to the provision of services to CNA and allowed the parties access to each
other's confidential information, only as it related to providing services to CNA. (D.I. 10
at ¶ 67; D.I. 19 at ¶ 67) Guidewire states that CNA wanted to use Accenture to provide
end-user training on Guidewire products; "Guidewire wanted a NDA in place because
Accenture employees would be looking at the Guidewire PolicyCenter product to
develop the end-user training for CNA." (D.I. 10 at ¶ 67)

## B. Accenture's Statements Relating to this Lawsuit

On December 18, 2007, the date this lawsuit was filed, Accenture issued a press

_____

[2]Guidewire claims that it entered into a prior NDA with Accenture on February 24,
2006, relating to a teaming opportunity for Safeco Insurance ("Safeco"). (D.I. 19 at ¶
65) According to Guidewire, Accenture had "considerable access to Guidewire
ClaimCenter at Safeco in the February-May 2006 timeframe" in connection with this
project. (*Id.*) Accenture generally denies these allegations on the basis of insufficient
knowledge. (D.I. 19 at ¶ 65)

release relating to the lawsuit.[3] The press release stated both that "Accenture believes that Guidewire willfully and deliberately developed, manufactured, used and sold, or offered for sale, computer software and services used for insurance claims management that are covered by [the '284 patent]," and that "[t]he suit also claims that Guidewire willfully and maliciously obtained and used or intends to use Accenture trade secrets without authorization in designing, developing, manufacturing and selling claims management software and services to assist in its ongoing efforts to unfairly compete against Accenture in the claims management market." (D.I. 22 at Ex. 1)

On December 19, 1007, *Insurance and Technology* magazine published an article about the lawsuit entitled "Accenture Sues Guidewire for Alleged Patent Infringement" (the "I&T article"). (D.I. 10 at ¶ 78; D.I. 19 at ¶ 78) In the I&T article, John Del Santo, an Accenture Managing Director, is quoted as stating that Accenture "carefully compared our U.S. patent to the information available to the Guidewire system and concluded that they not only infringed the patent but that they must have gotten access to our trade secrets at a client somewhere." (*Id.*) Further, Mr. Del Santo stated that "[w]e believe that their product development trajectory was just too fast to result in the kind of product that they have, which looks fairly similar to ours. From our view that's too much of a coincidence, so there has to be a trade secret violation here, in our opinion." (*Id.*)

## C. The Claims at Issue

With respect to its trade secret misappropriation claim, Accenture avers in its

---

[3]Guidewire states that it first learned of the suit through the press release, as compared to service of process. (D.I. 10 at ¶ 77)

complaint that: (1) "Guidewire has obtained and used or intends to use Accenture's trade secrets without authorization in its own process to design, develop, manufacture, and/or sell claims management software and services, and to assist it in its ongoing efforts to compete against Accenture in the claims management market"; (2) "Guidewire has also used Accenture trade secrets in connection with applying for and obtaining United States Patents"; and (3) "Guidewire has acted with knowledge that the information it used was Accenture's trade secrets and that it was not authorized to possess or use these trade secrets," therefore acting "willfully and maliciously." (*Id.* at ¶¶ 31-33) No further details regarding Guidewire's alleged theft of trade secrets is provided in the complaint.

Guidewire counterclaims that Accenture has brought its suit in bad faith. Guidewire asserts that Accenture has no basis for contending that Guidewire infringes any of the claims of the '284 patent, insofar as "Guidewire has not publicly disclosed sufficient details regarding its software products to allow Accenture to perform such an evaluation." (D.I. 10 at ¶ 82) Guidewire also claims that the '284 patent is invalid for obviousness and unenforceable due to inequitable conduct before the PTO. (*Id.* at ¶¶ 83-84) Guidewire avers that Accenture has used this litigation as an anticompetitive weapon, with no honest intent to enforce its patent rights; Accenture's knowledge of the invalidity and/or unenforceability of the '284 patent renders its suit "objectively baseless." (*Id.* at ¶¶ 85, 105) Finally, Guidewire asserts that Accenture's press release contained false and misleading statements, which have also been echoed to potential customers and which intimidate customers into not purchasing Guidewire products and services. (*Id.* at ¶¶ 106-111) These allegations also form the bases of Guidewire's

6

Lanham Act, DTPA, and common law unfair competition counterclaims. (*Id.*)

## III. STANDARD OF REVIEW

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, --- U.S. ----, 127 S. Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted) (hereinafter, "*Twombly*"). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* at 1959.

