IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCENTURE GLOBAL SERVICES, GmbH and ACCENTURE, LLP, | ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. 07-826 (SLR) |
| GUIDEWIRE SOFTWARE, INC., | ) | |
| Defendant. | ) | |

**DEFENDANT GUIDEWIRE SOFTWARE, INC.'S 30(B)(6) NOTICE OF DEPOSITION OF PLAINTIFFS ACCENTURE GLOBAL SERVICES GMBH AND ACCENTURE LLP**

PLEASE TAKE NOTICE that on March 26, 2009, beginning at 10:00 a.m., Defendant Guidewire Software, Inc. ("Guidewire") will take, as provided by Federal Rule of Civil Procedure 30(b)(6), the deposition of plaintiffs Accenture Global Services GmbH and Accenture LLP (collectively "Accenture") by oral examination of witnesses(es) designated by Accenture to testify on its behalf concerning the subjects listed below under Topics for Examination. Accenture must designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to matters known or reasonably available to Accenture. This deposition will take place at the offices of Durie Tangri Page Lemley Roberts & Kent located at 633 Page St, San Francisco CA 94111.

PLEASE TAKE FURTHER NOTICE that, under Federal Rule of Civil Procedure 30(b)(6), the deposition testimony will be recorded by stenographic means and will also be recorded by sound-and-visual means, including videotape and interactive real-time (i.e., simultaneous display of the transcript on a laptop through Live Note or similar software).

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 30(b)(6), Accenture must designate the person or persons most qualified to testify on its behalf as to the matters listed below under Topics for Examination.

## DEFINITIONS

For purposes of this Notice of Deposition, the following definitions shall apply:

1. The term "Accenture" means Accenture Global Services GmbH and Accenture LLP, including without limitation all of their corporate locations, and all of their predecessors, subsidiaries, parents, affiliates, and entities acting in joint-venture or partnership relationships with them, as well as all of their past or present directors, officers, agents, members, representatives, employees, consultants, attorneys, and others acting on behalf of them, either directly or indirectly.

2. The term "Accenture Claims Product" means any insurance claims processing, data entry, or analysis product or prototype demonstrated, produced, developed, proposed, manufactured, tested, used, distributed, acquired, licensed, leased, sold, offered for sale, imported, or marketed by or in conjunction with Accenture, or currently in a research and development, implementation, or testing phase, including but not limited to Accenture's ClaimCenter and ClaimWorks products.

3. The term "the '284 patent" means U.S. Patent No. 7,013,284, along with any patent claiming priority from a patent application from which that patent claims priority, any continuation, continuation in part, or divisional of a patent application from which that patent claims priority, or any foreign counterpart patent or patent application relating any of the above categories of patents or patent applications.

4. The term "patent related to the '284 patent" means any patent or patent application with a similar specification, including without limitation U.S. Patent No. 6,574,636;

and U.S. Patent Application Nos. 09/305,816, 10/405,903, 09/305,234, 09/305,228, 09/305,146, 09/305,817 and 11/017,086 along with any patent or patent application claiming priority from a patent application from which those applications claim priority, any continuation, continuation in part, or divisional of a patent application from which these patents or patent applications claim priority, or any foreign counterpart patents or patent applications relating any of the above categories of patents or patent applications (including, without limitation WO0077698, WO0067181, EP1250667, EP1688880, WO0067182, WO0067184, WO0067186, and WO0067180).

5. The term "the '111 patent" means U.S. Patent No. 7,017,111, along with any patent claiming priority from a patent application from which that patent claims priority, any continuation, continuation in part, or divisional of a patent application from which that patent claims priority, or any foreign counterpart patent or patent application relating any of the above categories of patents or patent applications.

6. The term "patent related to the '111 patent" means any patent or patent application with a similar specification, along with any patent or patent application claiming priority from a patent application from which the those applications claim priority, any continuation, continuation in part, or divisional of a patent application from which those patents or patent applications claim priority, or any foreign counterpart patents or patent applications relating any of the above categories of patents or patent applications (including, without limitation EP1275059 and WO0180052)..

