UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ACCENTURE GLOBAL SERVICES : CIVIL ACTION NO.
GmbH : April 27, 2009
Plaintiff, :
: 4:30 o'clock p.m.
v. :
:
GUIDEWIRE SOFTWARE INC. :
:
Defendant, :
.............................:

TRANSCRIPT OF DISCOVERY CONFERENCE
BEFORE THE HONORABLE SUE L. ROBINSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: POTTER, ANDERSON & CORRON.
BY: DAVID E. MOORE, ESQ.
-and-

MORRISON & FORRESTER.
BY: L. SCOTT OLIVER, ESQ.

For the Defendant: MORRIS, NICHOLS, ARSHT & TUNNELL.
BY: JACK B. BLUMENFELD, ESQ
BY: JULIA HEANEY, ESQ.
-and-
DURIE TANGRI, LLP
BY: RAGESH TANGRI, ESQ.
BY: CLEMENT S. ROBERTS, ESQ.

Court Reporter: LEONARD A. DIBBS
Official Court Reporter

P R O C E E D I N G S

THE COURT: Why don't we start off with the introductions, if you want to.

We'll go to the discovery issues and whatever else is on the agenda

MR. MOORE: David Moore from Potter, Anderson & Corroon on behalf of Accenture. With me Scott Oliver from Morrison and Forrester.

MR. BLUMENFELD: I'm here with Clement Roberts and Ragesh Tangri and also from my firm, Julie Heaney.

Just to give your Honor an idea of what is on the agenda, all the issues are on our side of the table.

We have the motion to unseal that we communicated to the Court about. I don't know how much you want to hear about that.

THE COURT: I do have a question.

It's not unheard of in a case like this at this stage of the case to think about unsealing documents. That is so contrary to what usually happens a patent case, that I have no idea. I glanced at all these papers. I see nothing compelling here. If you want to try to convince me to unseal it. If you want to start with that. That's fine.

MR. BLUMENFELD: Mr. Tangri is going to handle that.

After that.

We have a few interrogatories that Mr. Roberts will talk about.

We have a couple of discovery issues that we wanted to raise that we were going to admit.

That's the agenda for today.

THE COURT: All right.

MR. TANGRI: Your honor, Ragesh Tangri on the Motion to Unseal.

From hearing your Honor's remarks, I want to be clear what we're seeking to unseal is not any underlying document or any underlying material that was produced by one party or the other in the litigation.

What we are seeking to unseal is only the Motion for Leave to Amend, and, in particular, the proposed counterclaim that is appended to the Motion for Leave to Amend that we would request of the Court to file as the amended operative counterclaim in this case.

We are not trying to unseal the underlying evidentiary material.

And, it may help to focus all of our attention on what is actually at issue here.

If I were to hand up to the Court, if you would permit it, a communication that we received from counsel for Accenture on Friday or over the weekend in which they agreed to unseal

certain of the statements contained in the proposed amended counterclaim, and they continue to assert objections as to others.

The language that is quoted in this document is the language which we're talking about trying to unseal. And that is all not people's documents, not the stuff that has been produced in discovery, simply these words and phrases.

And I believe this document will help you. This is the same thing with the things highlighted of the matters that are still in you dispute.

THE COURT: All right.

MR. TANGRI: Your Honor, just to state briefly the law that we've covered in the papers. I won't dwell on it.

The law is, I think, quite clear, that other than discovery motions filed with the Court, pleadings filed with the Court, Motions to Amend, Summary Judgment motions, any sort of substantive pleading with the Court, is presumptively subject to the right of public access according to a long line of cases in this circuit, including the Leucadia case, Westinghouse case and others that we cited in the papers.

There is really, I don't think, any legal dispute that complaints, motions for leave to amend, Summary Judgment papers and the like are subject to the presumptive right of public access.

With that, the burden shifts to the party seeking to

have a presumptively public pleading remained sealed to demonstrate with evidence current operative admissible evidence, why they will suffer specific and particularized harm from the unsealing of the material.

And we submit that Accenture has not done that here and has not, indeed, even attempted to do that here.

The first thing that is clear is that there is no evidence submitted in connection with Accenture's opposition. There are no declarations, no deposition testimony. There is nothing of an evidentiary nature upon which they can rely to substantiate their claims of injury.

In the Leucadia and Westinghouse case, the Court was clear that there must be evidence. And in one of those cases they actually rejected declarations that had been submitted by the party seeking to preserve sealed material.

THE COURT: Before you go on though. Let me say something.

In this kind of a case it seems as though a pleading party is between a rock and a hard place. If the pleading party doesn't get enough detail, then you will come back and say, there is not enough detail and it should be denied.

If they come back with detail like this that in fact it doesn't sound like a pleading to me at all, but sounds like they are trying to give you facts so you can defend yourself. This isn't a general pleading. This is a very specific pleading.

Then you come back and say, well, this is all open to the public from the get-go before we explore and divine anything about the case.

Now, I understand what the case law is.

In this Court, the common courtesy extended to each other is to not come into Court with this kind of request, at least at this juncture, until there is some effort as divining whether in fact this really is the kind of information that deserves full public disclosure.

Now, I understand what you're cases say. It is not the kind of information that generally -- I don't generally have fights like this. I'm trying to figure out why it is that you and your client have decided to take on this fight this early in the game.

