IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCENTURE GLOBAL SERVICES, GmbH and ACCENTURE, LLP, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-826 (SLR) |
| GUIDEWIRE SOFTWARE, INC., | ) ) | **REDACTED – PUBLIC VERSION** |
| Defendant. | ) ) | |

## DEFENDANT GUIDEWIRE'S OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com
  *Attorneys for Defendant Guidewire Software, Inc.*

OF COUNSEL:

Daralyn J. Durie
Joseph C. Gratz
DURIE TANGRI LLP
332 Pine Street, Suite 200
San Francisco, CA  94104

Original Filing Date:  October 2, 2009
Redacted Filing Date: November 6, 2009

# TABLE OF CONTENTS

**Page**

I.   Introduction ......................................................................................................1

II.  Applicable Law ................................................................................................2

III. The '284 Patent ...............................................................................................2

    A.   Background .................................................................................................2

    B.   Argument ....................................................................................................4

          1.   "a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level" ...............................................5

               a.   "Claim folder" .................................................................6

               b.   "Insurance transaction" ...................................................6

               c.   "Decomposed into a plurality of levels" ..........................7

               d.   "Policy," "claim," "participant," and "line" levels .........7

          2.   "Wherein the event processor is triggered by application events associated with a change in the information, and sends an event trigger to the task engine" ...........................................8

               a.   "Event processor" ...........................................................9

                b.   "Application event" .......................................................10

                c.   "Task Engine" ................................................................13

           3.   "Wherein in response to the event trigger, the task engine identifies rules in the task library database" ...............................14

               a.   "Task library" ................................................................14

                b.   "Rules" ..........................................................................14

           4.   "Task Assistant" .......................................................................15

IV.  The '111 Patent .............................................................................................15

    A.   Background ...............................................................................................15

    B.   Argument ..................................................................................................16

          1.   "Identifying a level of significance of the file note" ..................17

          2.   "Obtaining a selection of fields of a first set of fields" ..............21

3. "The selection identifying information from a second set of fields" ........................................................................................23

4. "Displaying in the second set of fields, the information identified by selection of field of the first set of fields" ...........................23

5. "[Predefined text area] related to each field of the second set of fields based on the selected fields" ............................................24

6. "Storing the file note with the identified level of significance on a claim database" ................................................................24

V. Conclusion ........................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>Case</u>                                                                                                                                 <u>Page</u>

*Bowers v. Baystate Techs., Inc.*,
   320 F.3d 1317 (Fed. Cir. 2003)..................................................................................................7

*Girafa.com, Inc. v. IAC Search & Media*,
   No. 1:07-cv-00787-SLR, 2009 WL 2949526 (D. Del. Sept. 15, 2009) (Robinson, J.)...................7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................................................2

# I.     Introduction

Both the '284 patent and the '111 patent are directed to features of insurance claims management software.  Claim handlers at insurance companies manage each insurance claim from its inception—the "first notice of loss"—through its resolution.  Insurance claims management software assists claim handlers in managing the claim throughout this life cycle.  The software does this by, for example, providing storage for information about the claim, providing a task list or diary reminding the claim handler of tasks that need to be performed with respect to the claim, and allowing the claim handler to record notes about the claim.

Claims handling software frequently performs these functions in ways that mimic the traditional process performed by a claim handler on a traditional paper file.  When paper files were common, claims handlers stored information about a claim (such as the names and addresses of the claimants and their relevant policies) in a physical "claim folder" and kept a "diary" recording the tasks they had performed on the claim and the tasks that needed to be performed in the future.  File notes were, as the name implies, notes placed in the claim file.  Insurance organizations would establish "best practices" setting forth what tasks the claim handlers should perform in response to events in the life of a claim—for example, that they should review the file 30 days after the first notice of loss, or that they should send a check within a certain number of days after the claim has settled.  These best practices were compiled into complex manuals that were (in turn) stored in larger libraries.

