IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


ACCENTURE GLOBAL SERVICES   )
GMBH and ACCENTURE LLP,   )
                         )
       Plaintiffs,   )
                         )
       v.   ) Civ. No. 07-826-SLR
                         )
GUIDEWIRE SOFTWARE INC.,   )
                         )
       Defendant.   )

Richard L. Horwitz, Esquire, and David E. Moore, Esquire, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: James P. Bennett, Esquire, of Morrison & Foerster LLP, San Francisco, California; L. Scott Oliver, Esquire, Diana Luo, Esquire, Ruchika Agrawal, Esquire, Matthew Chen, Esquire and Douglas Chartier, Esquire of Morrison & Foerster LLP, Palo Alto, California.

Jack B. Blumenfeld, Esquire and Julia Heaney, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Daralyn J. Durie, Esquire and Clement S. Roberts, Esquire, of Durie Tangri LLP, San Francisco, California.


**MEMORANDUM OPINION**


Dated: March 5, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiffs Accenture Global Service GmbH and Accenture LLP (collectively, "Accenture" or "plaintiffs") brought this action against defendant Guidewire Software Inc. ("Guidewire" or "defendant") on December 18, 2007. (D.I. 1) In their complaint, plaintiffs asserted that defendant infringes U.S. Patent No. 7,013,284 ("the '284 patent"), describing a computer program for developing component-based software capable of performing tasks relating to insurance transactions (such as claims processing). (D.I. 1) Plaintiffs also brought state law claims,[1] as well as a claim for trade secret misappropriation. (*Id.*) On October 8, 2008, the court granted defendant's motion to dismiss the non-patent claims. (D.I. 75) Subsequently, and by stipulation of the parties,[2] plaintiffs filed an amended complaint re-alleging their trade secret misappropriation and tortious interference with business relations claims. (D.I. 77; D.I. 79) Plaintiffs filed a second amended complaint on December 17, 2008 adding a claim for infringement of plaintiffs' U.S. Patent No. 7,017,111 (the '111 patent). (D.I. 92)

Defendant moved to dismiss the second amended tortious interference with business relations claim on January 9, 2009; that motion was denied by the court. (D.I. 98; D.I. 224) Defendant was granted leave to amend its counterclaims to add a fifth counterclaim alleging trade secret misappropriation. (D.I. 226) Defendant also maintains its originally-filed affirmative defenses for patent invalidity, unenforceability,

---

[1]Unfair competition and deceptive trade practices in violation of the Delaware Uniform Deceptive Trade Practices Act ("DTPA"), 6 Del. C. §§ 2531 *et seq.*, common law unfair competition, and tortious interference with business relations.

[2]Pursuant to the scheduling order, February 15, 2009 was the final date to seek amendment of pleadings.

failure to mark, unclean hands, and patent misuse, as well as counterclaims for declaratory judgments of non-infringement, invalidity, and unenforceability, as well as breach of contract.[3]  (Id., D.I. 10)

Discovery has now ended.  By memorandum order dated February 26, 2010, the court denied without prejudice to renew defendant's motion for summary judgment that the '284 and '111 patents are invalid under 35 U.S.C. § 101 for claiming unpatentable subject matter.  (D.I. 348; D.I. 478)  Currently before the court are several summary judgment motions filed by defendant.  Defendant seeks judgments that:  (1) the '284 patent is invalid as indefinite (D.I. 346); (2) the '284 patent is invalid because of an on-sale bar (D.I. 352); (3) the '284 patent is invalid as anticipated or, in the alternative, obvious (D.I. 356); (4) plaintiffs' trade secret misappropriation claim is barred by the statute of limitations (D.I. 350); and (5) defendant does not infringe the '111 patent (D.I. 354).  Also before the court is a motion by plaintiffs to strike defendant's on-sale bar arguments and related documents not identified in its invalidity contentions during discovery.  (D.I. 381)

## II. BACKGROUND

### A. The Parties

Plaintiffs and defendant are competitors in the consulting and technology services industry.  Among other things, the parties provide computer software and consulting services to help design tools to aid insurance companies in their

---

[3]Guidewire's counterclaims of bad faith litigation as proscribed by Section 43(a) of the Lanham Act, sections 2532(a)(5), (8), & (12) of the DTPA, and the common law of unfair competition (claims V-VII) were dismissed by the court on October 8, 2008. (D.I. 10; D.I. 75)

management and processing of information.  Plaintiffs provide the "Accenture Claim Components Solution" ("Claim Components") product suite and associated services; defendant's insurance claims management product is called "Guidewire Insurance Suite," which consists of "Guidewire ClaimCenter," "Guidewire PolicyCenter," and "Guidewire BillingCenter" platforms.

### B. The Patents at Issue

The '284 patent, entitled "Component based interface to handle tasks during claim processing," was filed as U.S. Patent Application No. 09/305,331 on May 4, 1999. The critical date is May 4, 1998, or one year before filing.  Listed inventors are George V. Guyan ("Guyan") and Robert H. Pish ("Pish"); Accenture LLP is the named assignee.

Generally, the '284 patent provides a computer program for developing component based software for the insurance industry.  The program includes a data component, a client component, and a controller component.  The client component is responsible for allowing users to edit tasks, add new tasks, and "achieve an insurance-related goal upon completion," as well as to generate a historical record of completed tasks.

Claims 1 and 8 are independent claims.  They read as follows:

1.  A system for generating tasks to be performed in an insurance organization, the system comprising: an insurance transaction database for storing information related to an insurance transaction, the insurance transaction database comprising a claim folder containing the information related to the insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level, wherein the plurality of levels reflects a policy, the information related to the insurance transaction, claimants and an insured person in a structured format; a task library database for storing rules for determining tasks to be completed upon an occurrence of an event; a client component in communication with the insurance transaction database configured for providing information relating to the insurance

3

transaction, said client component enabling access by an assigned claim handler to a plurality of tasks that achieve an insurance related goal upon completion; and a server component in communication with the client component, the transaction database and the task library database, the server component including an event processor, a task engine and a task assistant; wherein the event processor is triggered by application events associated with a change in the information, and sends an event trigger to the task engine; wherein in response to the event trigger, the task engine identifies rules in the task library database associated with the event and applies the information to the identified rules to determine the tasks to be completed, and populates on a task assistant the determined tasks to be completed, wherein the task assistant transmits the determined tasks to the client component.

8. An automated method for generating tasks to be performed in an insurance organization, the method comprising: transmitting information related to an insurance transaction; determining characteristics of the information related to the insurance transaction; applying the characteristics of the information related to the insurance transaction to rules to determine a task to be completed, wherein an event processor interacts with an insurance transaction database containing information related to an insurance transaction decomposed into a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level, wherein the plurality of levels reflects a policy, the information related to the insurance transaction, claimants and an insured person in a structured format; transmitting the determined task to a task assistant accessible by an assigned claim handler, wherein said client component displays the determined task; allowing an authorized user to edit and perform the determined task and to update the information related to the insurance transaction in accordance with the determined task; storing the updated information related to the insurance transaction; and generating a historical record of the completed task.

The '111 patent, entitled "Insurance file note generation method and system,"

was filed as U.S. Patent Application No. 09/550,449 on April 14, 2000.  The critical date

is April 4, 1999.  Named inventors are Guyan, Peter L. Treacy, Mark W. Moran, and

Amy N. Shaheen; Accenture LLP is the assignee.

Generally, the '111 patent provides methods and systems for the automatic

generation of file notes for insurance claims using predefined text.  Provided

components of the foregoing include a claim folder interface and a file note interface

(containing fields and selectable items).  A claim handler is able to select a category

and subcategory and provide short text associated with the selection in a predefined

text area; a larger text area for free form text may also be provided.

Claims 1, 9 and 13 are independent claims.  Claims 1 and 9 are method claims,

and read as follows:

1.  A method for generating a file note for an insurance claim, comprising the steps of, executed in a data processing system, of:  prefilling a first set of fields with information identifying a file note, said information comprising at least one suffix indicating a type of insurance coverage for a participant in a claim and identification of the participant, wherein the at least one suffix is preselected from one or more types of insurance coverage applicable to the claim; obtaining a selection of fields of a first set of fields from a user, the selection identifying information for a second set of fields; displaying in the second set of fields, the information identified by selection of field of the first set of fields; permitting the user to add data to a predefined text area related to each field of the second set of fields based on the selected fields; generating a file note that contains the first set of fields, the second set of fields, and the data in the predefined text area; identifying a level of significance of the file note; and storing the file note with the identified level of significance in a claim database including file notes associated with the claim.