## IV. DISCUSSION

### A. *Twombly* and Civil Pleading Standards

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Twombly*, the Supreme Court revisited the Rule 8 pleading standard in the context of antitrust claims under § 1 of the Sherman Act, 15 U.S.C. § 1. 127 S. Ct. 1955 (2007). The Court dispensed with the

7

widely cited language that counseled dismissal only if plaintiff could "prove no set of
facts in support of his claim which would entitle him to relief," stating that "[t]he phrase
is best forgotten as an incomplete, negative gloss on an accepted pleading standard."
*Id.* at 1968-69 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (hereinafter,
"*Conley*")). Instead, the Court clarified that, while "heightened pleading of specifics"
was not required, a well-pleaded complaint should contain "enough facts to state a
claim to relief that is *plausible* on its face." *Id.* at 1974 (emphasis added). As stated by
the high Court, "[a]sking for plausible grounds to infer an agreement does not impose a
probability requirement at the pleading stage;[⁴] it simply calls for enough facts to raise
a reasonable expectation that discovery will reveal evidence" of the illegal activity. 127
S. Ct. at 1965. Within weeks of issuing the *Twombly* decision, the Court announced
*Erickson,* reversing a decision of the United States Court of Appeals for the Tenth
Circuit that had required a prisoner to plead specific facts in support of an Eighth
Amendment claim. 127 S. Ct. 2197 (2007) (hereinafter, "*Erickson*").

The Third Circuit has considered this new "plausibility" paradigm and found that
*Twombly*'s new concepts – a plaintiff's Rule 8 obligation to provide the "grounds" for its
"entitlement to relief" and the rejection of the "no set of facts" language from *Conley* –
apply not only to antitrust cases, but to the Rule 12(b)(6) standard in general.

> [T]aking *Twombly* and the Court's contemporaneous opinion in [*Erickson*]
> together, we understand the Court to instruct that a situation may arise where, at
> some point, the factual detail in a complaint is so undeveloped that it does not

---

⁴Plausibility is distinguished from the possibility of actual success; "[A]
well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of
those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*,
127 S. Ct. at 1965 (citations omitted).

provide a defendant the type of notice of claim which is contemplated by Rule 8. Put another way, in light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief. We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests.

*Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008) (citing *Twombly*,

127 S.Ct. at 1965 n.3).

The Third Circuit has also noted the apparent conflict between *Twombly*'s

emphasis on "plausibility" and the Court's statements that it was not adopting or

applying a "heightened pleading standard."[5]  *Id.* at 234.  Wrestling further with the

concept of "plausibility," the Third Circuit noted that "plausibility" is related to Rule 8's

requirement of a "showing," which requires only notice of a claim and its grounds, as

distinguished from a "bare averment that he wants relief and is entitled to it."  *Id.* (citing

*Twombly*, 127 S.Ct. at 1965 n.3)

> The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus:  "[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element.  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element.

*Phillips*, 515 F.3d at 234 (citations omitted).  The court turns to the instant motions with

these concepts in mind.

## B.  Guidewire's Motion to Dismiss

### 1.  Count two:  trade secret misappropriation

_____

[5]As the *Phillips* Court noted, the Second Circuit has also iterated confusion in applying *Twombly*.  *See Iqbal v. Hasty*, 490 F.3d 143, 155 (2d Cir. 2007) ("Considerable uncertainly concerning the standard for assessing the adequacy of pleadings has recently been created by the Supreme Court's decision in [*Twombly*].").

### a. Standards

Trade secret misappropriation claims are governed by the Delaware Uniform

Trade Secrets Act ("DUTSA"), 6 Del. C. §§ 2001 et seq.[6] The DUTSA defines trade

secret misappropriation as the "[a]cquisition of a trade secret[7] of another by a person

who knows or has reason to know that the trade secret was acquired by improper

means," or alternatively, the "[d]isclosure or use of a trade secret of another without

express or implied consent" by a person who either: (1) acquired the secret by

improper means; (2) knew or had reason to know that their knowledge of the trade

secret was (A) derived by another who acquired it by improper means, (B) "[a]cquired

under circumstances giving rise to a duty to maintain its secrecy or limit its use," or (C)

acquired by accident or mistake. 6 Del. C. § 2001(2).