7. The term "Accenture's Trade Secrets" has the meaning given that term in the complaint in the above-captioned action.

8. The terms "and" and "or" are terms of inclusion and not of exclusion and are to be construed either disjunctively or conjunctively as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

9. Nouns, whether singular or plural herein, shall be construed either as singular or plural as necessary to bring within the scope of these requests any information which might otherwise be construed to be outside their scope.

10. The term "all" means "any and all."

11. The term "any" means "any and all."

12. The term "each" shall mean "each and every."

13. The term "including" means "including but not limited to."

## TOPICS FOR EXAMINATION

**Patent Topics**

1. The identity of any reference or system anyone has ever claimed or asserted might constitute, by itself or in combination with other references, invalidating prior art to the '284 and '111 patents and to any patent related to the '284 or '111 patents.

2. Any examination Accenture has made of potential prior art to the '284 and '111 patents, (and to any patent related to the '284 or '111 patents) including, but not limited to, the date on which such an examination took place, the persons involved, the work performed and the conclusions reached.

3. The conception and reduction to practice of the '284 and '111 patents, including without limitation, what contributions were made by each of the inventors.

4. The conception and reduction to practice of the patents related to the '284 and '111 patents including, without limitation, what contributions were made by each of the inventors.

5. The role Accenture's employees played in the prosecution of the '284 and '111 patents, and in the prosecution of patents related to the '284 and '111 patents.

6. Accenture's knowledge of U.S. Patent No. 5,839,112 (to Schreitmueller) and any evaluation or decision of whether or not to cite it in connection with the application leading to the 284 patent and/or in connection with any patent related to the '284 patent.

7. Accenture's knowledge of U.S. Patent No. 6,937,990 (to Walker) and any evaluation or decision of whether or not to cite it in connection with the application leading to the 284 patent and/or in connection with any patent related to the '284 patent.

8. Accenture's knowledge of WO95/03569 (by Lawlor) and any evaluation or decision of whether or not to cite it in connection with the application leading to the '284 patent and/or in connection with any patent related to the '284 patent.

9. Accenture's knowledge of WO91/08543 and any evaluation or decision of whether or not to cite it in connection with the application leading to the '284 patent and/or in connection with any patent related to the '284 patent.

10. Accenture's knowledge of, evaluation of, or decision relating to whether or not to cross-reference the application leading to the '284 patent with the applications for any patent related to the '284 patent.

11. Accenture's knowledge of, evaluation or, or decision relating to whether or not to seek or file a supplemental declaration in the patent application that matured into the '284 patent.

12. Revenue from sales of Claims Components, Accenture's decision to partner with SAP (rather than promote Claims Components), market share of Claims Components, and the relative success, ratings and rankings of Claims Components relative to other claims-handling systems.

13. The market need addressed by Claims Components including, but not limited to, information Accenture received about that need, research (if any) performed by Accenture on the market opportunity, and the competition in that market.

14. Any praise or criticism Accenture has received for the inventions claimed by the ‘284 and ‘111 patents.

15. Any instance of which Accenture is aware in which others have taught away from the solutions embodied by Claims Components.

16. Any copying by competitors of the inventions claimed by the ‘284 and ‘111 patents.

17. The first sale or offer for sale of each of the inventions claimed in the ‘284 and ‘111 patents including, the circumstances of the offer or sale, the terms, and the differences between that version of the system and prior versions.

18. The post-critical date additions to Claims Components including, but not limited to the nature of the additions, the reasons for those additions, and the history of the development and testing of those additions.

19. The identity of the companies to which prior versions of Accenture’s claims handling product were offered, sold, demonstrated and advertised.

**Topics Re Accenture’s Trade Secrets**

20. The development of Accenture’s alleged trade secrets, including but not limited to, when they were developed, how they were developed, the identity of the persons who developed them, the costs of developing them, and the time taken to develop them.