MR. TANGRI: I didn't mean to interrupt.

THE COURT: You can find case law that says anything.

It seems to me clear what you're game is.

The question is whether I'm comfortable with letting you have that advantage.

MR. TANGRI: Let me try to address that, your Honor.

On the case law point, I don't -- I don't think you can find case law on both sides of this issue. Certainly Accenture hasn't cited any to support maintaining a public pleading as sealed without any evidence or particularized showing.

As to why we are doing this, we are the party who is

proposing to file the Amended Complaint to a certain trade secret claim. We doing so mindful of the fact that they filed a trade secret claim against us which was about the same length as the one that we are proposing to file which made very damaging and aggressive allegations against our client, which they issued a press release on the day they filed theirs.

So, they did all this in the press from day one of the lawsuit. There was no issue of common courtesy or trying to maintain things. They did it obviously without any internal documents of ours. And they did it in some ways we contend without any facts to support the overall allegations. And this Court in fact granted a Motion to Dismiss that trade secret claim for lack of sufficient factual specificity on key elements.

They have then refiled a new one which we contend still lacks adequate court support. We will address that at the trial rather than burdening the Court with another Motion to Dismiss.

They have used the litigation aggressively with customers in informing potential customers who are considering buying our client's products of the lawsuit, of the claims made in the lawsuit, and have what Accenture contends are the risk that those customers may face if they choose to purchase our client's products rather than Accenture products.

These are big boys and girls and people are going at each other. They are not taking the high road. They have been

aggressively pursuing the litigation with customers. And they have done it, we contend, without an adequate factual basis at all. They are doing it. And there is very little that can be done to stop it in light of first amendment concerns and the ability to communicate things that are the subject of an actual lawsuit.

So, that's what's happening in the world. And we are now proposing to file a complaint that we are not, I would submit respectfully, your Honor, that early in the process.

We have had discovery. We did not bring these claims lightly, nor did we bring them at the crack of a bat and it is reflected in the counterclaim filed.

We did it only when we uncovered significant evidence to support the claims. And mindful that we had taken the position that their complaint was woefully short on factual allegations to supports the claims. We did include them in our claims.

The press has written about this case. Accenture made one of its senior most executives available to the press for an interview the day the litigation was filed, or least he was quoted in an article that came out when the litigation was filed. He came out and talked about it.

And, so, we believe that, one, this pleading is completely appropriate as a way of stating claims. There is no rule that we are aware of nor has Accenture cited any that you

need not cite sufficient detail in your complaint, that you need not cite evidence in your complaint.

It maybe that you don't have to do it, but you're not barred from doing so, and after Quamly (phonetic) the degree to which you have to do so, I think everyone acknowledges is a little more pressing than before.

Fundamentally, we believe that there is no reason for the counterclaim not to be filed. It's timely. It's appropriate and it's based on material that was developed in discovery, and provided a basis for it that we could have not have known beforehand.

So we've been, I submit, that the rule is quite uniform that such pleadings are public, is that in situations like this one where the press has picked it up based on a press release issued by the plaintiff on the first day where senior executives have been made available for interviews by the plaintiffs, where customers have been aggressively hectored with the fact of the lawsuit as a reason to make a purchasing decision, that if they are going -- if we're going to have big boys and girls fighting like big boys and girls in all phases, not just in court, but in the market, it's fundamentally not appropriate for one to have one sides hand behind it's back especially when this is based on actual facts.

There are documents underlying that were produced by Accenture that say these things. This is not supposition. This

is not conjecture.

And I submit in just looking at some of these things -- there is one paragraph, paragraph 100 on page three of their document. It's one of the ones they are refusing to designate. They don't even have a reason stated next to it. They can't articulate a reason never mind evidence, which they don't have for anything. They don't have a reason articulated next to that. Three items above that. Number 97 is an issue in dispute.

They say the reason that this should be remain secret is that it is an internal communication. And the issue that has been given here and you can see what it is, it's an issue that directly supports the trade secret claim.

If you look further down on page four at items 104, 105 and 106 and 109, those too are statements that directly support our trade secret claim.

These nor collateral matters, your Honor. These go to the heart of claim. They are based on actual facts, actual statements unlike supposition and hyperbole that is being employed against our client in the market.

And the reason we're doing this is so that the market and the press and the public at large in a public court proceeding in the United States can hear both sides of the story. And the law permits that.

THE COURT: The law permits all sorts of things,

doesn't it?

This is my discomfort. I can understand where you are coming from. General allegations, you don't think they are supportable. They have -- so, to counter that, you have taken specific quotes from documents, I suspect most of them are e-mails, if I'm not mistaken, that would never see the light of day until Summary Judgment or trial, or if ever.

So you're saying we're allowed to do it because this is -- this proves our case, when, in fact, you don't have to prove your case in your pleadings.

MR. TANGRI: We do, your Honor, have to support our case in our pleadings.

Again, the cases from this circuit are clear. People have argued the distinction between trial. They said everything short of trial should be remain sealed and the circuit said no. And everything short of Summary Judgment should remain sealed, and the answer was no.