The '284 and '111 patents describe software which allows claim handlers to carry out claims handling tasks on a computer.  In particular, the '284 patent describes insurance claims management software that provides an electronic "claim folder," a "task assistant" that serves as a task list or diary, and software that automates the process of creating new task entries in response to events in the life of a claim.  The '111 patent describes a specific kind of electronic "file notes," in which the file note is entered in a structured way and the claim handler may check a box to indicate that the file note is particularly significant.

The parties have reached agreement on all but a few claim terms.[1]  This brief discusses the handful of disputes that remain.

## II.      Applicable Law

While claim terms are generally construed in accordance with their ordinary and customary meaning, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1317 (Fed. Cir. 2005) (*en banc*).  It is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims."  *Id.* The specification is "usually . . . dispositive . . . [and provides] the single best guide to the meaning of a disputed term."  *Id*. at 1315.

## III.      The '284 Patent

### A.      Background

The Abstract of the '284 patent describes the invention as providing "a computer program for developing component based computer software capable of handling insurance-related tasks."  The claims that were submitted with the original application were likewise all directed to "a computer program . . . for developing component based software."  But while the first sentence of the Abstract and the original claims are directed to programming tools that would allow an engineer to *develop* computer software for the insurance industry, the issued claims are directed to that software itself.

In response to a series of prior art rejections, Accenture amended its claims, and explained to the examiner that "the innovative aspect of the claimed invention is based on rules in a separate database maintained by users of the computer programmer system."  As Accenture further explained, "[w]ith the claimed system, an appropriate task is quickly and efficiently

---

[1] Guidewire hereby stipulates to Accenture's proposed constructions of "standardized tasks," "short text," "free form notes," and "suffix."  For this reason, this brief will not discuss those terms.

generated to meet the needs of the insurance organization, which assists the claim handler to process the insurance transaction." JA000477. Accenture attempted to distinguish its invention from the prior art on that basis, relying on the fact that the claims require a "task library database" that stores rules for processing claims and that can be used to determine tasks to be completed. *Id.* The examiner remained unconvinced that this processing of rules and generation of tasks was not already present in the prior art. JA000455-69.

In the end, all the independent claims were amended to add the limitation that "the insurance transaction database [comprises] a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level, wherein the plurality of levels reflects a policy, the information related to the insurance transaction, claimants and an insured person in a structured format." JA000547. The examiner allowed the claims specifically on the basis of that limitation, which the examiner concluded was not present in the prior art, without any discussion of what that limitation requires. JA000565-66.

The disparity between the claims as originally drafted and as ultimately allowed is reflected in the rest of the specification. Most of the specification, starting from the first column and continuing through the bottom of column 82, discusses the benefits of a particular approach to writing computer programs (called object-oriented programming). As a result, the first 82 columns of the specification have little if anything to do with the invention that was ultimately claimed in the '284 patent. Indeed, the Examiner noted that "the specification is nearly incomprehensible when viewed for subject matter pertaining to the claimed invention." In response, Accenture promised to revisit the specification for the purpose of addressing those concerns – a promise that Accenture never fulfilled.[2] JA000457; ███████████████

███

---

[2] The specification of the patent is sloppy in a number of other respects as well. For example, Figure 1 of the patent is labeled "Prior Art." However, the specification recites that "Prior Art Figure 1 is a schematic diagram of the present invention." The specification sheds no further light on Figure 1, whether it is intended to represent the prior art or the invention itself, or even what Figure 1 means.

The portion of the specification that is relevant to the claims as issued begins at the bottom of column 82. This portion of the specification (through the end, column 107) was copied directly from functional specifications that had been prepared in early 1998 in connection with the sale of Accenture's product, Claim Components, to Reliance Insurance Company. In some places, Accenture replaced references to Reliance's existing systems in the product specifications with the word "LEGACY." In other places, Accenture didn't even bother to make that change, and the specification recites, for example, that "the client application is a new component designed to keep track of people or organizations that interact with RELIANCE for any reason…." JA000068, 96:62-64. As a result of being copied verbatim from these product-specific documents, this portion of the specification is directed to a particular commercial embodiment, and includes many details about features of the commercial product, not all of which are required by the claims.