9.  A method for generating a file note for an insurance claim folder, comprising: providing on a display device a claim folder screen depicting attributes associated with a claim, the attributes comprising at least one suffix indicating a type of insurance coverage for a participant in the claim; permitting the selection of at least one attribute associated with a claim on the claim folder screen; providing on a display device a file note screen depicting the selected at least one attribute in a criteria section, and a text entry section, wherein the text entry section is based on the selected at least one attribute in the criteria section; receiving from a user information associated with the text entry section; generating the file note based on information received from the user; identifying a level of significance of the file note according to information received from the user; and storing the file note with the identified level of significance in a searchable claim database, the claim database associating the file note being with a file note index indicating changes to the file note.

In contrast, claim 13 is a system claim, as follows:

13.  A system for generating a file note for an insurance claim, comprising: prefilling means for prefilling a first set of fields with information identifying a file

5

note, said information comprising at least one suffix indicating a type of insurance coverage for a participant in a claim and identification of the participant, wherein the at least one suffix is preselected from one or more types of insurance coverage applicable to the claim; obtaining means for obtaining a selection of fields of a first set of fields from a user, the selection identifying information for a second set of fields; displaying means for displaying in the second set of fields, the information identified by selection of field of the first set of fields; permitting means for permitting the user to add data to a predefined text area related to each field of the second set of fields based on the selected fields; generating means for generating a file note that contains the first set of fields, the second set of fields, and the data in the predefined text area; and identifying means for identifying a level of significance of the file note; and storing means for storing the file note with the identified level of significance in a claim database including file notes associated with the claim.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party

6

opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Accenture's Motion to Strike and Defendant's Motion for Invalidity Based on the On-Sale Bar

Defendant moves for summary judgment on its on-sale bar defense. Plaintiffs move to strike arguments and documents related to this defense that were not identified in defendant's invalidity contentions or, alternatively, arguments and documents not contained in defendant's initial invalidity or supplemental invalidity expert reports. Insofar as plaintiffs' arguments are informed by a discussion of the substance of defendant's invalidity claim, the court addresses the motions together.

#### 1. Law regarding the on-sale bar

Section 102(b) provides in relevant part that "[a] person shall be entitled to a patent unless . . . the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States[.]" 35 U.S.C. § 102(b). "The overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*,

516 F.3d 1361, 1365 (Fed. Cir. 2008) (citation omitted).  There are two prongs to

establishing an on-sale bar.  With respect to the first,

> an accused infringer must demonstrate by clear and convincing evidence that
> there was a definite sale or offer for sale of the claimed invention prior to the
> critical date.  Only an offer which rises to the level of a commercial offer for sale,
> one which the other party could make into a binding contract by simple
> acceptance (assuming consideration), constitutes an offer for sale under §
> 102(b).  In addition, to satisfy the on-sale bar, the subject matter of the sale or
> offer for sale must satisfy each limitation of the claim, though it may do so
> inherently.  Inherency, however, may not be established merely by probabilities
> or possibilities.

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, No. 2008-1167,

300 Fed. Appx. 904, 906-07, 2008 WL 4962687, *2 (Fed. Cir. Nov. 21, 2008) (internal

quotations and citations omitted).

In addition to public use, the invention must also be complete and "ready for

patenting" at the time the offer was made.  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67

(1998).

> An on sale bar determination requires that the claimed invention asserted to be
> on sale was operable, the complete invention claimed was embodied in or
> obvious in view of the device offered for sale, and the sale or offer was primarily
> for profit rather than for experimental purposes.[4 ]  Section 102(b) may create a
> bar to patentability either alone, if the device placed on sale is an anticipation of
> the later claimed invention or, in conjunction with 35 U.S.C. § 103 [ ], if the
> claimed invention would have been obvious from the on-sale device in
> conjunction with the prior art.

*Keystone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451-52 (Fed.

Cir. 1993) (internal quotations and citations omitted).  Whether a product was placed on

sale under 35 U.S.C. § 102(b) is a question of law based on underlying factual

---

[4]Evidence of experimental use may negate either prong.  *EZ Dock v. Schafer
Sys., Inc.*, 276 F.3d 1347, 1351 (Fed. Cir. 2002).

determinations. *Id.* at 1451.

### 2. Defendant's on-sale bar defense

Throughout the 1990s, plaintiffs offered consulting services to the insurance industry to make insurance claims processing more consistent and efficient. Such services included studying clients' claims operations and making recommendations to reduce inconsistencies in processing. Plaintiffs ultimately partnered with two companies, St. Paul Insurance ("St. Paul") and Reliance Insurance ("Reliance") to develop an automated system. Plaintiffs called the St. Paul projects "Salsa," "Claim Works" and "Astro" at different stages. The Reliance project was dubbed "Tango."[5]

It is defendant's position that these names all reflect a common project and sales or offers for sale of the same product, which today is referred to as "Claim Components." According to plaintiffs, "Salsa" and "Claim Works" were separate projects; "Salsa" was terminated in 1998 and "Claim Works," utilizing a new programming language, became the "Astro" project, which was also terminated. A **new** "Astro" project began in July 1998 which was extensively tested in the last few months of 1998. At the same time, project "Tango" was underway at Reliance. Testing was completed at Reliance in 1999, and this program became plaintiffs' Claim Components product. The '284 patent was filed thereafter.

Defendant's on-sale bar defense is premised on two allegedly invalidating acts: (1) plaintiffs' sale of its invention to St. Paul; and (2) plaintiffs' offer to sell its invention to Reliance, which later purchased an embodiment of the claimed invention. (D.I. 377 at

---

[5]Defendant asserts that the Tango project was also synonymous with "Task Assistant Claims System" and "Millennium Claims."

1) Defendant compares the disclosures of several key pre-bar date technical specification and design documents to the specification of the '284 patent in an effort to demonstrate that the product sold and offered for sale meets the limitations of the asserted claims of the '284 patent.

On April 27, 2009, plaintiffs served a supplemental response to defendant's interrogatory numbered 16, seeking the exact passages that plaintiffs contend describe and enable each limitation of the asserted claims of the '284 patent (as required by 35 U.S.C. § 112). (D.I. 362 at 3642-43) Plaintiffs provided two charts identifying "exemplary" support. (*Id.* at 3648 et seq.) Defendant has provided two of its own charts with its moving papers comparing the '284 patent specification to pre-bar date Accenture documentation. (D.I. 377, exs. A & B) Defendant compares, on a limitation-by-limitation basis, portions of the specification (with certain portions cited by plaintiffs as enabling) to disclosures in plaintiffs' documents.

The first document is a "Component Description" for "Project Tango," the project codename the Reliance project (hereinafter, "the Component Description paper"). (D.I. 362 at 4357 et seq.) There appears to be no cover page for this document filed with the court. Only parts of the paper appear to have been provided, and each portion has a different footer date, ranging from April 30, 1998 to July 30, 1998. (D.I. 362, exs. 85-97) File metadata cited by defendant reveals a creation date of April 30, 1998. (D.I. 377, ex. A at 26, n.1; D.I. 364, ex. 142) The Component Description paper provided definitions for several functionalities, including the "Event Processor/Task Engine"

functionality.[6]  (D.I. 362 at 4357)  Descriptions of the Claim Folder functionality and

User Interfaces are also cited.[7]  (*Id.* at 4376-78)

As detailed in defendant's exhibits, a large amount of text from the as-filed

specification appears **verbatim** in the Component Description paper.[8]  The Component

Description paper contains several, but not all, of the portions of enabling text for claims

1 and 8.[9]  The enabling text for the added requirements of dependent claims 2-4, 9-15,

18-20 and 22 is all contained verbatim in the Component Description paper.  There is

some correlation with respect to dependant claims 5, 6, 16 and 21, but some of the

cited portions of the '284 patent do not appear verbatim.