The determination of whether a plaintiff has set forth a *prima facie* trade secret

misappropriation claim under the DUTSA implicates the following inquiries:

(1) Does a trade secret exist, *i.e.*, have the statutory elements – commercial
utility arising from secrecy and reasonable steps to maintain secrecy – been

---

[6]Accenture does not specifically plead a violation of the DUTSA; there is no
indication, however, that Delaware law would not apply, nor does Accenture indicate
otherwise in its answering papers.

For purposes of its analysis, the court cites as persuasive authority caselaw from
other states having enacted the Uniform Trade Secrets Act ("UTSA"). *See* 6 Del. C. §
2008 ("This chapter shall be applied and construed to effectuate its general purpose to
make uniform the law with respect to the subject of this chapter among states enacting
it.").

[7]A "trade secret" is information that both "[d]erives independent economic value,
actual or potential, from not being generally known to, and not being readily
ascertainable by proper means by, other persons who can obtain economic value from
its disclosure or use" and "[i]s the subject of efforts that are reasonable under the
circumstances to maintain its secrecy." 6 Del. C. § 2001(4).

shown; (2) has the secret been communicated by plaintiff to the defendant;[8] (3) was such communication pursuant to an express or implied understanding that the secrecy of the matter would be respected; and (4) has the secret information been improperly (e.g., in breach of the understanding) used or disclosed by the defendant to the injury of the plaintiff?

*Savor, Inc. v. FMR Corp.*, No. Civ. A. 10-249, 2004 WL 1965869, *5 (Del. Super. July 15, 2004) (citing *Wilmington Trust Co. v. Consistent Asset Mgmt. Co.*, No. Civ. A. 8867, 1987 WL 8459, *3-4 (Del. Ch. Mar. 25, 1987)).

### b. Discussion

It is not common for a trade secret misappropriation plaintiff to know, prior to

discovery, the details surrounding the purported theft. That being said, a court may be

asked to strike a balance between the notice required by Rule 8 with the reality that a

trade secret misappropriation plaintiff may have minimal facts available to it at the

pleading stage.

It is the court's opinion that the complaint at bar, however, presents nothing more

than "conclusions" and a "formulaic recitation of elements of a cause of action." With

respect to the theft of its trade secrets,[9] Accenture states only the following: Accenture

---

[8]The typical DUTSA case involves allegations that an former employee of plaintiff had access to trade secrets in the context of his or her employment; in such cases, general allegations that defendant had access to trade secrets in the context of his or her employment and later left to compete directly with plaintiff will usually suffice. *See, e.g., Orthovita, Inc. v. Erbe*, No. Civ. A. 07-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008) (applying pre-*Twombly* notice pleading standard); *T.D.I. Inter'l, Inc. v. Golf Preservations, Inc.*, No. Civ. A. 07-313, 2008 WL 294531, *2 (E.D. Ky. Jan. 31, 2008) (citing *Twombly*). This case is of the less typical variety, insofar as Guidewire is a corporate competitor of Accenture. The "communication" element provided in the caselaw is akin to pleading "acquisition" of the trade secret in the context of the case at bar. 6 Del. C. § 2001(2)(a).

[9]Accenture's basic description of the nature of its trade secrets is sufficient. *See Orthovita, Inc. v. Erbe*, No. Civ. A. 07-2395, 2008 WL 423446 at *9 (E.D. Pa. Feb. 14,

worked with CNA, during which time it learned about Guidewire; Accenture installed ACCS software on CNA's computers in late 2002; CNA informed Accenture in 2003 that its bid had lost;[10] and Accenture later learned that Guidewire had the winning bid. (D.I. 1 at ¶¶ 20-25) Accenture assumes, based upon what it feels was "a surprisingly quick development trajectory," that Guidewire has "somehow" obtained and used Accenture's trade secrets. (Id. at ¶¶ 24, 25, 31) The balance of Accenture's complaint recites only the remainder of the misappropriation elements, namely, that Guidewire acted with knowledge, and that its acts constitute harm to Accenture. (Id. at ¶¶ 33-34)

To support its trade secrets claim, Accenture was required to plead certain facts, namely, that Guidewire obtained its trade secrets by improper means or, alternatively, an improper use or disclosure. 6 Del. C. § 2001(2)(a) & (b). Accenture states only that Guidewire "somehow gained access to Accenture trade secrets in creating its software and services." (Id. at ¶ 25) This paragraph implies that Guidewire possessed the trade secrets in question. There is no allegation, however, that Guidewire obtained the information by improper means, or the nature of such means.[11] Accenture's use of the word "somehow" in describing Guidewire's acquisition of its trade secrets emphasizes

_____

2008) ("[A] plaintiff pleading misappropriation of a trade secret need not plead the details of its trade secrets in a publicly filed complaint, inasmuch as such disclosure would destroy the essential 'secrecy' of the claimed trade secret.") (denying motion to dismiss using "conventional pre-*Twombly*" analysis).