21. Accenture’s efforts to maintain the secrecy of its alleged trade secrets including, but not limited to the factual basis of Accenture’s assertion that those efforts were reasonable under the circumstances.

22. The independent economic value Accenture derives from the alleged secrets not being generally known to the public or to other persons who can obtain economic value from their disclosure or use including, but not limited to, the nature and extent of any benefit Accenture has received from each alleged trade secret individually, and any group of them, including but not limited to all of them, collectively.

23. Public knowledge or general knowledge of Accenture's alleged trade secrets including but not limited to the publication of any alleged trade secrets in patent applications or other places.

24. The identity of the people and entities to whom Accenture has disclosed its alleged trade secrets, including but not limited to the circumstances under which each such disclosure was made.

**Topics Re Guidewire's Trade Secrets**

25. The efforts Accenture has made to learn about Guidewire's products.

26. The distribution of information within Accenture about Guidewire's products, including, but not limited to, the dissemination of documents and materials labeled "confidential."

27. Accenture's prior knowledge (if any) of the desirability of features it now knows to be in Guidewire's products including, without limitation, the source of that alleged knowledge and the time it purportedly obtained that knowledge.

28. Accenture's advertising, marketing and promotion of features that it learned about by examining information about Guidewire's product.

29. Accenture's relationship with SAP including, but not limited to, the nature of the relationship, documents formalizing that relationship, the division of responsibility

between the companies, the sharing of information (including information about Guidewire), the history of the relationship, criticism of SAP by Accenture, and criticism of Accenture by SAP.

30. Accenture's efforts, if any, to avoid learning about or using competitors' confidential, proprietary or trade-secret information.

**Damages Topics**

31. The identity of any business transaction that Accenture has lost to Guidewire.

32. The reasons Accenture lost any business transaction identified in response to the previous topic including, but not limited to, statements made by the customer or potential customer about the sale, comments or criticism the customer or potential customer made about Accenture's system, the amount Accenture bid or proposed as compared to the amount bid or proposed by Guidewire and/or other companies, and the identity of any company *other than* Guidewire that competed for the business, and reasons why Accenture (rather than some other company) would have won the sale.

33. The amount Accenture has paid or received for any patent license, including, without limitation naked patent licenses and patent licenses given or taken in connection with a software license.

34. Accenture's knowledge (if any) of the typical royalty rate for naked patent licenses in the insurance industry, the software industry, and the claims handling industry.

35. Criticism of Accenture's products or services in the insurance industry including, but not limited to criticism of Claims Components, the amount Accenture charges, and the expense and time of installing, configuring or integrating Claims Components.

36. The identity and circumstances surrounding any instance in which any company that previously had contracted with Accenture for the installation of Claims

Components chose to stop that installation including, but not limited to, the customer's expressed reasons for stopping the installation and the identity of the company or solution the customer brought in after terminating Accenture.

37. The identity and circumstances surrounding any instance in which Accenture exceeded budget for the installation of Claims Components by more than 5%.

38. The history of Accenture's engagements at Reliance, Kemper, OneBeacon, St.Paul, State Farm, Allstate, Chubb and ProMutual including, but not limited to, any cost overruns, project failures and criticism of Accenture and/or SAP in connection with those engagements.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

*Attorneys for Defendant*
*GUIDEWIRE SOFTWARE, INC.*

OF COUNSEL:

Daralyn J. Durie
Clement S. Roberts
Joseph C. Gratz
DURIE TANGRI PAGE LEMLEY ROBERTS & KENT
332 PINE ST
SAN FRANCISCO, CA, 94111

Dated: March 11, 2009

2772646

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2009 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to:.

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP

I further certify that I caused to be served copies of the foregoing document on March 11, 2009 upon the following in the manner indicated:

**BY ELECTRONIC MAIL**

Richard L. Horwitz, Esquire
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Wilmington, DE 19801

James Pooley, Esquire
L. Scott Oliver, Esquire
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

*/s/ Julia Heaney*

Julia Heaney (#3052)