And we submitted case law that clearly states that Motions for Leave to Amend or for more definite statement or anything other than a pure discovery fight such as a Motion to Compel, that is the legal standard. And I think in recognition of the fact that, you know, this matter is set for trial in 2010. It was filed in 2007.

A great deal of time passes between those events as necessity. During that time the parties are free to for better

or for worse, are free to make hay of this in the market as they can. And the other side is certainly doing so.

So, it's fundamentally a question of whether it's going to be done on the basis of facts and an even playing field. They may file an answer. They are free to file an answer, admit, deny, state additional things, provide context. No one -- they are the masters of that.

And I submit that simply reviewing the highlighted materials, there is nothing confidential or protectable in their -- these are the cases where the particularized showing is made in support of evidence. It has to do with sensitive pricing information or actual trade secrets or which level of retailer are we going to target this year? Are we going to target the big bucks retailer?

THE COURT: No matter how you put it, this strikes me as over the top. Now, whether it is legally over the top, I don't know. But to come away with a ruling, it really leaves a bad taste in my mouth.

You can sit down and I will hear from the other side.

MR. TANGRI: Thank you, your Honor.

THE COURT: This is just one of those wonderful illustrations of how the Court system is really not about the law, it's about you all fighting in the marketplace and using us to do your dirty work.

Why is it that I shouldn't follow the clear case law

proposed by your worthy opponent and let them use e-mails to unveil those to the public?

MR. OLIVER: The first thing, your Honor, I don't think Leucadia, which cites Seattle Times are quite as clear as Guidewire makes out. Both of them expressly talk about discovery material being a separate category in terms that need special consideration.

And Mr. Tangri began by saying this isn't about unsealing the underlying documents. This is about whether we should be allowed to file our proposed counterclaim. But that's a distinction without a difference since the proposed counterclaim simply goes through and recites out particularly salacious statements from the e-mails that have been produced.

We have produced over a million pages. It's not surprising that they were able to find things that they find interesting.

And Accenture said we would be happy to stipulate to the filing of a short statement. We're not going to make arguments about whether you meet the pleading standards over the trade secret counterclaim. In fact, we would supply short of a blanket statement that the trade secrets counterclaim, we would agree could be filed. Guidewire rejected that.

And I think just looking at the quotes, and we can spin this both ways. And Mr. Tangri has picked ones that he finds particularly interesting such as number 93, we suck at the

software agenda. That's an internal assessment from Accenture. It was never meant to see the light of day about how our products competed in the marketplace.

And I think the Court asked why is it that Guidewire wants to take this on at this stage.

Two reasons: Number one, media campaign. They admit as much. Mr. Tangri has admitted as much. They admitted as much in their papers.

THE COURT: What goes around comes around.

The question is what I'm doing now looking at how bad you were in the first instance to see if this sort of putting e-mails in the pleading is now the standard that I'm suppose to be upholding.

MR. OLIVER: Number one, the Court dismissed the counterclaims going to the press releases.

Number two, I don't have a problem if Guidewire wants to make press releases about the litigation, if they want to talk about the litigation with customers, that's fine.

What I have a problem with is using internal communications. It's clear that as soon as the Court unseals this, the next day, Guidewire sales folks are going to be out in the field saying, do you know that Accenture believes that they don't have a good software model.

That's issue number one, the media campaign.

Issue number two, this would inform competitive

development. We're still shipping a product that is being discussed here. If, for instance, these quotes talk about the dashboard and indicate that Guidewire believe -- that Accenture believes that Guidewire has a superior dashboard. That informs Guidewire of their competitive product.

That's a fundamentally unfair process -- unfair use of these materials.

As I said, I don't have a problem with filing a short and plain statement. To be honest, I wouldn't really have a problem with filing this paper. We're mixing up filing this counterclaim and allowing that counterclaim to go forward with unsealing the materials.

I don't think the case law supports it. We did go through and we identified materials in the counterclaim -- the quotes -- the non-highlighted quotes here for which we don't think there is any confidentiality. But simply reviewing the highlight quotes, I think the confidentiality internal communications and internal strategy is clear.

As to number 100, we simply overlooked the category and that would be internal strategy communications. It says in fact in the first sentence, talk about an orchestrated strategy to defuse Guidewire.

With that, I'll rest, your Honor.

THE COURT: All right.

I'm not going to make a decision from the bench. This

seems to be something that I should write about.

If counsel for Guidewire wants to have the last word, I'm happy to let you have the last word.

MR. TANGRI: A very brief last word, your Honor.

Mr. Oliver mentioned two reasons that the material should not be unsealed. The first one was the media issue, the customers' issue. We discussed that.

Second, I think is the perfect example of the sort of interest that Accenture could properly assert under the law as a basis for maintaining a sealed -- this language as sealed in a public pleading. He said it talks about a feature of the dashboard where Accenture believes that Guidewire is ahead of it and there is ongoing development efforts.

That is the second reason.

That is the type of argument that Courts have looked at in the past, not media, because the Courts want something public. The media is a possibility, not customers because the Courts want something public. That sort of interest, giving somebody a competitive advantage in their development efforts based on internal knowledge from the other side. And it was never asserted prior to this hearing and it is still not supported by the evidence.

That is the type of interest that the cases have acknowledged. They have required substantive evidence, current evidence in the form of current declarations, not two words on a

spread sheet and a lawyer's statement.