**B.    Argument**

All of the disputed claim terms with respect to the '284 patent appear in Claim 1. Claim 1 of the '284 patent, in its entirety, with the disputed language emphasized, reads as follows:

1. A system for generating tasks to be performed in an insurance organization, the system comprising:

   an insurance transaction database for storing information related to an insurance transaction, the insurance transaction database comprising **a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level**, wherein the plurality of levels reflects a policy, the information related to the insurance transaction, claimants and an insured person in a structured format;

   a **task library** database for storing rules for determining tasks to be completed upon an occurrence of an event;

   a client component in communication with the insurance transaction database configured for providing information relating to the insurance transaction, said client component enabling access by an assigned claim handler to a plurality of tasks that achieve an insurance related goal upon completion; and

a server component in communication with the client component, the transaction database and the **task library** database, the server component including an **event processor**, a **task engine** and a **task assistant**;

**wherein the event processor is triggered by application events associated with a change in the information, and sends an event trigger to the task engine**; **wherein in response to the event trigger, the task engine identifies rules in the task library database** associated with the event and applies the information to the identified rules to determine the tasks to be completed, and populates on a **task assistant** the determined tasks to be completed, wherein the **task assistant** transmits the determined tasks to the client component.

As discussed below, each of these disputed terms and phrases can be most accurately construed by looking at the context and the structure of the claim as a whole.

1. **"a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level"**

| *Accenture's Construction* | *Guidewire's Construction* |
|---|---|
| "claim folder" means "a feature that manages information about a claim"<br><br>"decomposed into a plurality of levels" means "broken down into one or more structured set(s) of information"<br><br>"policy level" means "structured set of information about any insurance policy"<br><br>"claim level" means "structured set of information about any insurance claim"<br><br>"participant level" means "structured set of information about any person relevant to a claim"<br><br>"line level" means "structured set of information about any applicable coverage" | An organized collection of information relating to a claim, containing information related to a transaction involving insurance, separated into two or more levels from the group comprising a level containing information about a policy, a level containing information about a claim, a level containing information about a participant, and a level containing information about a type of coverage. |

### a. "Claim folder"

The parties appear to be in general agreement as to the meaning of the Claim Folder limitation. A claim folder, as used in the claims, is an electronic representation of a traditional, paper claim folder. In the paper world, a claim folder is a physical folder that collects information about a claim. Here, because the claim is directed to a computerized system, the claim folder is electronic. The claim itself requires that the claim folder be stored in a database.

Accenture proposes that the claim folder means "a feature that manages information about a claim." There are two potential problems with this proposed construction. First, the word "feature" is ambiguous. The claim itself is clear that "the database comprises a claim folder," and thus that the claim folder is stored in a database. As a result, the claim folder must be a collection of records in that database. Guidewire's proposed construction is that the claim folder is an organized collection of information. To the extent that Accenture means something different by "feature," its construction is not supported by the language of the claim, and there is no reason to inject the ambiguity associated with the word "feature" into the claim.

The second potential ambiguity in Accenture's construction is its assertion that the claim folder "manages information." The claim folder is a repository of information in a database, the contents of which are presented to a user via a user interface. The user (or other parts of the system) can manage the information in the claim folder, but the claim folder doesn't manage the information itself. Here, too, Accenture's proposed construction runs the risk of creating more ambiguity than it resolves.

### b. "Insurance transaction"

The claim folder contains information relating to an insurance transaction. Although Accenture has not proposed a construction for this phrase, there should be no dispute that an insurance transaction is a transaction related to insurance, and could include, for example, a claim on an insurance policy.

### c.   "Decomposed into a plurality of levels"

The parties agree that decomposed into levels means "broken down into structured sets of information."  The specification explains that "the Claim Folder decomposes a claim into different levels."  JA000299.  Webster's New Collegiate Dictionary defines "decompose" as "to separate into constituent parts or elements or into simpler compounds."  Ex. 2.  In the embodiment described in the specification, the claim folder is separated into these levels by a navigation tree on the left hand side of the screen, with a series of icons that represent file folders.  Clicking on a particular opens up any subfolders.  There does not appear to be any difference between Accenture's use of the words "broken down" and Guidewire's use of the word "separated" to describe this concept.