For dependant claim 17, defendant cites disclosures contained in two documents

outside of the Component Description paper.  The first is a portion of what appears to

be a presentation entitled "Leadership in Claims Workers Composition Simulation

Script."[10]  (D.I. 362 at 4143)  The second is another Project Tango document

---

[6]The date printed on the section describing the event processor/task engine is
April 30, 1998.  (D.I. 362 at 4357)

[7]The date printed on this section is April 29, 1998.  (D.I. 362 at 4376-78)

[8]The court incorporates defendant's exhibits by reference.  (D.I. 377, exs. A & B)

[9]With respect to claim 8, the primary difference is that the Components Paper
does not contain the text of the '284 specification corresponding to the flow chart at
Figure 13.  The same applies for claim 1, however there are additional enabling
portions of the '284 patent specification that are also not disclosed, relating to the
server components (222), claim tree feature in the Claim Folder window, the Task
Library Controller, and the Task Library component.

[10]The only date on this document is a footer noting October 27, 2009.  Defendant
lists the document as "undated" in its table of contents.  It appears as though the 2009
date may be the date the document was printed.

concerning "UI Design" (hereinafter, the "UI design paper").[11]  (*Id.* at 4379 et al.)

Defendant also provides a comparison of the '284 patent specification with the Component Description paper that goes beyond those portions of the '284 patent specification cited by plaintiffs as enabling the asserted claims.[12]  (D.I. 377, ex. B)  A substantial amount of text appears verbatim in both documents.

With respect to the actual offers for sale, defendant points to separate evidence. Specifically, defendant relies upon a series of contract documents between plaintiffs and St. Paul:  (1) a February 8, 1995 consulting services agreement (hereinafter, the "St. Paul CSA") (D.I. 362, ex. 70 at 4129-37); (2) a June 16, 1997 letter agreement modifying the St. Paul CSA (*Id.*, ex. 74 at 4190-98); and (3) a September 29, 1997 letter confirming the ongoing collaboration on "Claim Works" (*Id.* at 4199-4202).  (D.I. 377 at 8-10)  With respect to Reliance, the key document is a Power Point® presentation on the "Millennium Claims System Release 1 Business Case," titled for "Reliance Insurance Company" and dated February 19, 1998 (hereinafter, the "Reliance presentation").  (*Id.*, ex. 73 at 4156-89)

### 3. Plaintiff's motion to strike

Plaintiffs assert that they were "ambushed" by the foregoing on-sale bar theory.

---

[11]The cited portion of the UI Design paper corresponds to a description of the "Injury Window," "ICD-9 Search Window" and "Disability Management Window" functionalities.  (D.I. 362 at 4459)

[12]For claim 8, the corresponding portions are:  '284 patent col. 83:15-85:35; col. 103:59-105:63 (the Component Description presentation omits a paragraph corresponding to figure 13 in the patent); 105:64-107:17 (minus brief descriptions of Figs. 14 & 15).  Other citations are included as correlating text relating to dependant claims.

Plaintiffs argue that defendant's on-sale bar summary judgment motion makes "new arguments" and documents not identified in discovery. (D.I. 382 at 2)  The motion at bar comes on the heels of a contentious discovery process between the parties; the court intervened, on multiple occasions, to settle disputes related to production and privilege.  A brief history of the relevant discovery follows.

### a.  Discovery timeline

The scheduling order entered by the court on June 26, 2008 provided that fact discovery would close November 21, 2008 and expert discovery would be completed by September 26, 2009.  (D.I. 57)  Expert reports were due on September 17, 2009, opening claim construction briefs were due October 2, 2009, and summary judgment motions were due October 9, 2009.  (*Id.*)  On March 19, 2009, the parties entered a joint stipulation amending the scheduling order pushing back the final date for document production (June 10, 2009), the close of fact discovery (August 12, 2009), and the close of expert discovery (November 30, 2009).[13]  (D.I. 141)  A second amended schedule was approved by the court on December 4, 2009, designating additional time for rebuttal expert reports (through December 14, 2009) and motion practice (commencing December 16, 2009).[14]  (D.I. 338)

### b.  Defendant's identification of its defense

Early on in fact discovery, on May 24, 2008, plaintiffs served a set of contention

---

[13]The court executed this proposed order on March 23, 2009, as reflected on the docket.

[14]A review of the docket indicates that depositions have been noticed (by defendant) through February 2010.

13

interrogatories including Interrogatory numbered 3, as follows:

> For each claim of the '284 patent, state all facts and evidence supporting any contention by Guidewire that the claim is invalid, under 35 U.S.C. §§ 102, 103 and/or 112, including but not limited to the identification of all prior art to the '284 patent and an explanation of why such prior art anticipates and/or renders obvious the invention in the '284 patent.

(D.I. 383, ex. 1 at 6)  Defendant did not provide a contention relating to the on-sale bar

until its third supplemental response to plaintiffs' interrogatories, served September 24,

2009.  In that response, defendant stated the following:

> [E]ach of the claims of the '284 patent is invalid under 35 U.S.C. § 102(b) because the invention was in public use or on sale in the United States more than one year prior to the date of the application for patent in the United States. Specifically, each of the claims of the '284 patent was ready for patenting on or before May 4, 1998, because Accenture had both (1) reduced the invention to practice or had drafted an enabling disclosure as of that date and (2) sold or offered the invention for sale to the St. Paul Companies and/or to Reliance.

(D.I. 383, ex. 2 at 10)  This response was not further supplemented.

On October 16, 2009, defendant served a 238-page[15] amended expert report of

William Kuebler ("Kuebler") relating to defendant's invalidity defenses.  Under the

heading titled "Lack of Enablement by Specific Portions in Specification Identified by

Accenture in Reponse to Interrogatory No. 16," Kuebler stated:

> 59.  I have also been informed that Guidewire contends that Accenture fully reduced the invention claimed in the '284 patent to practice more than a year before Accenture filed its patent application.  I have been asked, however, to assume that Guidewire is shown to be *incorrect* in this assertion and to offer an opinion on [obviousness].

(D.I. 366, ex. 162 at 6717-18)

Kuebler provided a supplemental expert report on November 30, 2009 providing

_____

[15]Excluding appendices of exhibits and cited prior art.

14

details regarding the on-sale bar defense, including the identification of many (but not all) documents cited in defendant's summary judgment motion.  (D.I. 369, ex. 182)  The majority of the documents cited in Kuebler's November 30 report were produced on April 24, 2009; six were produced in November 2008, and three in June and July 2009.  (D.I. 383, ex. 4)  Plaintiffs assert, and defendant does not challenge, that an additional 41 documents were cited in defendant's summary judgment motion.  (D.I. 382 at 5)  Twenty-six of these were produced in November 2008; the remainder were produced between January and June 2009.  (D.I. 383, ex. 5)  Plaintiffs were granted until December 29, 2009 to serve their rebuttal report.  (D.I. 380)

### c. Discussion

It is plaintiffs' position that defendant breached its duty to amend its interrogatory response imposed by Fed. R. Civ. P. 26(e), reproduced below.

Supplementing Disclosures and Responses.

(1) In General.  A party who has made a disclosure under Rule 26(a)–or who has responded to an interrogatory, request for production, or request for admission– must supplement or correct its disclosure or response:

> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, **and** if the additional or corrective information has not **otherwise been made known** to the other parties during the discovery process or in writing; or

> (B) as ordered by the court.

(emphasis added)  Courts consider four factors in determining whether a party has breached its duty to amend a discovery response under Rule 26(e)(1):  (1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the party knew that the response was incomplete; and (4)

15

whether the corrective information was otherwise made known to the other party through the discovery process or in writing. *Tritek Tech., Inc. v. United States*, 63 Fed. Cl. 740, 746-47 (Ct. Cl. 2005). A focus in past disputes has been whether a party has provided adequate notice of its legal contentions and their corresponding evidentiary bases.[16] *See Boehringer Ingelheim Int'l GMBH v. Barr Labs. Inc.,* Civ. No. 05-700-SLR, 2008 WL 2756127, at *2 (D. Del. July 15, 2008).