[10]Accenture did not directly state that it submitted a bid, but averred that "the CNA bid had been won by Guidewire." (D.I. 1 at ¶ 23)

[11]The only "improper means" that can be inferred from the complaint is through CNA, a prospective customer of Accenture. The fact that Accenture does not choose to specifically implicate CNA does not change the court's conslusion that Accenture's pleadings are insufficient.

this point. (*Id.*) Notably, there is no specific allegation that Guidewire gained access to ACCS through CNA.[12]

Secondly, there is no allegation that Guidewire either disclosed or used the secrets in developing Guidewire Insurance Suite,[13] only that Guidewire "seemed to" develop its product "surprisingly quick[ly]" in Accenture's opinion, which is of no import. Accenture is not entitled to conduct a fishing expedition based upon such bare allegations; its DUTSA claim is dismissed. *See Knights Armament Co. v. Optical Systems Technology, Inc.*, No. Civ. A. 07-1323, 2008 WL 2944649, *5 (M.D. Fla. July 15, 2008) (dismissing UTSA counterclaim under *Twombly* where defendant stated that plaintiffs had access to the secrets through business dealings, but "[gave] no further details as to how [they] allegedly used the trade secrets."); *compare Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 895, 897 (Del. Supr. 2002) (trade secret misappropriation pled where Savor alleged a purportedly unique combination of marketing strategies and processes for a rebate program, and that it provided the program to defendant under cover that the enclosed materials were "protected by various copyrights, patents pending, and trademark registrations").

_____

[12]The fact that both parties had a relationship with CNA does not, by itself, give rise to an inference of misappropriation absent any direct or inferential allegations of acquisition or disclosure. *See generally Vincit Enters., Inc. v. Zimmerman*, No. Civ. A. 06-57, 2006 WL 1319515, *7 (E.D. Ten. May 12, 2006) ("An allegation that [defendant] was talking to his former customer in the presence of colleagues from his new employer does not support an inference that he used or disclosed any trade secrets of [plaintiff], and there are no direct factual allegations in the complaint that Zimmerman in fact used or disclosed any such trade secrets.") (dismissing claim under Tennessee UTSA).

[13]"[A]llegations of similarity, without more, do not support a claim of misappropriation of trade secrets." *Brown v. Adidas*, 938 F. Supp. 628, 634 (S.D. Cal. 1996).

## 2. Count five: tortious interference with business relations

"The basic elements which establish a prima facie tortious interference with a business relationship in Delaware are the existence of a valid business relation . . . or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Bove v. Goldenberg*, No. Civ. A. 05-134, 2007 WL 446014, *4 (Del. Super. Feb. 7, 2007) (citing *Bowl-Mor Co. v. Brunswick* Corp., 297 A.2d 61, 65 (Del. Ch. 1972)). Put another way, a plaintiff must establish: (1) the reasonable probability of a business opportunity; (2) intentional interference; (3) proximate causation; and (4) damages, "all of which must be considered in light of defendant's privilege to compete or protect his business interests in a fair and lawful manner." *Lipson v. Anesthesia Services, P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001) (citations omitted).

### a. Business opportunity

Accenture avers that it worked with CNA for two years before losing its bid to Guidewire, who came in at a price $10 million lower than Accenture, a more experienced vendor in the field. (D.I. 1 at ¶¶ 22-23) These facts implicate a legitimate business relation or expectancy on the part of Accenture.

### b. Intentional interference with Accenture's relationship with CNA

Accenture puts forth no new allegations with respect to its unfair competition or tortious interference claims; it relies entirely on the preceding portions of the complaint.