That, I believe, highlights why they fail to meet the applicable standard.

THE COURT: All right. Thank you.

Let's get on with the rest.

MR. ROBERTS: I would like to talk about a couple of interrogatories that we have proposed to them and that they haven't answered and that we would like them to be compelled to answer.

First category I would like to talk about are interrogatories we have asked them for their contentions. They have responded by saying 33(d) and pointing to the entirety of their document production.

So, first one of these -- I have the interrogatories if, your Honor, would like to read them along with me? I can tell you what they say. Whatever your Honor's preference is.

THE COURT: In my Court, contention interrogatories have to be responded to. They are usually is some mechanism for everyone to do that. I'm not sure I need to hear much more from you on contention interrogatories unless the contentions that you are asking about are completely irrelevant.

MR. ROBERTS: Interrogatory 3 asks them which companies they contend -- it's a loss profits. So which companies do you contend that you lost sales to us and why do you contend that you lost, that you would have made the sale and not someone

else?

They responded by saying, 33(d) to all of their documents.

Interrogatory number 11 and number 14, we asked them to identify prior art that wasn't disclosed to the PTO.

Then in 14 we asked them to say why it is that the prior art is supposedly cumulative. So, what is it cumulative of. Identify the prior art that you contend it is cumulative of and then identify why you contend it is cumulative. They haven't answered either one of those. They say it's expert testimony.

Interrogatory number 8 and number 9.

Interrogatory 8 asks for the basis for their contention that we have misappropriated their trade secrets.

And what they have done, your Honor, they have come back and they have identified their trade secrets and then they said where in our product the trade secrets are allegedly embodied. So they said, for example, that, you know, one of their trade secrets is a market need for a flexible claim handling system. And they said, aha, you have a flexible claim handling system, therefore, you misappropriated it.

That doesn't tell us anything about why is it that we're alleged to have misappropriated it. It doesn't distinguish it from independent development. It doesn't distinguish it from getting the idea from somewhere else. There

is nothing in their telling us how it is that we allegedly misappropriated it.

Interrogatory 9 is the same idea, but it goes to value. What's your contention about why these trade secrets have value?

And, you know, if you've had customers tell you that the trade secrets are valuable. If you have had feedback from them. So, it is those kind of things. Again, they haven't answered either of those.

And the last one is more factual, your Honor.

This is interrogatories 20 and 21.

What these ask for -- we ask them to identify the pre-critical date, presentation.

Your Honor, we've asserted the on-sale bar defense in this case.

So we said, tell us to whom you presented this product prior to the critical date because we need to go out and take discovery to find out about the on-sale bar defense.

THE COURT: They give you a third of the on-sale bar defense, but you're asking them to prove your case for you?

MR. ROBERTS: Let me show you, your Honor.

If I might approach.

THE COURT: I have to say that I'm out of here at 5:30. You need to prioritize.

MR. ROBERTS: If I could ask you, for example, to look at Tab 12. And Tab 12 is an Accenture press release 2000.

It's an Accenture Powerpoint presentation for 2000. If you look at slide five, it says that Release 1.0 of this product was in 1997.

This is a product that was -- the patent was filed, the '284 patent was filed 5-4-99. The critical date is 5-4-98. They have produced, I think, prior to 2000 -- I think they produced less than 200 total e-mails from less than -- from pre-2000, we have almost no material that they have produced from this time.

And, your Honor, we've been talking about back-up tapes. We don't need to get into that. The parties are working on that together.

But they have as of today almost no e-mails from this time period, almost no documents from this time period. We have almost nothing prior to 2000. Similarly, if your Honor looked at tab 11, one of the very few documents they have produced from 1998. And this is a presentation on this product SNCF from April of 1998.

This is at a minimum, evidence that there have been offers to deal with or sell this product in the marketplace prior to the critical date.

And their response is we didn't make presentations to anybody. We didn't make any presentation or any advertisements to anybody. And we're going to dispute whether or not these things were or were not offers for sale and they'll say it was a

presentation and it wasn't offered for sale. Fine.

We need to at least know the identity of the parties and to whom they made the presentation so that we can gather evidence to prove the case.

It's not them proving the case for us. They are going to contend that they were presentations, not offers for sale.

But given the fact that they produced almost no documents from prior to 2000 and almost nothing from '97, '98. In order for us to even begin to get down the road on this, we need to have them answer the interrogatories.

THE COURT: Anything else?

MR. ROBERTS: No, your Honor.

THE COURT: Let's hear the response to those.

MR. OLIVER: Let's see, I think we only have disputes with about two of these.

Number 3, we will supplement today. In fact, my people are sending that out.

Number 8 and 9 which is misappropriation of the trade secrets. I see Mr. Robert's point that simply finding the code that incorporates the trade secret and the other side's product is sufficient.

We've only just received a half terabyte of information from the pilot server from Guidewire. We are diligent in going through that to find support for the misappropriation case.

It's going to take sometime to dig through that, but we

will agree to supplement those -- that interrogatory as we find information.

We're also taking the deposition of CNA, which we believe was a conduit for trade secrets. CNA depos for this week have been taken off calendar. We expect that they will be happening in the next month, at least the first round. They were also informed that they are in the misappropriations case. We will be supplementing the interrogatory as we go along.