However, Accenture seeks to construe a "plurality" of levels to mean "**one** or more" levels.  But the term "plurality" has a well known meaning as used in drafting patent claims:  it means "**two** or more."  *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1332 (Fed. Cir. 2003) ("The claim, however, uses the term 'plurality,' meaning 'comprising, or consisting of more than one.'"); *Girafa.com, Inc. v. IAC Search & Media*, No. 1:07-cv-00787-SLR, 2009 WL 2949526, at *2 n.3 (D. Del. Sept. 15, 2009) (Robinson, J.) ("Plaintiff advocated a definition of "more than one," a definition more consistent with "plurality.").   Accenture's construction is inconsistent with these cases, and should not be accepted.

### d.   "Policy," "claim," "participant," and "line" levels

The remaining disputed phrases within this term refer to various "levels" of information in the claim folder.  As set forth below, the parties have only minimal disagreements about the meaning of these phrases.

**A policy level:** The parties appear to agree that a policy level is "a structured set of information" about an insurance policy.  Accenture's use of the words "structured set of information" is consistent with Guidewire's construction, because a "set" of information may consist of any number of elements (even just one).  The only potential complication is that

Accenture refers to "any insurance policy," rather than "an insurance policy."  With that minor change, Guidewire can agree to Accenture's proposed construction.  It is sufficient for a policy level that there be information about at least one insurance policy; there does not need to be information about all possible insurance policies.  It isn't clear what Accenture meant by "any" insurance policy; any ambiguity can be clarified by changing "any" to "an."

**A claim level**:  The parties appear to agree that a claim level is a structured set of information about an insurance claim, subject to the same clarification that "any" means "an."

**A participant level**:  The parties likewise appear to agree that a participant level is a structured set of information about a person relevant to a claim.

**A line level**:  The parties appear to agree that a line level is a structured set of information about an applicable coverage.

2.   **"Wherein the <u>event processor</u> is triggered by <u>application events</u> associated with a change in the information, and sends an <u>event trigger</u> to the <u>task engine</u>"**

| *Accenture's Construction* | *Guidewire's Construction* |
|---|---|
| "event processor" means "a module that determines what the response should be to any event"<br><br>"event" means "any occurrence or change in the life a claim"<br><br>"event trigger" means "notification or indication that an event has happened"<br><br>"task engine" means "a module that generates the tasks that need to be performed in response to any event" | Wherein, based upon an event in an application program, which event is associated with a change in the information, the event processor sends information signifying that an event has taken place to the task engine. |

### a.   "Event processor"

| Accenture's Construction | Guidewire's Construction |
|---|---|
| a module that determines what the response should be to any event | Based upon an event in an application program, the event processor sends information signifying that an event has taken place. |

The Event Processor works hand in hand with the Task Engine, which is why the two are treated together in the specification as Event Processor/Task Engine.  JA000073, 105:64-107:24. The Event Processor is essentially a black box – it is set out at 1400 in Figure 14, which shows the interaction of the various components.



FIG. 14

Notwithstanding the name Event Processor, the specification makes clear that "the Event Processor does not process any events."  *Id.* at 106:64.  Instead, the Event Processor provides information to the Task Engine, and the Task Engine processes the event and generates tasks that are responsive to an event.

Accenture proposes that "event processor" is "a module that determines what the response should be to any event."  Although that language tracks language in the specification,

that language was developed to describe the operation of a complete system, and not the operations actually claimed in the '284 patent.  It is, therefore, somewhat vague as to what "response" means, and potentially misleading for that reason.  The Event Processor sends a "response" only in the sense that it sends a message to the Task Engine that an event has taken place.  That is why, "the Event Processor is completely generic to any specific entity or event in the system."  JA000073, 106:8-9.