In this case, the court does not find defendant's interrogatory response incomplete. Defendant identified its on-sale bar theory and specified the two customer sales that formed the basis for its theory. Defendant also stated that plaintiffs had "drafted an enabling disclosure" as of the on-sale bar date. These assertions form the core of defendant's motion. Plaintiffs generally requested all "facts and evidence" supporting defendant's theories; it is not clear that defendant was required to identify

---

[16]Violations of Rule 26(e) are addressed by Rule 37(c)(1) which provides, in pertinent part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

In determining whether a failure to disclose is harmless, courts consider such factors as: (1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; (4) the possibility of curing the prejudice; (5) the explanation for the failure to disclose; and (6) the presence of bad faith or willfulness in not disclosing the evidence (the "Pennypack factors"). *See Konstantopoulous v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977)).

every production document supporting its case (as it would do in pre-trial disclosures).[17]

Even if this level of detail is fairly within the scope of plaintiffs' contention interrogatory, Rule 26(e)(1) excludes parties from supplementing requests with information that has already been communicated to an adversary during the course of discovery. There is sufficient evidence of record that defendant identified the majority of the documents it now relies upon during the discovery process. For example, as plaintiffs acknowledge, nearly all of the documents cited in defendant's summary judgment brief were identified during depositions of plaintiffs' witnesses. (D.I. 383, ex. 5) This includes the Component Description presentation and the UI design paper.[18] The June 16, 1997 letter amendment to the St. Paul CSA and Reliance presentation were also marked as evidence.[19]

Additionally, defendant provides numerous email exchanges between counsel indicating that the documents relating to St. Paul and Reliance were the subject of discovery disputes; defendant did not conceal its intention to utilize those documents

---

[17]Although it is not relevant to whether defendant's responses were adequate in the first instance, the court notes that there is no indication that, by letter or otherwise, plaintiffs sought to compel more detailed responses from defendant between September 24, 2009 and the close of discovery.

[18]Admitted during the depositions of Jackowski (exhs. 11 & 20). The "Leadership in Claims Workers Compensation Simulation Script" does not appear to have been admitted in deposition, however, this relates only to one portion of dependant claim 17.

[19]Admitted during the depositions of Hoeschen (ex. 7) and Guyan (ex. 45), respectively. There is no indication that the actual St. Paul CSA or September 1997 letter were marked.

for its on-sale bar defense.[20] Further, at the November 4, 2009 discovery conference,
defendant reiterated that it was still seeking "some specific . . . contract documents
entered into between Accenture and Reliance . . . that also form the basis of our on-
sale bar defense." (Id., ex. P at 35:1-8) In view of the foregoing, the court is persuaded
that plaintiffs had notice of the specific documents upon which defendant now relies.[21]

The parties, having elected to extend the discovery schedule nearly to the
dispositive motions deadlines, encountered difficulties in deposing each other's experts.
During a telephone conference with the parties on January 12, 2010, the court
determined that no deposition testimony would be considered in connection with
summary judgment briefing. (D.I. 425, ex. U at 9:22-25) Plaintiffs were afforded
additional time to prepare a rebuttal to Kuebler's report, and were not otherwise
prejudiced in discovery.[22] Therefore, plaintiffs' motion to strike is denied and the court

---

[20]See, e.g., D.I. 425, ex. G (custodian was "the QA partner for both Reliance and
St. Paul and is therefore likely to have discoverable information about the on-sale bar
issues") (3/2/09); id., ex. H (requesting information regarding offers for sale of "Salsa,
Claim Works and Claim Components" prior to the critical date) (4/6/09); id., ex. I at 4
(requesting the "Requirements Engagement Letter" with Reliance "given its centrality to
our on-sale bar defense") (5/27/09)

[21]Defendant asserts that it was not obligated to limit its summary judgment
arguments to those documents cited in Kuebler's November 30th report, insofar as it
does not plan to introduce all of its on-sale bar evidence through Kuebler at trial. (D.I.
425 at 14-15) Defendant's ability to introduce evidence through Kuebler is, of course,
limited to information contained in his reports.

[22]Plaintiffs argue that defendant engaged in undue delay insofar as it had all the
relevant documents by July 2009. (D.I. 382 at 11) Defendant supplemented its
interrogatory response in September 2009. Absent additional information, for example,
the dates and the sizes of plaintiffs' document productions, the court has no basis upon
which to find unreasonable delay. Having pushed the discovery deadlines nearly to the
dispositive motion dates, both parties should have anticipated short periods in which to
prepare rebuttal cases. Neither party had any advantage in this regard.

18

turns now to the merits of defendant's motion for summary judgment.

### 4. Merits of defendant's motion

As indicated previously, defendant relies on different evidence with respect to the offer-for-sale and ready-for-patenting prongs of the on-sale bar inquiry. In its exhibits in support of its motion, defendant compares the text of the Component Description paper (a Reliance document) to that of the '284 specification to show that what was allegedly offered for sale was the invention (and ready for patenting at that time). With respect to the offer to Reliance itself, defendant relies on the Reliance presentation. This presentation does not contain the same detailed description as the '284 patent specification; rather, it is a typical business document summarizing the "Millennium Claims" technology, costs, savings, and the like.

It is defendant's position with respect to St. Paul that plaintiffs developed the claimed software (described in the Component Description presentation) while under contract with St. Paul. (D.I. 377 at 8 & ex. B) Defendant's focus is primarily on the Accenture–St. Paul relationship; less information is provided with respect to the "Salsa" and "Claim Works" projects. Defendant asserts that Claim Components was sold under the "Claim Works" name to St. Paul, but provides no significant comparison of "Claim Works" to the asserted claims. For this reason, defendant has not provided clear and convincing evidence that "Claim Works" met all of the limitations of an asserted claim. The court need not evaluate defendant's evidence with respect to whether an offer or a sale occurred.

Plaintiffs argue the following in opposition to defendant's motion: (1) the contracts with both clients were for consulting services only, not sales of software; (2)

19

the Reliance presentation was "mere marketing"; and (3) there are factual disputes regarding when the presentation was provided to Reliance. The first two of these arguments are far from convincing. Plaintiffs' counsel have (on multiple occasions) conceded that an embodiment of the '284 patent was sold to both companies. (D.I. 427, exs. A & B) Plaintiffs' own declarant characterized the presentation to Reliance as a "sales pitch."[23] (D.I. 423 at ¶ 18)

The critical date is May 4, 1998. Both parties debate the creation date for the critical Reliance documents based on available metadata. As noted previously, defendant provides documentation indicating that the Components Description paper was created on April 30, 1998, despite displaying a footer date of July 30, 1998 in some sections. (D.I. 364, ex. 142 at 5535) The Reliance presentation is dated February 19, 1998 on its face; plaintiffs assert that the metadata proves that the presentation was last modified on September 16, 1998. (D.I. 421, ex. 11) The same summary of metadata, however, shows a "createdate" of January 13, 1998 – before the critical date. (Id.) It is not clear what changes were made to either document, if any, from their creation dates onwards and on what date(s) any such changes were made. All that the

---

[23]The purpose of plaintiffs' consulting agreements were to co-develop software for each insurance company. Plaintiffs were paid for their efforts. A June 16, 1997 letter agreement between plaintiffs and St. Paul addressed the fruits of this collaboration: intellectual property rights belonged to plaintiffs, while "Claim Works" would belong to St. Paul. (D.I. 362, ex. 74) "Claim Works" development and integration were generally considered "deliverables" under this contract.

It is plaintiffs' position that it did not intend to be bound by the pitch to Reliance. (D.I. 423 at ¶ 18) Plaintiffs' intent is irrelevant under the contract laws; if a contract could have resulted from plaintiffs' offer, it may be the subject of the on-sale bar defense. See Lacks Industries, Inc., 2008 WL 4962687 at *2. The court need not issue a finding in this regard in view of other factual disputes of record.

20

court has (and perhaps the parties have) is the final version of both documents.[24]

Plaintiffs and Reliance entered into a consulting agreement in October 1998 that had an "effective date" of June 1, 1998. (D.I. 362, ex. 66) A subsequent "Work Order No. 1" pursuant to the consulting agreement provided for a "design phase" and "construction phase" concluding with the delivery of the "complete First Release system." (*Id.*, ex. 76) The details of this system are cited as contained in a "May 1998" document entitled "Reliance Millennium Claims Requirements Confirmation Final Deliverables" (*id.* at 4210), which document does not appear to be before the court.

According to the work order, the design of "Astro" commenced in April 1998. (*Id.* at 4218-19) All work on "Tango" was scheduled to commence after June 1998. (*Id.*) There is no clear indication that the "Astro" design existing prior to May 4, 1998 embodied all limitations of the asserted claims.