14

Accenture asserts that additional facts *exist* that support its unfair competition and

tortious interference claims, but it cannot iterate those additional facts at this juncture,

insofar as it "cannot be expected to know and recite the details of Guidewire's behavior,

which must be developed in discovery." According to Accenture, "it is clear enough that

Guidewire has interfered with Accenture's relationship with CNA, getting unauthorized

access to information that informed its unusually speedy product development." (D.I.

14 at 11, citing D.I. 1 at ¶¶ 9-24) Notably, although Accenture identifies Guidewire as a

"challenger to Accenture" in the marketplace (D.I. 1 at ¶ 24), the complaint does not

specifically allege that Guidewire interfered with Accenture's dealings with CNA.

Accenture generally states the following:

> As a provider of insurance claims software and related services, Accenture has
> business relationships with customers and prospective customers in the United
> States and around the world. On information and belief, Guidewire has
> knowledge of Accenture's customer and prospective customer relationships.
> Through the acts complained of above, Guidewire has specifically and
> intentionally interfered with those business relationships, with either the sole
> purpose of harming Accenture, or by using dishonest, unfair, or improper means.
> As a result of Guidewire's interference, Accenture's relationships with its
> customers and prospective customers have been injured and Accenture has
> suffered damages in an amount to be fully determined at trial.[14]

(*Id.* at ¶ 40) Accenture does not specifically allege that Guidewire had knowledge of its

dealings with CNA. Certainly, without the benefit of discovery, Accenture cannot know

the precise (and confidential) details surrounding the relationship between Guidewire

and CNA. Accenture was not required to plead the precise nature of Guidewire's

---

[14]In view of this submission, the court disagrees with Guidewire that Accenture's
remaining claims are "founded on allegations of trade secret misappropriation" and thus
precluded by the DUTSA. *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F.
Supp. 635, 637 (D. Del. 1991).

interference with its business expectancy, but it was required to allege some wrongful or improper conduct vis-a-vis CNA, the only customer mentioned in Accenture's complaint.

### c. Causation

The court also notes that there is no allegation that CNA elected to terminate its relationship with Accenture due to any wrongful or improper conduct on the part of Guidewire. It can be inferred from the complaint that CNA accepted Guidewire's bid because it came in $10 million less than Accenture's. That CNA accepted a lower bid for equivalent products and services[15] is not an indication of improper interference.[16]

### d. Conclusion

In view of the foregoing, the court finds Accenture's general allegation that Guidewire wrongfully interfered with its customer and prospective customer relationships insufficient to sustain its tortious interference claim.

### 3. Counts three and four: unfair competition

Accenture does not specify a particular section of the DTPA as the basis of its claim.[17] (D.I. 1 at ¶ 36) The DTPA prohibits conduct that "[d]isparages the goods,

---

[15]Accenture asserts that Guidewire Insurance Suite infringes its patents, which it also asserts cover ACCS.

[16]Accenture's reliance on *Ethypharm S.A. France v. Bentley Pharmaceuticals*, 388 F. Supp. 2d 426, 435 (D. Del. 2005), in which this court declined to dismiss a tortious interference claim, is slightly misplaced, insofar as plaintiffs specifically asserted in that case that defendant's interference was the result of "stealing and using certain information" from plaintiffs. *Id.* at 435.

[17]The DTPA codifies the common law of unfair competition. *See Moore North Am., Inc. v. Poser Business Forms, Inc.*, No. Civ. A. 97-712-SLR, 2000 WL 1480992, *7 (D. Del. Sept. 29, 2000) (citations omitted). However, the DTPA does not preempt common law unfair competition claims. 6 Del. C. § 2532(c).

16

services, or business of another by false or misleading representation of fact" or that generally "creates a likelihood of confusion or of misunderstanding." 6 Del. C. §§ 2532(8) & (12).

At common law, the spectrum of conduct actionable under the umbrella of unfair competition has been characterized as "notoriously undefined." *State of Delaware ex rel. Brady v. Wellington Homes, Inc.*, No. Civ. A. 99C-09-168, 2003 WL 22048231, *1 (Del. Super. Aug. 20, 2003) (citing the prefatory note to the 1964 Uniform Deceptive Trade Practices Act). The claim has been characterized as "unfair competition between businesses or trades," consistent with the historical application of the action "whenever one trader diverted patronage from a rival." *Id.* The Delaware Superior Court has stated that the "elements of the tort of unfair competition are that the plaintiff has a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. 2001). In a recent decision, Delaware's Court of Chancery has stated that "[t]he essential element separating unfair competition from legitimate market participation . . . is an unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue." *Edix Media Group, Inc. v. Mahani*, No. Civ. A. 2186-N, 2006 WL 3742595, *11 (Del. Ch. Dec. 12, 2006).