Interrogatory number 9 asks about the value of the trade secrets allegedly misappropriated. Because we sell these as a package, I view that as an expert discovery question. It's virtually impossible for me to sit here and say of the 22 trade secrets we've identified, secret A has a million dollars and secret B has 1.3 million dollars. That is something where an economics experts need to come in and wave their devining rods and tell us what they think the economic value is.

I'm happy to produce sales as a whole and revenue as a whole and profits and the like. It's extremely difficult to parse out what secret contributes to what portion of the value.

We will agree to supplement our response to that in expert discovery.

And on numbers 20 and 21, the pre-critical date, advertisements about claims handling technology. We're aware of SNCF and USAA. And we're investigating others. And we will agree to supplement those interrogatories again because the

documents both for us and for Guidewire from this period are fairly sparse. The e-mails are long gone.

It's difficult and it's going to take some time to dig through. We will agree to supplement.

That leaves numbers 11 and 14 which is what prior art of which you Accenture were aware of at the time and number 14, why is that prior art not cumulative? Both of those, I view as appropriate questions for the outside patent prosecutors, appropriate questions for the inventors. And undoubtedly, it is a topic for expert discovery. None of the inventors is currently employed by Accenture. And we're not aware of any prior art.

It doesn't strike me that having us go through and make an analysis as the prosecutors undoubtedly did, of why that art is not cumulative. It's something that Accenture should do rather than a topic that should be discussed in the depositions of patent prosecutors that have, in fact, already been scheduled.

THE COURT: This case isn't the typical patent case, but clearly I require contention interrogatories to be answered before experts -- before expert discovery just do the best they can unless they are not relevant.

Now, it seems to me as though the answer I got except perhaps with respect to the prior art was we've agreed to supplement, but it's going to take time.

What I need is discovery cutoff -- fact discovery cutoff is June 12th?

MR. BLUMENFELD: We extended that until August 12th, your Honor.

THE COURT: Say that again.

MR. BLUMENFELD: I believe the current date is August 12th. We have a stipulation and, I think, your Honor has signed it.

THE COURT: All right.

I think we need a date certain just to keep everybody on board. Let's think about that. We might have other dates. We'll hold that.

Let's hear the response about prior art and why perhaps that isn't an appropriate contention to be given.

MR. ROBERTS: There are two things about prior art.

First, patent prosecutors disclose what they believe to be prior art all the time. There are a lot of systems out there, many of which we have or will be asserting in a constant prior art search for a patent such as the Pyramid system, Pfizer, Valeo. There are a whole bunch of systems out there, none of these were disclosed to the USPTO.

We want to know which ones they were aware of. There are lots of people still at Accenture. Bill Michael's, who was around at that time, worked with Vin Gayan (phonetic), Bobby Pisch (phonetic) is still there and still writing e-mails and is

the current custodian. We think that they should ask him which of these systems were you aware of.

THE COURT: It doesn't strike me as the typical contention.

It's like why did you commit inequitable conduct. It doesn't strike me as though that that is an appropriate contention interrogatory as opposed to a deposition question.

MR. ROBERTS: If that's your Honor's preference, that's fine. I would still then prefer a response to 14.

14 says both for the ones that you identified in response to 11 which sounds like your Honor's preference that we do it through deposition.

And there are pieces of prior art that we said they didn't disclose and they knew about and we cited them in our affirmative defenses.

If your Honor remembers, there were multiple patents filed on the same day, they weren't cross-referenced. Some of them there was prior art discussed that was not discussed in the application leading to the '284 patent.

And we said, for those of them that you have contended to this Court that they are cumulative. They did that in a meeting in response to our Motion to Dismiss. They said, your Honor, it's not an inequitable conduct case, all of this stuff cumulative. It's a legal contention. Presumably they had some basis for making that contention. What they want to do is

contend that this stuff is cumulative.

They should tell us. I want to be able to understand what they're contention is so that when I depose Mr. Gayan, Mr. Pisch, their engineers, that we can go through it, otherwise, unless I know they are going to come out after the close of discovery and then they are going to make up a theory of how it is. This is going to be a legal theory. They are going to come into court and say all this is cumulative prior art.

If you look at their answer when they answered this interrogatory, they said all of the art that you have cited, you guys have cited in your answering counterclaim is cumulative on one or more of the pieces of prior art that was cited in the patent office. That was their answer to the interrogatory. It just doesn't help me at all.

We need the information now prior to expert discovery so that we can we can develop the facts on the record so that we understand.

THE COURT: You don't really develop facts about when prior art was -- I'm sure what the facts are you develop with respect to prior art.

MR. ROBERTS: For example, your Honor, with respect to the prior art. The question is going to be whether or not the cumulative of things that were disclosed. We're going to be deposing the patent prosecutors.

I'm going to want to ask the patent prosecutors, so

here's this piece of art that you are contending is cumulative of this other one. Where is it that you contend that this is the same as that? Why do you contend these two things are the same? Explain to me how passage here in your view discloses this feature over here.

I need to be able to do that when I'm deposing the patent prosecutors, otherwise, it's sort of how much am I suppose to develop this?