The claim itself specifies that the Event Processor is "triggered by application events" and "sends an event trigger" to the Task Engine.  And the parties agree that an event trigger is a "notification or indication that an event has happened."  That is all that the claim requires.  As a result, based upon the claim language, Guidewire proposes that the Event Processor be defined as follows:  "Based upon an event in an application program, the event processor sends information signifying that an event has taken place."  That language best fits the operations actually called out in the claim and without the risk of implying the presence of some *other* unclaimed (and unspecified) "response."

b.    "Application event"

| Accenture's Construction | Guidewire's Construction |
|---|---|
| [No construction proposed.] | an event in an application program |

Accenture has proposed a construction of "event," but has not proposed a construction of "application event."  Accenture's construction of event is "any occurrence or change in the life a claim."  That is a reasonable construction of some of the uses of the term "event" in the claim, but is not correct as applied to the term "application event."  An application event is not an event that takes place in the life of a claim, but instead an event that takes place in an application program.[3]  One example of an application event might be a button press in the user interface;

---

[3] An application is "[a] complete, self-contained program that performs a specific function directly for the user. This is in contrast to system software such as the operating system kernel, server processes, libraries which exists to support application programs and utility programs." Free On-Line Dictionary of Computing, "application program," *at* http://foldoc.org/application+program (listing "application" and "app" as synonyms).  One example of an application is Microsoft Word.

another example of an application event might be a change to the information in a particular field on a form displayed on the screen.

The term "application event" does not appear in the specification, but the specification discusses numerous examples of such events.  The specification describes the handling of application events in applications written in the Visual Basic programming language.  It is replete with examples of Visual Basic ("VB") application events, and the "event handlers" that handle those events.  For example, Figure 3 of the patent shows dozens of application events (labeled "VB Event"), such as "Control_Change (User Changes Data)."



**FIG. 3**

The specification describes this application event as follows: "Window 'Save Processing'
involves tracking changes to data on a form 204 and responding to save and cancel events
initiated by the user."  JA000030, 19:8-11.

The specification also describes application events resulting from a button press, such as
pressing the "Save" or "OK" button:  "Any controller 206 that manages an edit window has a

public method called Save that saves changes the user makes to the data on the form 204. This method is called by the event handlers for both the Save and OK buttons (when/if the OK button needs to save changes before closing)." *Id.* at 19:20-21.  This usage comports with that of a number of third-party engineers who have been deposed in this case.



As a result, the term "application event" should be construed to mean an event in an application program.

### c.      "Task Engine"

| Accenture's Construction | Guidewire's Construction |
|---|---|
| a module that generates the tasks that need to be performed in response to any event | The task engine receives information signifying that an event has taken place, and applies rules to generate a task. |

Accenture proposes that the "task engine" is "a module that generates the tasks that need to be performed in response to any event."  This is largely correct.  The Task Engine is described in the specification beginning at JA000073, 105:64.  The Task Engine generates tasks and passes those tasks to the Task Assistant to be displayed to the user.  The specification explains that "the Task Engine 1404 processes the most common set of event responses, those that need to generate tasks 1406 based on events 1006 that have occurred."  JA000073, 106:13-15.  So, in other words, the Task Engine receives information about an event that has occurred, and generates a task in response to that event.

Guidewire's only objection is to Accenture's assertion that the Task Engine generates tasks in response to "any" event.  The Task Engine does not need to have the capability to

generate tasks in response to all conceivable events.  With the modification of "any" event to

"an" event, Guidewire does not object to Accenture's proposed construction.

> **3.**   **"Wherein in response to the event trigger, the task engine identifies <u>rules</u> in the <u>task library</u> database"**

| Accenture's Construction | Guidewire's Construction |
|---|---|
| "rules" means "guidelines that govern which tasks are assigned"<br><br>"task library" means "a feature that contains the templates that contain the fields and values with which tasks are established" | Wherein in response to information signifying that an event has taken place, the task engine identifies rules in the task library database. |

> **a.**   **"Task library"**

The Task Library stores a set of tasks and rules that can be used to generate tasks.  The

specification explains that the "task generation rules [are] defined in the Task Library."  *Id.* at

106:40.  The structure of the claim requires that the rules be stored in a database (the Task

Library Database), by specifying that there is "a task library database for storing rules."