Based on the foregoing, the court concludes that defendant has not provided clear and convincing evidence of the sale (or offer for sale) of a complete, "ready for patenting" form of software embodying all limitations of the asserted claims prior to May 4, 1998. It is true that significant portions of the '284 patent specification were embodied in the Components Description paper prior to filing; presumably, that document was utilized in drafting the patent. It is not clear that the version of this paper before the court existed as of May 4, 1998. There is no indication that relevant portions of the paper were not added on July 30, 1998, or the "date last modified" according to

---

[24](*See* D.I. 427 at 11)

21

the metadata.[25]

Even if the document was not substantively modified after its creation, defendant's own exhibits indicate that certain portions of the specification relied upon by plaintiffs as enabling the asserted claims are not contained in the Components Description paper. On defendant's motion for summary judgment, it is appropriate to construe the lack of total overlap as additional support for plaintiffs' argument that the Components Description paper did not describe the "complete" invention prior to the critical date; the (albeit few) missing enabling portions of specification may have been added between May 4, 1998 and May 4, 1999.

In addition to the foregoing, defendant's argument suffers a fatal flaw. It is not sufficiently clear that the invention described in the Components Description paper was the subject of the Reliance presentation. The Reliance presentation is a business proposal, not a technical document. Defendant does not call out, and the court has not located, evidence demonstrating a link between the contents of the Components Description paper and plaintiffs' alleged offer for sale. If such a link exists, it should be established at trial; summary judgment is inappropriate on this record.

---

[25]What is good for the goose is good for the gander. If it did not consider either party's metadata, defendant's theory would fail due to the July 1998 date on the Component Description paper. Considering both parties' metadata leads to the inescapable conclusion that both documents at issue existed (in some form) prior to the critical date. In contrast to the Component Description paper, the Reliance presentation has a print date corresponding to a verifiable event. Notwithstanding, if defendant proceeds with its current theory at trial, defendant must prove that the version of the Reliance presentation before the court was given before the critical date, rendering the "modifydate" of September 16, 1998 meaningless. Evidence regarding metadata should in all cases be admitted through a computer technician, document custodian, or other witness able to lay the proper foundation for such information.

## B. Defendant's Motion for Partial Summary Judgment that Plaintiffs' Trade Secret Misappropriation Claim is Barred by the Applicable Statute of Limitations

### 1. Summary of defendant's argument

To prevail on a claim of trade secret misappropriation under Delaware Uniform

Trade Secrets Act (the "DUTSA"), a plaintiff must show the "[a]cquisition of a trade

secret of another by a person who knows or has reason to know that the trade secret

was acquired by improper means" or, alternatively, the "[d]isclosure or use of a trade

secret of another without express or implied consent" by a person who either: (1)

acquired the secret by improper means; (2) knew or had reason to know that their

knowledge of the trade secret was (A) derived by another who acquired it by improper

means, (B) "[a]cquired under circumstances giving rise to a duty to maintain its secrecy

or limit its use," or (C) acquired by accident or mistake. See 6 Del. C. § 2001(2). The

DUTSA provides that

> [a]n action for misappropriation must be brought within 3 years after the
> misappropriation is discovered or by the exercise of reasonable diligence should
> have been discovered. For the purposes of this section, a continuing
> misappropriation constitutes a single claim.

6 Del. C. § 2006. This is generally referred to as the "discovery rule."[26] Defendant

asserts that the discovery rule bars plaintiffs' trade secret misappropriation claim

because plaintiffs were on notice of every fact it ultimately alleged in support of their

claim (both in the original December 2007 complaint and in the amended complaints)

by August 2004. (D.I. 351 at 1)

---

[26]See, e.g., VLIW Technology, LLC v. Hewlett-Packard Co., Civ. No. 20069,
2005 WL 1089027, *13 (Del. Ch. May 4, 2005).

23

## 2. Overview of facts relevant to the instant motion

The following facts are taken from plaintiffs' papers and, therefore, are undisputed for purposes of the instant motion. Defendant was founded in 2001. At that time, plaintiffs were already selling Claim Components. (D.I. 402 at 4) Defendant was "much smaller in size and formed by a group of friends with zero insurance experience," yet it successfully underbid plaintiffs by over ten million dollars for a contract with CNA Insurance ("CNA") for its ClaimCenter product in May 2003. (*Id.* at 4, 17) This was "surprising and disappointing" to plaintiffs. (*Id.* at 4) Between 2000 and 2002, plaintiffs had worked with CNA and installed Claim Components on CNA computers for testing purposes. (D.I. 1 at ¶¶ 21-22)

Accenture partner Michael Costonis ("Costonis") "first took notice" of defendant in January 2004 when he read an article about it. (D.I. 402 at 4) Costonis reviewed defendant's website in August 2004, at which time he noticed similarities between plaintiffs' and defendant's products. (*Id.* at 2) Costonis also noticed similarities between the parties' marketing. The products had similar names. Additionally, "certain functional descriptions were similar, such as the descriptions for a 'claim folder' and elements surrounding 'task-based processing.'" (*Id.* at 5; D.I. 363, ex. 129 at 15-17) )

In early 2005, plaintiffs learned from a former employee (then working for Allstate Insurance Company) that, in his view, defendant copied plaintiffs' software. (*Id.* at 5; D.I. 363, ex. 129 at 22-25) In March 2006, Costonis had an email exchange with employee James Medin, who was formerly with CNA during the implementation of ClaimCenter, who "indicated that CNA provided its requirements to Guidewire." (*Id.* at

24

5; D.I. 363, ex. 129 at 26-29; D.I. 403 at ¶ 14)  The most "damning" information came in April 2006, when two of plaintiffs' employees received technical training from defendant as part of a joint engagement between the parties to implement ClaimCenter at Safeco Insurance ("Safeco").  (D.I. 402 at 6)  The two employees executed confidentiality agreements in connection with this training.  (D.I. 402 at 22-23)  Plaintiffs' employees received detailed technical information about ClaimCenter, which made its way to Costonis and to plaintiffs' legal department.  (D.I. 402 at 6)  Plaintiffs gleaned that "at least seventeen" of its trade secrets[27] were contained in defendant's User Guide for ClaimCenter. (*Id.*)

In its initial complaint, plaintiffs inferred (but did not allege) that defendant obtained its trade secrets through its dealings with CNA.[28]  (D.I. 75 at 12-13)  In its amended complaint, filed November 13, 2008, plaintiffs provided the following information:  (1) Michael Conroy ("Conroy") and Wayne Hoeschen ("Hoeschen") joined defendant's Board of Advisors in 2002; (2) Conroy and Hoeschen formerly worked for St. Paul and had significant involvement with the implementation of plaintiffs' Claim Components there; (3) CNA's former Chief Executive Officer, Dennis Chookaszian ("Chookaszian"), joined defendant's Board of Advisors around this time; (4) Chookaszian had overseen the development and implementation of Claim Components at CNA; (5) Conroy, Hoeschen and Chookaszian all possessed plaintiffs' confidential information; and (6) in 2003, after defendant won the CNA bid, CNA staffed the project

---

[27]Twenty are asserted in this suit.

[28]The court incorporates by reference its prior opinion discussing in detail plaintiffs' first iteration of its trade secret misappropriation theory.  (D.I. 75)

with the same CNA employees[29] who had been "intimately involved" with the

assessment by plaintiffs and who had access (under confidentiality agreements) to

plaintiffs' trade secrets. (D.I. 79 at ¶¶ 23-28) Plaintiffs averred that they did not know

whether CNA or former St. Paul employees "knowingly provided the Accenture Trade

Secrets to [defendant], whether [defendant] surreptitiously obtained this information

from those employees' files under false pretenses, or whether [defendant] in some

other way encouraged and enabled the improper disclosure to it." (Id. at ¶ 29) As of

December 2008, plaintiffs still did not know precisely how defendant learned its trade

secrets. Plaintiffs again averred that

> considering that Guidewire, a complete newcomer to the insurance market, was
> able to develop its product in approximately 28 months, compared to nearly a
> decade for Accenture's pioneering development, and considering that
> Guidewire's product . . . bears an uncanny similarity to Accenture's, it is
> reasonable to conclude that at least a significant portion of the Accenture trade
> secrets were improperly disclosed to, and used by, Guidewire.