Accenture concedes that its unfair competition claims derive "at least in part from its interference claim," and that "[b]ecause [it] has successfully alleged interference, it has satisfied the pleading requirement for unfair competition." (D.I. 14 at 8-9) In view of the court's finding that Accenture's tortious interference claim was

17

insufficiently pled, and Accenture's failure to identify a rationale under which its unfair competition claim survives this determination, its unfair competition claims are also dismissed. The court notes as well that Accenture has not alleged that Guidewire has made false or misleading representations of fact or created confusion in the marketplace, therefore, it has not sufficiently pled a DTPA claim. Accenture's common law claim is also insufficiently pled since, as observed previously, there is no allegation that CNA elected to terminate its relationship with Accenture due to any wrongful interference or unfair action on the part of Guidewire.

## C. Accenture's Motion to Dismiss the Bad Faith Litigation Counterclaims

### 1. Count five: Section 43(a) of the Lanham Act

The elements of an unfair competition claim under § 43(a) of the Lanham Act are that: (1) the defendant made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or services; (2) the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the defendant caused the statement to enter interstate commerce; and (5) the statement results in actual or probable injury to the plaintiff.[18] *See Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1348 (Fed. Cir. 1999). Guidewire bases its Lanham Act claim on allegations that Accenture, in the press release and I&T article, made statements regarding Guidewire's infringement of the '284 patent and misappropriation

---

[18]Where the defendant's statement concerns infringement of defendant's patent, plaintiff must also show that defendant's statement was made in bad faith. *See Zenith*, 182 F.3d at 1352.

18

of Accenture's trade secrets that were "false and misleading." (D.I. 10 at ¶¶ 77-78)
Accordingly, the court starts its analysis there.

In order for Guidewire's Lanham Act claim to survive a motion to dismiss, the
court must find that Guidewire has asserted enough facts to make its claim plausible, to
wit, that it is plausible, from the facts contained in the complaint, that Accenture's
statements were, in context, literally false or that they were misleading and that the
relevant public "was, in fact, misled." *See Johnson & Johnson-Merck Consumer
Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994)
(citing *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228 (3d Cir.
1990)).

Accenture makes, essentially, four statements regarding infringement and trade
secret misappropriation. First, Accenture states in the press release that, "[a]s detailed
in the complaint, [it] **believes**" Guidewire's products infringe the '284 patent. (D.I. 22 at
ex. 1) (emphasis added) Second, Accenture states in the press release that "[t]he suit
**claims**" that Guidewire misappropriated trade secrets. (*Id.*)(emphasis added). Third,
Mr. Del Santo states in the I&T article that Accenture "carefully compared [its] U.S.
patent to the information available about the Guidewire system and **concluded** that
[Guidewire] not only infringed the patent but that [Guidewire] must have gotten the
access to [Accenture's] trade secrets at a client somewhere." (*Id.* at ex. 4) (emphasis
added) Fourth, Mr. Del Santo states in the I&T article that Accenture "**believe[s]** that
[Guidewire's] product development trajectory was just too fast to result in the kind of
product that they have, which looks fairly similar to [Accenture's]. **From [Accenture's]**

**view** that's too much of a coincidence, so there has to be a trade secret violation here, **in [Accenture's] opinion**." (*Id.*) (emphasis added)

Guidewire has failed to allege facts sufficient to make plausible its contention that these statements, when analyzed in context, were literally false. To the extent that these statements are viewed as paraphrasing the complaint, Guidewire alleges no facts that would suggest that the statements were not accurate paraphrases. Moreover, to the extent that these statements are viewed as statements of belief or opinion or conclusion, Guidewire fails to allege sufficient facts to make it plausible that Accenture did not truly hold these beliefs or opinions or reach these conclusions. Guidewire's allegations suggest that Accenture's beliefs, opinions, and conclusions were unreasonable or unsubstantiated (D.I. 11 at ¶¶ 77-85), but this does not make the statements communicating those sentiments literally false.