THE COURT: I think if you ask them -- if you asked them what was cumulative about it somehow you're not going to be able to divine their answer without a contention interrogatory being answered?

MR. ROBERTS: Yes, your Honor, that's exactly right.

What I am worried about -- I am worried about being able to match up -- match up the prior art that was disclosed to the patent office. There are hundreds of pieces of prior art, hundreds of pieces of prior art. I don't even know which ones to sit down and take through with the Patent Examiner.

These are people that have not seen this art in ten years. I'm going to sit down with them and say, okay, of these 300 pieces, I've got multiple copies, 15 boxes worth of prior art that I want you to look through and which ones are cumulative and they are going to throw up their hands.

THE COURT: You've made your point.

MR. ROBERTS: Just briefly, your Honor.

Mr. Oliver mentioned with respect to interrogatory 9, the evaluation that we're asking, what's your contention that these things have value. I'm not asking them to do an evaluation. I'm not asking them to put a number on it. Saying put a number on it clearly expert, clearly.

What I'm asking for is, again, their contention about why they contend these things are valuable. If he wants to do it in the aggregate, fine.

THE COURT: Helpful in the market place valuable?

MR. ROBERTS: Yes.

Do you know what's going to happen at trial? They are going to come in here and they are going to say trade secret number one, right, which is the market need for a flexible claim handling software.

Trade secret number one, that Guidewire took that and you should award us $12,000,000. They are going to come in and they are going to do that, fine. I don't need to know the evaluation, but I need to know what's the basis for their contention that the thing had value in the first place.

Is it that they did a lot of research and the research wasn't available to other people?

Is the value that they were the first people to produce a flexible claim handling system and, therefore, they got up to speed quickly and nobody else has one? It strikes me as somewhat unrealistic.

I need to understand what their theory is, otherwise I can't go out and take discovery to disprove it.

One thing I'll say, if I maybe permitted?

Mr. Oliver, his mention about time. He said with respect to interrogatory 8, as I understand -- as I understood it, well, we're happy to supplement as we go along and tell you what it is.

We think CNA was the transmission motive. They have had all of our documents that mention CNA since the last discovery hearing. They have had all CNA documents that mention Guidewire since the last discovery hearing.

If your Honor recalls, when we came here last time, you asked us to -- ordered us to present something in like ten days all the documents that mentioned CNA. We gave it to them then. So, when he says they gave us a half terabyte worth of data -- we gave them at their request an entire copy of our file server, literally every document in the company. We gave them over eight and a half million documents.

So, yes, they got a lot of material. So, their demand kept expanding, fine. We gave them everything. There is nothing more to ask for. But that shouldn't be a reason to delay past the start of deposition telling us how it is that which we misappropriated. This should have been in their pleading.

They should have had a factual basis for contending

when they pled the case that we misappropriated, that we knew or should have known that the stuff we were getting was misappropriated and that we received it, right? They didn't plead it and we moved to dismiss.

Your Honor dismissed on that ground. They replead it. We could have moved to dismiss a second time, but we said -- Your honor made it clear that she wants to move forward with discovery, she wants to keep the cases moving, we'll do it through an interrogatory.

So, we asked them in the interrogatory. And now what they're saying is that, oh, we're not going to be able to answer this until we get through the depositions.

That, your Honor, doesn't seem fair for something that they should have been able to have as a matter of law on the day they filed the case.

THE COURT: I agree by June 12th that these interrogatories except for -- I copied the subject matter, not the numbers -- the prior art contention as opposed to the cumulative prior art.

MR. ROBERTS: Interrogatory number 11.

THE COURT: 11 is the exception. The rest should be supplemented to the best of your ability. That means why is it explained your theory of why -- of what prior art was cumulative, why the trade secrets are valuable. June 12th.

All right. What else is there?

MR. BLUMENFELD: We have two e-discovery issues that I was going to handle has morphed since we walked into the courtroom as your Honor put it, a date certain issue.

Mr. Tangri has a more substantive issue. Mine has to do with Lotus Notes. And, basically, the issue is that the patent here has as Mr. Roberts said a May 1999 application date.

Trade secrets, at least some of them, they are going to contend were before that.

In the fall of 2003, Accenture switched it's e-mail system from Lotus Notes Microsoft Exchange. We've been working with them for a couple of months to try to figure out how to get e-mails from before that switch, before the fall of 2003. We've now gone down from 23,000 back-up tapes to one hundred and one back-up tapes.

Today, Mr. Oliver told us what they are going to do and what they agreed to do is to catalog the contents of the hundred and one back-up tapes in the next couple of weeks. Hopefully, that will give us a listing of whose documents are on the tapes and some information of what they are and then we can move on.

Our concern now that we have gotten to that point, our concern is one of timing. That is the clock is ticking, documents were supposed to have been produced by the end of March.

We have a August discovery cutoff. We would like to make sure that the process keeps on moving, and that if there

are issues that come up as a result of the catalog, we can deal with them.

I ask reluctantly -- we would ask that your Honor set another conference date in a month or so so we can make sure that we're on track. If we don't need the conference, we know how to take it off and let you know that.

We are concerned about keeping this issue moving because we're essentially three months from the end of discovery and this is Lotus Notes process is just beginning now.