Accenture appears to argue that the Task Library stores not just the rules, but also must

store templates for creating those rules.  Accenture's proposed construction is that the task

library is "a feature that contains the templates that contain the fields and values with which tasks

are established."  That requirement isn't present in the concept of a Task Library, and isn't

required by the specification. All the specification requires is that the Task Library store rules; it

need not store templates that can be used to *create* rules.

> **b.**   **"Rules"**

Accenture proposes that "rules" means "guidelines that govern which tasks are assigned."

This construction is both wrong and odd.  The task engine uses rules to generate tasks.  The rules

are stored in the task library database.  The rules do not govern which tasks are assigned, but

rather generate the tasks that must be performed in response to a particular event.  In other words, the rules govern the generation of tasks, and are not restricted to the assignment of tasks.  Guidewire does not believe that the concept of a "rule" needs further explanation for the jury.

### 4.      "Task Assistant"

| Accenture's Construction | Guidewire's Construction |
|---|---|
| a feature that can automatically display a list of actions that need to be performed on a claim | The task assistant provides diary functions at a work step level that allow the management of complex claim events. |

Accenture proposes that a Task Assistant is "a feature that can automatically display a list of actions that need to be performed on a claim."  This is not quite right, because the Task Assistant is actually the module that sends the list of actions to the client component to be displayed – the Task Assistant does not display the list itself. JA000074, 107:56-59.

Guidewire's construction is taken directly from the specification.  The description of the Task Assistant in the specification begins at JA000072, 103:59.  The best description of what the Task Assistant is, as opposed to the benefits of using one,[4] is the second sentence of that passage:  the Task Assistant "provides diary functions at a work step level that allow the management of complex claim events."  In essence, the Task Assistant is a computerized task list that can be used by a claims adjuster to manage the performance of tasks.

## IV.     The '111 Patent

### A.     Background

The '111 patent is directed to a structured way to generate file notes with a consistent format, such that those file notes can be easily searched and retrieved.

File notes, either paper or electronic, are not new.  Indeed, the claims of this patent as originally presented were rejected by the examiner as being unpatentable over the prior art.  JA000722-25.  In order to gain allowance of the claims and to distinguish over that prior art,

---

[4] Here, too, the specification provides what is captioned a "definition" that begins at that point and continues to JA000072, 104:32.  However, the text that appears below that heading is not so much a definition as it is a recitation of the benefits of using a Task Assistant.

Accenture added a limitation to every independent claim requiring the steps of "identifying a level of significance of the file note" and "storing the file note with the identified level of significance in a claim database."  JA000629.

**B.**     **Argument**

All of the disputed claim terms in the '111 patent appear in Claim 1.  Claim 1 of the '111 patent, in its entirety, with the disputed language emphasized, reads as follows:

1. A method for generating a file note for an insurance claim, comprising the steps of, executed in a data processing system, of:

prefilling a first set of fields with information identifying a file note, said information comprising at least one suffix indicating a type of insurance coverage for a participant in a claim and identification of the participant, wherein the at least one suffix is preselected from one or more types of insurance coverage applicable to the claim;

**obtaining a selection of fields of a first set of fields** from a user, **the selection identifying information for a second set of fields**; **displaying in the second set of fields, the information identified by selection of field of the first set of fields**;

permitting the user to add data to a predefined text area **related to each field of the second set of fields based on the selected fields**;

generating a file note that contains the first set of fields, the second set of fields, and the data in the predefined text area;

**identifying a level of significance of the file note**; and

**storing the file note with the identified level of significance in a claim database** including file notes associated with the claim.

Once again, Guidewire believes that these terms can most accurately be construed by looking at them in context.