(D.I. 92 at ¶ 29)

### 3. Discussion

It is clear to the court that plaintiffs possessed significantly more knowledge

about their trade secrets misappropriation claim than was disclosed in their initial

(December 2007) complaint. By their own admission, the most "damning" indications of

defendant's liability came in 2005 and 2006:  plaintiffs were notified by two separate

individuals that defendant had obtained its trade secrets; and plaintiffs obtained

---

[29]Richard Afferrit and Jerome Reynolds.

confidential[30] technical documentation about ClaimCenter. The question at bar is

whether there are sufficient undisputed facts in the record to compel the conclusion that

plaintiffs knew (or should have known) the factual bases for its claim on or before

December 17, 2004.[31] *See VLIW Tech., LLC.*, 2005 WL 1089027 at *13; *see also*

*Chasteen v. Unisia Jecs Corp.*, 216 F.3d 1212, 1218 (10th Cir. 2000) (question on

summary judgment is whether the undisputed material facts demonstrate that plaintiffs

had knowledge of sufficient facts from which a reasonable jury could infer that

defendant misappropriated plaintiffs' trade secrets) (discussing *Sokol Crystal Prods.,*

*Inc. v. DSC Comm's Corp.*, 15 F.3d 1427, 1430 (7th Cir. 1994) and *Intermedica, Inc. v.*

*Ventritex, Inc.*, 822 F. Supp. 634, 641-42 (N.D. Cal. 1993) in the summary judgment

context)).[32]

The record is nondispositive in this regard. At his deposition, Costonis stated

that, after reviewing defendant's website in August 2004, he perceived the names of the

parties' products (Claim Components and Claim Center Components) and the

---

[30]It appears that the two employees who received training from defendant executed confidentiality agreements in connection with that training. The type of technical information about ClaimCenter is analogous to the confidential technical information about Claim Components that, according to plaintiffs, constitutes their trade secrets at issue in this case. Ironically, then, plaintiffs may have only come into the possession of the facts sufficient to make their claim by misusing defendant's technical documentation.

[31]Plaintiffs were required to plead the "acquisition of [its] trade secret[s]" by defendant, who "kn[ew] or ha[d] reason to know that the trade secret was acquired by improper means." 6 Del. C. § 2001(2).

[32]The court looks to other decisions interpreting the UTSA for guidance. *See* 6 Del. C. § 2008 ("This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.").

27

"groupings of functionality" of plaintiffs' and defendant's products to be "nearly identical." (D.I. 363, ex. 129 at 14:10-16:17) Specifically, Costonis noticed that both products had claim folder functionality and similar "elements around task-based processing." (Id.) Costonis outlined these similarities at the time but "made no determination of how they came about." (Id. at 18:24-19:20) Costonis had no technical information available to him in 2004, only the information on defendant's website. (Id.) Plaintiffs have provided an archived web page of defendant's web site (for August 31, 2004) that provides only basic information regarding the "major components" of Claim Center.[33] (D.I. 414, ex. 11) Although plaintiffs admit that these similarities gave it "concern" that defendant had "copied much if not all" of its patent-pending inventions (D.I. 406 at 16, n.11); Costonis currently declares that the "high-level" similarities he perceived did not make him suspect trade secret misappropriation in August 2004. (D.I. 403 at ¶¶ 8-11)

Plaintiffs have also produced a document, entitled "Guidewire Software Competitor Profile," that supports its position. (D.I. 414, ex. 12) In this presentation, dated March 28, 2003, plaintiffs state that "[s]cant information exists on [defendant] or its main product, Claim Center." (Id. at ACN359001) Defendant has not argued that plaintiffs had, prior to 2006, a technical description of (or the software code for) Claim Center. Nor is it clear that, had plaintiffs investigated deeper in 2004, such information could have been obtained. (D.I. 351; D.I. 403) Rather, defendant avers that plaintiffs obtained its technical information only by breaching a non-disclosure agreement

---

[33]Defendant does not dispute the authenticity or content of this archived web page in its reply papers. (D.I. 428)

relating to the Safeco training. (D.I. 403 at 4)

The court finds the case similar in certain regards to *Veritas Operating Corporation v. Microsoft Corporation*, Civ. No. 06-0703, 2008 WL 474248 (W.D. Wash. Feb. 4, 2008),[34] also involving software products. In *Veritas*, persuasive evidence indicated that plaintiff did not receive the source code that would have allowed plaintiff to confirm its trade secret misappropriation concerns until the end of 2004. *Id.* at *10-11. Defendant agreed in its interrogatory responses that a line-by-line comparison of code was the appropriate way to flesh out plaintiff's misappropriation claim. *Id.* In denying defendant's summary judgment motion on statute of limitations grounds, the *Veritas* court noted that a specifications document, obtained by plaintiff in 1999, was insufficient evidence upon which to conclude that no issue of material fact existed with respect to when the statute of limitations period tolled in that case.[35] *Id.*

For similar reasons, the court is not persuaded at this time that plaintiffs had a reasonable opportunity to discover its cause of action until it reviewed defendant's comprehensive technical information in 2006. It has long been held that courts should not "apply statute of limitations law in a way that pressures litigants to file suits based merely on suspicions and fears." *See Sokol Crystal Prods.*, 15 F.3d at 1430 (citing *Intermedica*, 775 F. Supp. at 1266)). It is not sufficiently clear on this record that plaintiffs possessed (or could have possessed) more than concerns and suspicions in August 2004. *See id.* Whether plaintiffs could have discovered defendant's purported

[34]Applying the Washington Uniform Trade Secrets Act.

[35]Plaintiff argued that this technical document did not contain the entire framework for the final prototype of the software at issue. 2008 WL 474248 at *12.

29

misconduct prior to 2006 is a matter for the jury, should defendant decide to present it.

Summary judgment is denied.

### C. Defendant's Motion for Summary Judgment that the '284 and '111 Patents are Invalid Under 35 U.S.C. § 101

#### 1. Legal framework

Section 101 provides that patentable subject matter extends to "new and useful

process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101.

Defendant asserts that the '284 and '111 patents are not directed to patentable subject

matter as required by the Federal Circuit's *en banc* decision in *In re Bilski*, 545 F.3d 943

(Fed. Cir. 2008). The majority in *Bilski* found the Court's prior "useful, concrete and

tangible result" test for patentability no longer valid; the "machine-or-transformation test"

outlined by the Supreme Court is the appropriate inquiry. *Id.* at 959-60.[36] This test

provides that a process is patent-eligible under § 101 if:

> (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular
> article into a different state or thing. A claimed process involving a fundamental
> principle [such as an equation] that uses a particular machine or apparatus
> would not preempt uses of the principle that do not also use the specified

---

[36]   [A] process tied to a particular machine, or transforming or reducing a
particular article into a different state or thing, will generally produce a
"concrete" and "tangible" result as those terms were used in our prior
decisions. But while looking for "a useful, concrete and tangible result"
may in many instances provide useful indications of whether a claim is
drawn to a fundamental principle or a practical application of such a
principle, that inquiry is insufficient to determine whether a claim is
patent-eligible under § 101. And it was certainly never intended to
supplant the Supreme Court's test. Therefore, we also conclude that the
"useful, concrete and tangible result" inquiry is inadequate and reaffirm
that the machine-or-transformation test outlined by the Supreme Court is
the proper test to apply.

*Bilski*, 545 F.3d at 959-60.

> machine or apparatus in the manner claimed. And a claimed process that transforms a particular article to a specified different state or thing by applying a fundamental principle would not pre-empt the use of the principle to transform any other article, to transform the same article but in a manner not covered by the claim, or to do anything other than transform the specified article.

*Id.* at 954 (citing *Gottschalk v. Benson*, 409 U.S. 63, 70 (1972)). While it is not permissible to pre-empt the use of an intangible principle, an **application** of the principle may be patentable; the scope of the exclusion of others to practice or utilize the fundamental principle imparted by the claims must be examined. *Bilski*, 545 F.3d at 953 (citing *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)). Whether the asserted claims are invalid for failure to claim statutory subject matter is a question of law that may be informed by subsidiary factual issues. *See In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009) (citations omitted).

### 2. Discussion

The *Bilski* case has been granted certiori by the Supreme Court. *See Bilski v. Doll*, 129 S. Ct. 2735 (U.S. 2009). As reflected in its memorandum order of February 26, 2010 (D.I. 478), hereby incorporated by reference, the court has determined that defendant's motion raises significant issues regarding the invalidity of the '284 and '111 patents under *Bilski* and has denied defendant's motion without prejudice to renew after the Supreme Court issues its ruling.