Guidewire has also failed to allege facts sufficient to make plausible the contention that the relevant public was misled by these statements. In this regard, Guidewire was required to allege facts suggesting that the marketplace was **actually** confused or misled, not just that the marketplace **could** have been confused or misled. *See Sandoz*, 902 F.2d at 228-29 (plaintiff must allege how consumers "*actually do react*" to the allegedly misleading statements, not how they "*could react*"). Guidewire alleges that Accenture communicated these sentiments to one or more of Guidewire's customers or potential customers, including CNA and Astra Buana. (D.I. ¶ 79) Guidewire has failed to allege, however, that any of its customers or potential customers actually were misled by these sentiments.

20

Guidewire has also failed to allege sufficient facts to make plausible the contention that these statements are, *inter alia*, "commercial advertising or promotion" of Accenture's products. To be "commercial advertising or promotion," the statements in the press release and article must be, *inter alia*, "commercial speech." *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994). To be "commercial speech," these statements must "propos[e] a commercial transaction." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993). The form of the statements is not dispositive, and courts find statements to be commercial speech even where promulgated outside the traditional advertising campaign. *See Gordon & Breach*, 859 F. Supp. at 1534-35.

However, to be commercial speech the statements must, at a minimum, criticize or unfavorably compare Guidewire's products. *See In re Warfarin Sodium Antitrust Litigation*, No. Civ. A 98-1232, 1998 WL 883469, at *14 (D. Del. 1998), reversed on other grounds, 214 F.3d 395 (3d Cir. 2000) (defendant's statements "proposed commercial transaction" by denigrating competing product, characterizing it as an unsafe substitute, and touting own product's quality). In this case, neither the press release nor article contains statements criticizing Guidewire's products or unfavorably comparing them to Accenture's products. Indeed, the statements do not discuss the products at all. Rather, the statements criticize Guidewire's product development methods. Where a statement does not disparage the products themselves, there is no implicit invitation to sample the competing products. The press release and I&T article, then, do not contain statements that "invite a commercial transaction" and are not

commercial speech. Accordingly, Guidewire's count five is dismissed.

## 2. Count six: DTPA

Unlike Accenture, Guidewire alleges violations of specific DTPA provisions. (D.I. 10 at ¶ 113) To wit, Guidewire alleges that Accenture's statements in the press release and article violate DTPA subsections 5, 8, and 12 in that they represent that Guidewire's goods have characteristics that they do not have; disparage Guidewire's goods and business by false or misleading representations of fact; and create a likelihood of confusion or misunderstanding.[19] *See* 6 Del. C. §§ 2532(5), (8) & (12).

Consistent with its preceding analysis, the court does not find that Guidewire's allegations are sufficient to make plausible its claim that Accenture's statements violated the DTPA. First, the statements do not discuss the characteristics of Guidewire's goods. Second, the statements express belief or opinion or conclusion that Guidewire infringed the '284 patent and misappropriated Accenture's trade secrets; the only fact represented is that Accenture holds that belief or opinion or has reached that conclusion. Because Guidewire has not alleged facts sufficient to make it plausible that Accenture does not sincerely hold this belief or opinion or did not truly reach this conclusion, these statements are not false representations of fact disparaging Guidewire. Nor has Guidewire alleged sufficient facts to make plausible the contention that Accenture's statements **likely** caused confusion or misunderstanding in the relevant marketplace. Accordingly, Guidewire's count six is dismissed.

---

[19]To the extent Guidewire bases its DTPA claim on Accenture's statements regarding patent infringement, Guidewire must also allege sufficient facts to make plausible that Accenture made these statements in bad faith. *See Zenith*, 182 F.3d at 1355.

22

### 3. Count seven: common law unfair competition

As explained above, the *prima facie* case for common law unfair competition requires plaintiff to allege facts sufficient to make plausible its claim that defendant interfered with plaintiff's legitimate business expectancy. In support of this claim, Guidewire alleges that, through the lawsuit and public statements, Accenture "attempt[ed]" or "intended" to interfere with Guidewire's business interests. (D.I. 11 at ¶ 85) Guidewire has failed to allege that Accenture's conduct affected the marketplace at all, let alone actually interfered with one of Guidewire's legitimate business expectancies. Accordingly, Guidewire's count seven is dismissed.

## V. CONCLUSION

For the aforementioned reasons, the court grants Guidewire's motion to dismiss counts two through five. (D.I. 11) The court also grants Accenture's motion to dismiss Guidewire's counts five through seven. (D.I. 20) An appropriate order shall issue.