THE COURT: All right, Mr. Tangri, I suppose can address both of them.

MR. TANGRI: Your Honor, the last two issues are two related issues that go to the custodians who have or have not been searched by Accenture for documents.

Accenture, as we understand it has produced from approximately 20 custodians out of the list of, I believe, over 400 who have had some involvement with the product at issue, the product that they contend embodies the trade secrets and the patents that they accuse of infringing.

We sent them about a month and a half ago, two and a half months ago a list of additional custodians, about 45 who we believe were also likely to be in possession of relevant materials, whose files ought to be searched. We contended.

They agreed to produce for certain of those custodians. As to five of those custodians they refused to produce. And as

to about another half of the custodians, about twenty or so, they said they are former employees and that they are not producing documents for former employees.

We have been talking to them about the group of five who are current employees for whom they declined to produce.

We agreed to withdraw the request as to one. Just before the hearing they agreed to produce for two. So there are two left for whom we would request of the court require these documents be searched and the responsive documents there be produced. Those two are a gentleman by the name Pierre Nanterme and a gentlemen named Mike Sutcliff.

Mr. Nanterme is the chief executive of the group within Accenture that is responsible for the claimed component software that is at issue.

In February of '03 he was part of a committee that was the executive sponsor among other things for developing, running that software.

He sat, at that time, I believe today on a committee that makes determinations as to overall product strategy within this space. And he was quoted in December of 2007 in Accenture's press release announcing the lawsuit with fanfare. He gave a quote as part of that press release.

What I have just said is based on documents that have been produced from other custodians. There are relatively few documents concerning Mr. Namterme within the documents produced

by other custodians.

But based on what we've learned, we believe he's likely to have relevant information and, therefore, they ought to undertake to search and produce responsive documents from him.

Mr. Sutcliff is a Managing Director of Accenture. He has been directly involved. And, again, we know this from documents others for whom some have been produced that relate to Sutcliff, although, not many.

He's been directly involved in setting strategy vis-a-vis Guidewire, competing with Guidewire. He has been involved in specific decisions related to specific clients against which Accenture is competing with Guidewire over.

We believe he therefore would likely have information directly relevant to their loss sales claim.

He's also been involved in discussions about the possible hiring of Guidewire employees into Accenture, which we believe make him likely to have relevant information about our trade secret claims against them.

That is our argument with respect to those two gentlemen and why we believe that they should undertake what we consider a fairly modest burden of searching their e-mails and producing them.

As Mr. Roberts said earlier, they asked us and we have produced everything in the company that's been very disproportionate to date. We're asking for these two.

We are also asking as to the former employees who are on the list that we sent over of additional custodians that we would like searched, that Accenture produce documents that were in the possession of those former employees while they were at Accenture. Obviously, they don't have an obligation to go to the former employees. But to the extent that Accenture still possesses many documents for those custodians, we believe they should be produced.

There is some question based on 30(b)(6) deposition of their person responsible for document collection, which we took on Tuesday. We noticed it in November. We got it on Tuesday. There are a lot of open questions. We're meeting and conferring with them over the preparation for that deposition.

But it was not clear from that deposition whether hard drives from those former employees would have been preserved, if they were, whether they would have been searched. There is -- it's fairly quite clear, I believe, that Enterprise Systems, the Microsoft Exchange Server, the server level, depositories were not searched as to employees, whether or not the hard drives are there.

We believe that as to the former employees they ought to make a diligent search for those. They were on the list we sent them and produced the documents they are responsible for. We don't believe that former employees, the category that gets you out from under that is a sufficient basis if they have

relevance.

THE COURT: Are those the two issues that you wanted to address this afternoon and the 20 former?

MR. TANGRI: Correct, your Honor.

MR. OLIVER: Your Honor, I will take those in reverse order. With respect former employees, we have searched. In fact, for two former employees, we have retained their hard drives for purposes other than litigation.

The others are being searched and are being reviewed and will be produced. For the other employees, we have confirmed that we do not have the hard drive or paper documents.

As to the Microsoft Exchange, the e-mail server. The e-mail server purges itself every 90 days.

So, there by definition we do not have the documents as they left years ago. I believe, although I will confirm and report to Guidewire, that none of the former employees they have identified has left within the past 90 days. So, that's former employees.

There are these two additional custodians, Pierre Nanterme and Mr. Sutcliff.

Pierre Nanterme joined in September of 2007 in his current role as essentially the CEO of financial services world wide. It is certainly true that he's involved in product strategy. It is certainly true that he was quoted in the press release. He's at such a high level in the organization that he

has no value in searching for documents by him.

They would almost certainly be duplicative of documents generated by folks that were actually involved with competing with Guidewire and direct litigation.

Similarly, for Mr. Sutcliffe, who assumed his role in February of 2008 after the litigation was filed. It may be that he was part of the team that went to customers along with Guidewire and Guidewire was competing with Accenture and their customers. There were certainly others, Mr. Casson (phonetic), Mr. Delsano, Mr. Crisonis (phonetic) all of whom we have searched and produced who are involved in those issues as your Honor knows from competitive opportunities as well.