### 1.    "Identifying a level of significance of the file note"

| *Accenture's Construction* | *Guidewire's Construction* |
|---|---|
| "level of significance" means "relevance [of the file note]" | After the file note has been generated, adding an indicator to the file note for the purpose of specifying the significance of the file note. |

Figure 1B, which is reproduced on the first page of the patent, illustrates what is described in the specification as the level of significance of a file note.  The user pulls up a computer screen that allows the user to enter notes about a particular event (here, the receipt of an appraisal for work to be performed by an auto body shop and a date by which the work would be completed).  Towards the bottom of the screen, there is a box marked "significant," which the claims adjuster can check if the file note is a significant one.  That way, there is a ready way to retrieve all "significant" file notes.



**FIG. 1B**

The specification further explains, with reference to Figure 1B, that the claims handler can indicate whether the file note is significant, or that the file note may already be indicated as significant (i.e., the box may be automatically checked) based on the subcategory into which the note falls. But here, too, the subcategory is not itself the indicator of the level of significance: instead, the subcategory is used to determine whether the file note is significant and, if it is, the significance box is automatically checked. Indeed, equating a subcategory with a "level of significance" would violate the presumption in favor of claim differentiation, since dependent claims 7 and 19 require that "the second set of fields includes a category and a subcategory." JA000611, 8:1-2; JA000612, 10:4-5. This is a key issue because (as discussed below) Accenture's infringement case is predicated on eliding the distinction between precisely these

18

two things – i.e., the category ("topic") of the file note and the indication of significance.





Accenture proposes that the level of significance of a file note means the relevance of the file note.  While this proposal might not seem that controversial at first blush, it is completely recursive.  Accenture has proposed this construction because it wants to read this limitation on the act of selecting a topic entry for a file note (one of the steps in creating the file note). ██  ███████████████████████████████████████████████  ███████████████████████████████████████  Accenture thus intends to argue that the topic of the file note inherently identifies its relevance, and therefore also indicates its level of significance.  In other words, Accenture argues that any file note inherently indicates its own level of significance.

To the contrary, indicating the level of significance of a file note means, after the file note has been generated, adding an indicator to the file note for the purpose of specifying the significance of the file note.  That the level of significance must be indicated after the file note is generated is made clear by Accenture's remarks to the PTO during prosecution, stating that "The file note is generated and a level of significance of the file note is identified."  JA000635.

This limitation cannot be satisfied by attributing "relevance" to the information itself, but requires an indicator of the significance of the file note that is separate from the content of the file note.  As noted above, regarding the category or "topic" as the "level of significance"

violates the presumption in favor of claim differentiation.  Accenture's construction effectively

reads the "level of significance" limitation, which was part of the basis for allowance, out of the

claim.  *See* JA000619-20 (allowing claims over prior art in view of an amendment adding the

"level of significance" limitation).  For that reason, Accenture's construction cannot be correct.

### 2.   "Obtaining a selection of fields of a first set of fields"

| Accenture's Construction | Guidewire's Construction |
| --- | --- |
| obtaining one or more pieces of information | Obtaining a selection of one or more fields from a first set of such fields.  A field is a component of a record corresponding to an attribute of that record. |

Accenture's proposed construction of this phrase, and the following phrases, seeks to

rewrite the language of the claims.  This claim element requires the selection of one or more

fields from a set of fields (the "first set of fields" that is referred to in the first claim limitation).

In other words, there must be a group of fields and one or more fields must be selected from that

group.

Accenture's proposed construction conflates a field with any piece of information.  That

is incorrect; the two concepts are distinct.  A field is "a component of a record corresponding to

an attribute" of that record.  Ex. 7, IBM Dictionary of Computing definition of "data field."  This

can be understood most readily in the context of an electronic form:  a field is a place on the

form where a particular type of information is to be entered, such as a location in which to enter

name, or date of birth, or country of residence.  Thus the field may be a country field, and the

information entered into that field might be United States of America.  But United States of

America is not itself the field; it is the information that is used to fill out the field.

The specification is consistent with this understanding of a field.  The specification notes

that box 112 in Figure 1B is a "suffix field."  JA000601.  Within that field, there are two possible

entries shown – 011-COLL and 012-PIPM – either of which can be selected by the claim handler

to fill that field.  This is because, as the first claim limitation explains, "the at least one suffix

is preselected from one or more types of insurance coverage applicable to the claim." JA000611, 7:34-36. The specification explains that "[s]uffix field 112 may be a combinational box or a list box and lists all suffixes for the claim." JA000609, 4:20-22.