The court noted in its memorandum order that the *Bilski* Court did not iterate "whether or when recitation of a computer suffices to tie a process claim to a particular machine," and noted that the distinctions between patentable and unpatentable software claims were not illuminated by the facts of that case. 545 F.3d at 962-63. The

31

court has stayed the present action until *Bilski* is reviewed, and denies defendant's

motion for summary judgment without prejudice to renew. The court briefly illuminates

several of its concerns regarding the patentability of the '111 and '284 patents under

the *Bilski* framework.[37]

## a. "Transformation" prong – both patents

The question at bar is whether the claims exclude others from the practice of a

concept, or whether the concepts therein contribute to the transformation of an article to

a specified different state or thing.[38] It is plaintiffs' position that the claims of the

asserted patents meet the "transformation" test because file notes and insurance claims

data represent "physical and tangible objects," such as "damages incurred to vehicles

and real property, and/or injuries sustained by people involved in an accident." (D.I.

397 at 11, 14, citing '111 patent, col. 3:35-41) The court disagrees. For example, the

'111 patent provides that a file note may contain "information" such as the cost of

automobile repair, hours worked, or the amount of medical expenses.[39] This is non-

tangible information, as is a general insurance "claim" (i.e., an assertion of a right to

---

[37]The parties did not devote significant attention to the § 101 issue. Although the court certainly appreciates concise briefing, the parties' short submissions did not, in the court's opinion, sufficiently address several issues necessary for disposition of the issue, as discussed *infra*. The court highlights some of these issues for the parties' benefit should defendant's motion be renewed.

[38]Software is subject to the same requirements as process and method claims. *Bilski*, 545 F.3d at 960, n.23. Defendant's motion is directed to the method claims of the '284 patent (claims 8, 9-21 and 22), the method claims of the '111 patent (claims 1, 2-8, 9 and 10-12), and the system claims of both patents (claims 1 and 2-8 of the '284 patent, and claim 13 of the '111 patent).

[39]Plaintiffs do not cite from the '284 patent specification. (D.I. 397 at 11-12)

32

recover).[40]  *Cf. In re Abele*, 684 F.2d 902 (C.C.P.A. 1982) (holding that a claim

providing for the electronic transformation of x-ray data, or data "clearly represent[ing]

physical and tangible objects," into a particular visual depiction on a display was

patentable) (cited by *Bilski*, 545 F.3d at 963).  Thus, even if a tangible visual "display" is

provided, that visual image would not represent any specific tangible objects (or type of

data).

### b. '111 patent – "machine" prong

It is plaintiffs' position that claims 1 and 9 of the '111 patent "contain significant

ties to computer components, specifically, databases and display devices."  (D.I. 397 at

at 13)  Because generating and storing file notes do not require a computer (i.e., they

can be processed manually), "[t]ying the claimed method[s] of generating file notes to

this specific sort of machine, and leaving open the ability of others to use different

machines or to continue to use paper file notes, therefore, minimizes the patent's

'preemptive footprint.'"  (*Id.* at 14)

Claim construction is an "important first step" in a section 101 analysis.  *Bilski*,

545 F.3d at 951.  In accordance with the parties' arguments, there are only a finite

number of claim terms that may signal that the invention of the '111 patent is tied to a

particular machine – in this context, a particular computer.  Claim 1 of the '111 patent

recites that the method is to be preformed in "a data processing system," and provides

a "claim database" for generated file notes.  Claim 9 provides for depictions on "a

---

[40]Black's Law Dictionary defines "claim" in several related manners:  "a cause of
action;" "to demand as one's own or as one's right;" and "means by or through which
claimant obtains possession of enjoyment of privilege or thing."  BLACK'S LAW
DICTIONARY 247 (West Publishing Co., 6th Ed. 1990).

display device" of "a claim folder screen" and "a file note screen;" a "searchable claim database" is provided for file note storage. Finally, claim 13 recites only a "claim database" as the storage means for that system.

The parties sought the court's assistance in the construction of a "claim folder," but did not seek construction of a "database," "a data processing system," "a display device," a claim folder "screen" or a file note "screen." By its memorandum order of the same date, the court has defined "claim folder" as used in the '284 patent claims as "an electronic analog of a physical [claims] folder."[41] Construing each of these terms as computer-related (in accordance with the invention),[42] these terms do not imply a specific computer having any particular programming – they are descriptive of a general computer system at best.

There appears to be only one portion of the '111 patent specification directed to a computer (a machine) having a specific program for generating file notes in accordance with the invention. See '111 patent, col. 6:15-44. The '111 patent discloses a data processing system comprising a memory, secondary storage device, central processing unit, input device and video display; the memory contains a program for automatically generating file notes. Id. The drafters state, however, that "[a]lthough the description may refer to terms commonly used in describing particular computer

---

[41]The other disputed terms of the '111 patent – suffix, short text, level of significance, free form notes, field, and terms reciting a "selection" of fields – do not appear to have any bearing on the § 101 analysis.

[42]Each of these terms has an ordinary definition applicable in a non-computer setting. For example, a "database" is generally "an organized body of related information." See http://www.websters-online-dictionary.org/definition/database.

systems, such as in a personal computer, the description and concepts equally apply to
other computer systems such as network computers, workstations, and mainframe
computers having architectures that may be different from the architecture shown in
Fig. 4." (*Id.* at col. 6:22-29)  If the architecture of the computer is of no import, it is
unclear how the claimed methods are drawn to a **specific** machine within the meaning
of *Bilski*.[43]  Put another way, the patent claims implicate the use of a machine, but a
machine does not impose any limit on the claimed methods themselves.  *See Every
Penny Counts, Inc. v. Bank of Am. Corp.*, Civ. No. 07-042, 2009 U.S. Dist. LEXIS
53626, *6 (M.D. Fla. May 27, 2009);[44] *see also Research Corp. Tech., Inc. v. Microsoft
Corp.*, Civ. No. 01-658, 2009 WL 2413623, *17 (D. Ariz. July 28, 2009) ("[T]he potential
for use on a machine is not the equivalent of being tied to a machine.").[45]  Claim 13 is

---

[43]In *Dealertrack Inc. v. Huber*, the District Court for the District of California held
a claim to a "computer-aided method" of managing a credit application invalid under §
101 for similar reasons.  657 F. Supp. 2d 1152 (N.D. Cal. July 7, 2009) (stating that the
patent did "not specify how the computer hardware and database are 'specially
programmed' to perform the steps claimed in the patent").  The *Dealertrack* court cited
in support several post-*Bilski* Board of Patent Appeals and Interferences decisions in
which claims directed to general or all-purpose computers (or processors) were held
insufficient; the court incorporates by reference that synopsis here.  *Id.* at 1155.

[44]The *Every Penny Counts* court found a claim to a system whereby consumers
could save and/or donate a portion of a credit or debit transaction invalid.  Claim 15
recited a system comprising a network, entry means, and computing means responsive
to particular types of data.  This was found insufficient under *Bilski*.  2009 U.S. Dist.
LEXIS 53626.

[45]The *Research Corporation Technologies* court invalidated (under *Bilski*) claims
directed to methods for halftoning images by utilizing a pixel-by-pixel comparison of the
image against a particular property.  The only component of the claims that could
require a "machine" was the pixel-by-pixel comparison; though cumbersome, such a
comparison could be done by hand, implicating a formula rather than a particular
machine.  2009 WL 2413623 at *12.

more deficient than the method claims. Claim 13 is drawn to a system for generating

file notes comprising several different "means" – none of which implicate software or a

particular program. A "claim database" is perhaps the only link between the claim and a

computer system. For the reasons described above, there is no indication that a

machine imposes any limitation on the claimed system.[46]

### c. '284 patent – "machine" prong

Claim 1 of the '284 patent is directed to a system for generating tasks;

this system is comprised of several components: an insurance transaction database

(comprising a claim folder); a task library database for storing rules for tasks to be

completed; a client component; and a server component (including an event processor,

a task engine and a task assistant). Claim 8 recites an automated method for

generating tasks to be performed in an insurance organization, comprising several

steps involving transmittal, determining and applying characteristics of the information

to rules; displaying the task on a "client component"; allowing a user to edit tasks; and

storing the information. Plaintiffs assert that claims 1 and 8 of the '284 patent contain

"substantial ties to specific components" insofar as they recite specific "databases,

client components, server components, specialized event processors, task engines,

and task assistants," the latter two being non-standard computer elements. (D.I. 397 at

6-7)

---

[46]Claim 13 is comparable to claim 1 of U.S. Patent No. 6,172,679, found invalid
by the court in *Fuzzysharp Techs. Inc. v. 3D Labs. Inc., Ltd.*, Civ. No. 07-5948, 2009
WL 4899215 (N.D. Cal. Dec. 11, 2009).