Again, it strikes us as going out and collecting hard drives, which is not a trivial exercise. It's certainly not. That is one that is going to take months to do. It requires sending folks out to the offices, locating these individuals, collecting their hard drives and putting their hard drives into our review system which does not have a non-trivial cost associated with it. We don't believe that the costs associated with that is justified per these almost completely duplicative individuals.

THE COURT: This is my only concern. Generally when an opposing party wants to depose people like this or wants to call them to trial, my response as you say, they are high level. Chances are they weren't really involved. Their time is

valuable and critical. I'm not going to waste their time with the deposition when they haven't really been involved.

If you don't produce the documents then we can't tell whether that kind of response is appropriate or not. I don't know that. I don't know what kind of search terms you're looking for. But it seems to me if they offered -- I don't know that -- I don't know that you need to produce everything they have been copied on. Chances are they are copied on lots and lots and lots of things.

If they have authored anything that is relevant to this, then I certainly think that needs to be produced.

Now, I don't know whether -- I don't know what kind of search you're doing here.

MR. TANGRI: Your Honor, as I understand it, what Accenture has been doing is that they have captured the hard drive of the individual in question and put those documents into a review tool.

There is a list of -- an agreed upon list of search terms between the parties. Those are run, documents are returned authored or not authored. At that point, it's just a machine doing the work. It doesn't make any difference. They have been produced.

If the search terms are hit and there is no claim of privilege, then that's what we would request be done here. It really isn't that burdensome.

THE COURT: I think it actually serves your client better to do this.

I'm going to require you to do that for these two.

MR. OLIVER: Your honor, just so I am clear. Are you ordering us only to produce documents they have authored or to produce all documents in which they have been copied?

THE COURT: I think you should produce them and go through the search at least initially the way you do with everything. If you've got some concerns, apparently we're going to get together on another conference. At that point, we can discuss that.

MR. OLIVER: Fair enough. Thank you, your Honor.

THE COURT: I've set June 12th as a date. I don't like to set multiple dates.

If we've got a date for the first issue that Mr. Blumenfeld talked about, we've got a date for the supplementation and these other searches.

Can we come up with a universal date so we're not making this too complicated?

MR. TANGRI: Our request would be that the production that they are going to be making -- first, our request -- I understand your Honor's order of June 12th.

We would respectfully request an earlier date in light of the fact that discovery closes on August 12th, in light of the fact that Mr. Roberts claimed that this material is helpful

for taking depositions and preparing to take depositions, in light of the fact that although we're not the plaintiff, we have every interest in seeing this case in getting discovery closed and a trial date and everything get done quickly as possible, and in light of the fact that we have been meeting and conferring about these issues for many months now.

We would respectfully request an earlier date for them to make whatever production that is being ordered by your Honor today. We've been inclined to request two weeks.

Your Honor, obviously, set out a much longer period.

I would respectfully request that they produce by the end of May which is over a month and we could then have a discovery conference with your Honor somewhere within the first week or two in June.

THE COURT: Mr. Oliver, your response?

MR. OLIVER: My concern is that we are at the moment trying to collect from all of the other custodians.

So with respect -- especially Pierre Nanterme and Mike Sutcliff -- I have concerns about our ability to gather up their hard drives and put them into our review system and complete the review and be ready for production before -- I would propose June 12th just as a universal date.

It's possible that we can do it by the end of May. If we can, we will certainly produce earlier.

In fact, my production on the other custodians gave

some things that Guidewire has agreed to give to me that I care about. So, there is not going to be a benefit to me from slowing this down at all.

I am reluctant to set a date that seems overly ambitious. At the end of May seems overly ambitious.

MR. TANGRI: Just briefly again?

These additional custodians he's talking about are relatively limited in number, somewhere on the order of twenty.

We produced as Mr. Roberts stated for every custodian in the company in a very prompt period of time.

This is in the modern age is a question of will and resources and contacts in the first instance.

It is not, we submit, not credible that the law firm of Morrison and Forrester and the resources of Accenture cannot produce for twenty custodians in slightly over a month.

Our concern is if we do not have another discovery conference on the calendar, we need to get this material. We need time to look at it and communicate with them as to issue that need to be resolve before hand, to get it at the end of May and have a conference, for example, on the June 12th date that I just threw out as it's being debated.

That would be helpful if we had that ten days or so in between getting the material and having the conference. If we don't get the material until June 12th, we're looking at having a conference that would be less than six weeks before the close

of discovery.

THE COURT: All right.

The supplementation and production, the goal is June 1. We'll set a discovery conference the following week.

I'm looking at Wednesday, June 10th at 3:30.

MR. OLIVER: Both Mr. Roberts and I will be in Chicago for a deposition that day.

Is it possible that we could find others to take this? Would it be possible on the Court's calendar to set the hearing on the 12th, the Friday?

THE COURT: Actually. I don't have time on the 12th. I have time on the 11th?

MR. OLIVER: In the afternoon, your Honor?

THE COURT: Yes.

MR. ROBERTS: That's fine with us.

THE COURT: June 11th at 3:30. My 4:30 is taken.

MR. OLIVER: Thank you.

THE COURT: In the next week or so, I will issue something on the pending motion to unseal.

All right. Production and supplementation by June 1. Discovery conference June 11 at 3:30, and I thank you for your time.

(At this time 5:30 o'clock p.m. court proceedings concluded.)