**FIG. 1B**

Accenture's proposed construction suffers from a second flaw: it omits the requirement that the fields be selected from a set of fields. In other words, the fields cannot be obtained from anywhere – they must be selected from a group of fields. Guidewire's construction simply defines field, and otherwise tracks the plain language of the claim.

3.      **"The selection identifying information from a second set of fields"**

| Accenture's Construction | Guidewire's Construction |
|---|---|
| the selection identifying one or more pieces of additional information | The selection identifying the contents of one or more other components of a record not in the first set of components. |

The issue here largely boils down to the same distinction between a field and the information in that field.  The selection of fields from the first set of fields must identify not just any information, but information from a second set of fields.  The claim as written is virtually incomprehensible, but what the claim appears to mean is that the selection of the first fields identifies the contents of one or more other fields (the second set of fields).  So, as a consequence of selecting one or more initial fields, a second set of fields are automatically prefilled with information, at least in part.

4.      **"Displaying in the second set of fields, the information identified by selection of field of the first set of fields"**

| Accenture's Construction | Guidewire's Construction |
|---|---|
| Plain and ordinary meaning | The initial selection of fields defines information that is displayed in the second set of fields. |

This limitation merely requires that the information identified in the preceding step be displayed in the second set of fields (in other words, the information that has been automatically filled in based on the selection of the first set of fields).

**"[Predefined text area] related to each field of the second set of fields based on the selected fields"**

| Accenture's Construction | Guidewire's Construction |
|---|---|
| Plain and ordinary meaning | [the predefined text area] has text which is predefined on the basis of the contents of the second set of fields, which in turn are based on the fields selected from the first set of fields. |

Accenture contends that this limitation has a plain and ordinary meaning.  Guidewire submits that the meaning of this limitation is anything but plain.  This limitation appears to require that the text area has text which is predefined on the basis of the contents of each field in the second set of fields.  The contents of the second set of fields are, in turn, based on the fields selected from the first set of fields, as made clear earlier in the claim.

5.     **"Storing the file note with the identified level of significance on a claim database"**

| Accenture's Construction | Guidewire's Construction |
|---|---|
| Plain and ordinary meaning  See above re: "level of significance" | Plain meaning. |

This limitation means what it says:  the file note and the identified level of significance must be two different things, and must be stored together.  While both Accenture and Guidewire proposed that this claim term be given its ordinary meaning, it is clear that the parties disagree about what that ordinary meaning is.  Guidewire thus proposes that the Court make clear that the identified level of significance is not an inherent feature of the file note itself, but is a separate indication that is stored with the file note.

# V.    Conclusion

The parties have reached agreement with respect to virtually all of the patent terms.  With

respect to terms that remain disputed, the court should adopt Guidewire's proposed

constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

*Attorneys for Defendant Guidewire Software, Inc.*

OF COUNSEL:

Daralyn J. Durie
Joseph C. Gratz
Durie Tangri LLP
332 Pine Street, Suite 200
San Francisco, CA  94104
(415) 362-6666

October 2, 2009
3157018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2009 I electronically filed the foregoing with

the Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Richard L. Horwitz
> David E. Moore
> POTTER ANDERSON & CORROON LLP

I further certify that I caused to be served copies of the foregoing document on

November 6, 2009 upon the following in the manner indicated:

## <u>BY ELECTRONIC MAIL</u>

| | |
|---|---|
| Richard L. Horwitz, Esquire | James Pooley, Esquire |
| David E. Moore, Esquire | L. Scott Oliver, Esquire |
| POTTER ANDERSON & CORROON LLP | MORRISON & FOERSTER LLP |
| 1313 North Market Street | 755 Page Mill Road |
| Wilmington, DE  19801 | Palo Alto, CA  94304 |

*/s/ Andrew C. Mayo*
_____
Andrew C. Mayo (#5207)