As discussed above, "[s]imply because the process at issue requires machines or computers to work [ ] does not mean that the process or system is a machine." *See Every Penny Counts, Inc.,* 2009 U.S. Dist. LEXIS 53626 at *6. In contrast to the '111 patent, the specification of the '284 patent contains a significant detailed description of a computer program for developing software for handling insurance-related tasks. Although the claims are interpreted against this backdrop, the invention is ultimately defined, of course, by the claims. It is unclear to the court whether (and how) the claims may be interpreted to define a particularly-programmed computer. As reflected in the court's contemporaneous claim construction memorandum, the court has defined "task engine" as "a feature that generates the tasks that need to be performed in response to an event." A "task assistant" is "a feature that stores the rules with which tasks are established." An "event processor" is "a feature that announces an event to the task engine." As with "claim folder," discussed *supra,* these features are electronic in nature, but do not implicate a particular machine. Although plaintiffs assert that other components (databases, client component, and server component) are important signals that claims 1 and 8 are tied to a machine, the court was not asked to define them. Notwithstanding, none of these terms imply a specific computer having any particular programming.

Without holding so expressly, it appears that claims 1 and 8 of the '284 patent may be valid if interpreted as claiming a particular machine (computer) programmed with the software so painstakingly described in the specification. The parties have not framed their arguments in this manner and, therefore, it is unclear to the court which (if

any) of the claim terms achieve this goal. It appears to be a possibility that such programming is implicit in the claims' recitation of particular "rules" – a term not presented to the court for construction.[47] Even were this to be the case, it is unclear whether the claims are framed in a manner implicating a particular computer programmed in this fashion. On its face, claim 1 of the '284 patent is very similar to the claim invalidated in *Every Penny Counts,* namely, it is a configuration of components that carries out a process. 2009 U.S. Dist. LEXIS 53626 at *3.

For the aforementioned reasons, it is not self evident that the patents are drawn to tangible inventions rather than to concepts, in violation of the "machine" prong of *Bilski.* The court may revisit the issue upon defendant's renewed motion should the Supreme Court validate the *Bilski* framework.

## D. Defendant's Motion For Summary Judgment that the '284 Patent is Invalid as Anticipated and/or Obvious

The court begins by reiterating that defendant has submitted over **9000** pages in support for its motions at bar; at least **5000** pages correspond to the instant motion.

---

[47]Plaintiffs analogize their claims to those in *In re Comiskey,* 554 F.3d 967 (Fed. Cir. 2009), wherein the Federal Circuit reviewed pending patent claims drawn to a method and system for mandatory arbitration involving legal documents, such as wills or contracts "requir[ing] resolution by binding arbitration of any challenge or complaint concerning any unilateral document . . .[or] contractual document." *Id.* at 970. The claims in that case recited the use of "module[s]," including a "registration module for enrolling a person" and an "arbitration module for requiring a complainant [or party] to submit a request for arbitration resolution to the mandatory arbitration system." *Id.* at 981. Utilizing a computer dictionary, the Court noted that "module" is typically defined as a "self-contained hardware or software component that interacts with a larger system." *Id.* (citation omitted). The Court found that, "under the broadest reasonable interpretation," the claims "could require the use of a machine as part of Comiskey's arbitration system"; the § 101 determination was ultimately left to the PTO. *Id.* It is unclear to the court whether the PTO has since found the claims patentable.

This record is clearly inconsistent with the lack of any disputed factual issues. The court certainly does not have the resources to examine all of the evidence at bar. Further, there is no practical way for a party to submit 9000, or even 5000, pages to a jury. Parties are expected to pare down their most persuasive evidence beyond that which occurred here.

Turning to the motion at bar, defendant asserts that the '284 patent is anticipated by any of three prior art systems: (1) the RiskMaster/Win system (claims 1-22); (2) the Pyramid system (claims 1-22); and (3) the Diamond system (claims 1-16 and 18-22). Defendant asserts that any one of these systems or combinations of these systems also render claims 1-22 of the '284 obvious.

Claims 1 and 8 of the '284 patent contain a large number of limitations. Defendant has grouped several limitations together conceptually and addresses its motion to: (1) the "claim folder limitations," or the claim folder and information therein decomposed into a policy level, claim level, and participant level; and (2) the "workflow limitations," or all those limitations collectively requiring (a) "detecting that an application event has taken place;" (b) "in response, sending a trigger;" (c) "identifying rules in a database of such rules;" (d) including the task on a list of tasks;" and (e) "transmitting the list of tasks to the claim handler's desktop (the client component)."[48]   (D.I. 357 at 8) Defendant briefly addresses other limitations and the limitations of the dependant claims.

---

[48] '284 patent col. 107:47-59 (claim 1) and col. 108:20-34 (claim 8).

This conflated approach precludes the demonstration of invalidity by clear and convincing evidence. That is, defendant's wholesale grouping of limitations does not allow for the requisite demonstration of the manner in which the elements of the asserted prior art systems are arranged.[49] *See NetMoney IN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1370 (Fed. Cir. 2008) ("[A]n anticipatory reference [must] show all of the limitations of the claims arranged or combined in the **same way** as recited in the claims, not merely in a particular order") (emphasis added). While plaintiffs' anticipation opposition correctly provides a limitation by limitation comparison, it, too, suffers from glaring deficiencies. Many of the alleged issues of material fact are, in reality, premised upon plaintiffs' attempt to read limitations from the specification into the claims – constructions that starkly contrast with those proffered during claim construction.[50] Neither do plaintiffs' alleged factual disputes find any basis in the court's claim construction.[51]

Notwithstanding the state of plaintiffs' opposition, defendant has failed to carry its burden to clearly or convincingly demonstrate anticipation (or obviousness) on the

---

[49]For example, with respect to the server components of claim 1, defendant fails to convincingly specify, and the court cannot glean from the record, whether Riskmaster/Win performs the task generation operations client-side or server-side. Accordingly, defendant has failed to identify in the Riskmaster/Win platform a "server component including an event processor, a task engine and a task assistant."

[50]*Compare* D.I. 418, Appedix C (plaintiffs' limitation-by-limitation chart illuminating its proffered issues of material fact) *with* D.I. 284 (joint proposed claim construction chart).

[51]This error also contaminates plaintiffs' obviousness analysis, which necessarily includes a comparison of the differences between the claimed invention and the prior art. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (U.S. 1966).

record at bar. The court denies defendant's motion without prejudice to renew. The accompanying claim construction order should clarify any remaining disputes. After the stay on proceedings has been lifted, the parties' briefing on a renewed motion shall be limited as directed by the court.

## E. Defendant's Motion for Summary Judgment that the '284 Patent is Invalid as Indefinite

Defendant asserts that the limitation "a plurality of levels from the group comprising a policy level, a claim level, a participant level and a line level. . ." is an improper *Markush* group rendering the '284 patent claims invalid. By its memorandum order of the same date, the court has rejected defendant's argument that "from the group" and "comprising" are inconsistent and construed the limitations appropriately.

Defendant also asserts that claim 6 of the '284 patent is invalid because there is no antecedent basis for "the characteristics" as recited therein ("wherein the characteristics are regulatory compliance requirements, account servicing commitments and best practices"). Defendant did not present this argument in connection with claim construction. The court, therefore, is not in a position to assign a particular meaning to "the characteristics," only to determine whether its meaning is reasonably ascertainable. *See, gen., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) ("Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite.") (citations omitted). The court answers this question in the affirmative. Notably, defendant has moved for summary judgment that claim 6 of the '284 patent is anticipated and obvious in view of the three prior art systems noted *supra*. Certainly

defendant's assertion that the claim can be (positively) contrasted with the prior art is at odds with the assertion that the bounds of the claim are indeterminable.

### F. Defendant's Motion for Summary Judgment that it Does Not Infringe the '111 Patent

The court's concurrent memorandum order regarding claim construction should narrow the disputes with respect to infringement of the '111 patent.  The court denies defendant's motion without prejudice at this time.  Upon lift of the stay, defendant may file a renewed motion directed to any remaining disputes.

## V. CONCLUSION

For the aforementioned reasons, the court denies without prejudice to renew defendant's motions that it does not infringe the '111 patent (D.I. 354) and that the '284 patent is invalid under §§ 102 and/or 103 (D.I. 356).  The remainder of the pending motions are denied.  An appropriate order shall issue.