IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ACCENTURE GLOBAL SERVICES, GmbH and ACCENTURE, LLP,, : CIVIL ACTION

Plaintiffs,

vs.

GUIDEWIRE SOFTWARE, INC.,

Defendant. : NO. 07-826 (SLR)

- - -

Wilmington, Delaware
Monday, November 17, 2008
4:32 o'clock, p.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, U.S.D.C.J.

- - -

APPEARANCES:

POTTER, ANDERSON & CORROON LLP
BY: DAVID E. MOORE, ESQ.

-and-

MORRISON & FOERSTER, LLP
BY: L. SCOTT OLIVER, ESQ. and
(Palo Alto, California)

Counsel for Plaintiffs

Valerie J. Gunning
Official Court Reporter

APPEARANCES (Continued):

MORRIS, NICHOLS, ARSHT & TUNNELL
BY: JACK B. BLUMENFELD, ESQ.

-and-

KEKER & VAN NEST LLP
BY: CLEMENT S. ROBERTS, ESQ. and
JOSEPH C. GRATZ, ESQ.
(San Francisco, California)

Counsel for Defendant

- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 4:32 p.m.)

THE COURT: Good afternoon.

(Counsel respond, "Good afternoon, your Honor.")

MR. MOORE: Just a few introductions, I guess. David Moore, from Potter Anderson, on behalf of plaintiffs, and in me is Scott Oliver, from Morrison & Foerster.

THE COURT: Good afternoon.

Mr. Blumenfeld?

MR. BLUMENFELD: Good afternoon, your Honor. I'm here for the defendant Guidewire with Clement Roberts and Joe Gratz, from Keker & Van Nest in San Francisco.

THE COURT: All right. You're here, so I take it there are things we need to discuss.

I generally start with counsel for plaintiffs, so we'll do so this evening.

MR. OLIVER: Thank you, your Honor.

Thankfully, I think there's only one real substantive dispute between the parties relating to discovery, and it relates to Guidewire's production of the design and development documentation that surrounds its software product.

By this Friday, Accenture will have produced about 75,000 documents. We have about 1500 still to go. We've produced e-mail, marketing materials, inventor notebooks, the whole communications with customers, et cetera.

Last week, Guidewire produced its current version of its source code. It has produced a smattering of financial documents, and this is about the extent right here (indicating), maybe half an inch thick, of the design and development documents that accompany the source code. We don't have any versions of historical Guidewire source code. We don't have, aside from these, any design, development, architectural documents. We don't have anything telling us who wrote the code, who led the teams that wrote each modules, which leaves us in a bit of a pickle for figuring out who we take in deposition.

We don't have anything about how Guidewire documented its product to its customers, and these are products that are built in conjunction with the customer, very sophisticated insurance companies dealing Guidewire, so it's not as if this is an off-the-shelf Microsoft Word program.

And this is critically important to us, because when we looked at the code that we got last week, there are 2.3 million lines in it. And while we have sophisticated

source code analysis consultants working with us, that is just a mammoth undertaking when you don't know what the code is meant to do, how it was developed, what each release changed, et cetera, et cetera.

Guidewire seems to take the position that those documents, the design and development and architectural documents, might be used to support our trade secret misappropriation claim. To that, I have two responses.

One, we filed our Amended Complaint and it does have trade secret claims, and I believe unless the Court dismisses those claims, those will remain in the case.

And, two, more fundamentally, I don't think that a party should be allowed to withhold relevant evidence, in this case, critical evidence to help us understand what the code does and how it was designed on the theory that it might later be used to go to a trade secret misappropriation or show infringement of another patent.

We need to start depositions in December or January to keep this case on schedule, so I would ask that the Court make it clear to Guidewire that these documents do need to be produced. The deadline is Friday. Obviously, that may not be feasible given the volume of documents that I expect are there, but we would ask for an order compelling production in the near term.

Thank you.

THE COURT: All right. Thank you.

Let's hear from counsel for defendant.

MR. ROBERTS: Good afternoon, your Honor. Not surprisingly, I see this very differently, so first let me address what it is we produced.

Counsel for Accenture said they produced 75,000 pages of documents. We produced over 800,000 pages of material. He held up a binder that I gave him this afternoon, to show examples of the kinds of documents we gave him and said that's all we've produced. I have some figures here, your Honor. We produced 180 megabytes of English language documents, about how it works. It's a complete set of the customer, architectural manuals, schematics. It talks about how the code fits together. It's almost 6,000 documents.

What he held up was, for example, like one chapter of a multi-hundred page document explaining how the code works and how it's put together.

We've given them a complete copy of the source code. He says he'd like other versions. I'm fine with that. What we had said to him was, here's the current version. Why don't you look at that and then tell us what other versions you want.

We have a source code system, your Honor, that we make a new version of the code every month. It's called

Agile Development. So what happens is, every month they created a new version.

This company has been around since, you know, for a very long time. We have hundreds of versions of the source code. We thought it prudent to start with one, since he mentioned it is quite big, and then they could tell us what other versions they wanted or from what time period.

He's talking about this in terms of trade secret. I will talk about this in terms of an electronic discovery issue.

What they had asked us to produce is they want all of the e-mails from every one on our customer service -- from everyone on our initial disclosure. They want a copy of the entire hard drives, the images of those hard drives. They want our entire file server system, the entire thing, and I just don't think that's reasonable.

We've collected that information to preserve it, but it literally, your Honor, it's over a terabyte of information at 16.4 million files.

Even if we were just to take the portion of that information, that e-mail, Microsoft office documents, things like that, which is about one-sixteenth of that terabyte, you're still talking just to review the files, not even production costs, over $6 million.

And you compare that with what we've done with them, which is we gave them key words, and we said, here are the key words we'd like you to search. And he said, well, by next week, they will have produced their e-mail.

We have not seen any production from the key words at all thus far. I believe him, that they'll get it to us, but the real point is they have not been willing to give us key words. What they want is everything, all documents, produced at all.

We gave them a set of key words. They said they were too burdensome. We narrowed them so that they are only producing 150,000 documents. That's about the total number that they said they were willing to produce. And at the same time, like I said, even if we're just talking about the Microsoft word documents and e-mails, you know, they're asking us to produce more than a million documents without regard to relevancy.

Your Honor said very well in the order that, you know, look, regardless of whether trade secrets are in the case, you can't just go on a fishing expedition. It has to be focused by relevance.

I've made several proposals. For example, I said, if you wanted, we will just produce the documents that are to and from CNA. You think there's an issue with CNA on the trade secret case, how about we limit this? We just

give you the CNA materials, anything sent to or from anyone at CNA and Guidewire.

No, not good enough. We don't know whether CNA gave you trade secrets or not. We need everything.

And so, really, I would put this in electronic version. If they give us key words, we're more than happy to search for them. I would request that we probably be limited to producing the same number, roughly, of documents that they are. But there's no way they can say that us asking them for more than 150,000 documents is unduly burdensome, and at the same time coming here today and say that we should be required to produce all design and development documents. It would be a multi-multi-multi-million dollars effort and it's not warranted.

THE COURT: And how many key words do you end up giving them or they ended up agreeing to search?

MR. ROBERTS: Thirty. And those key words were the names of the products, the inventors' names, a couple of key legal terms, like trade secret, a couple of key technical terms from the patent, like relational database and claim folder, and then relevant patent numbers and inventors' names, and that was it. And I have a list of the key words, if your Honor is interested in going out to that level.

THE COURT: All right. Thank you very much.

MR. OLIVER: Your Honor, can I briefly respond?

THE COURT: Yes, you can, although, before you do, let me just say that anyone who knows how I operate should realize that I expect reasonableness and compromise when it comes to this sort of discovery. And if, in fact, plaintiff has not been reasonable in at least its first step, then plaintiff will get nothing as opposed to everything.

So if, in fact, what you're asking for has no limits at all in terms of the amount of -- the quantum of documents that would be produced and has to be reviewed, then I would say you're on the unreasonable side of the dispute, and you have two choices. One is to go away with nothing. The other is to start cooperating and at least come up with a first step.

So you may respond, if you choose to, at this point.

MR. OLIVER: Thank you.

Just a couple of brief comments.

One, Mr. Roberts said that every month, they create a new version of the code. It's inconceivable that every month, there isn't some sort of documentation about that code. So that's when I say design and development documentation, I'm willing to give key words, but there has

to be a very substantial volume of design and development documents.

THE COURT: Well, I think that's not the point. The point is, there's such a volume, that when you ask for everything, it is burdensome. So I mean if they develop a new source code, this will be part of my lexicon now, Agile Development, new source code every month, and each source code is 2.3 million lines, and a million point one -- there are 2.1 million lines is the same as the month before and you have not even figured out what the relevant part of the source code is, and I'm saying that you are being extravagant and unreasonable.

I think the point is to -- even though this is the end of document production, prioritize what's most important to you, and let's take it one step at a time.

And if you have not tried to do that, then what I would suggest is I will leave you in the courtroom. I have given you an hour. I will leave you in the courtroom and you work out that first step and I will come back, and if you can't figure it out, I will give that to you. All right?

Now, I mean, if you want to tell me that you have made a reasonable effort to narrow the focus of your, or this is the first time you've heard that this is going to produce 16.4 million files, then I'm happy to listen to

you, but if you are not telling me that, then you're wasting my time.

MR. OLIVER: This is, your Honor, the first time I've heard it's going to cost $6 million.

Mr. Roberts --

THE COURT: No. That it would produce 16.4 million files, is what I wrote down. So go ahead and finish.

MR. OLIVER: I don't want 16.4 million files. I've asked Mr. Roberts to produce from his clients electronic documents, the PST files, the e-mail files, for the handful of employees who have e-mail predating 2005. The product was created, we understand, in about 2002.

I will take the raw PST files. I don't need somebody going through them. I don't need them produced in TIFF. I would take them just in native format. That should be an easy production.

THE COURT: And when you say the handful of employees, I mean you say that. Does everybody know who that is?

MR. OLIVER: Less than ten. Mr. Roberts has identified them for us.

THE COURT: All right.

MR. OLIVER: Primary custodians who have e-mail that predates 2005.

What I would propose is that we take those PST files, and based on our review of those, come up with a list of key words, and I'm happy to work with Guidewire about making sure that the volume from each key word doesn't turn out to be something on the order of a half million documents. I appreciate that neither of us wants to be reviewing that.

But as far as I've understood it, Guidewire hasn't been willing to produce those PST files, those e-mail archives to us, on the theory I understood, that they might reveal some trade secret issue. And so that is, I think, the central problem we have here, and if Guidewire is willing to produce those to us, we'll go through them. We'll do it speedily and we'll come back with a list of key words. I can probably come up with some key words today, but I think that would be a more informed list once we got an opportunity to review those PST files.

THE COURT: Well, let's hear from counsel for defendant.

MR. ROBERTS: So, your Honor, so this is a new electronic on-line company, and everything they do is over e-mail, and if you are asking for pre-2005 e-mails, right, there are lots of and lots and lots and lots of e-mails.

Now, I understand he says, hey, you can just

produce them to us and not review them, but I can't do that to my client. I mean, it's not limited by relevance. It's not limited by subject matter. If you would give me every e-mail sent or received by ten people, there were, I think, 16 custodians that he initially identified.

We've looked at those. We think there are over a million e-mails. So say give me a million e-mails and I will look at them, then I will come back and ask for more documents, that is not, I would say, a reasonable starting bargaining position.

We did not take that task with them. We gave them key words. They searched the key words. They said, hey, some of these key words are pulling up junk. Some of these have too many hits. Why don't you refine them and we'll try it again, and we did that. And if they were willing to do that same thing, I would be would be willing to do it, too. And I've made several proposals, like I said, for just producing e-mails to or from CNA. We gave them key words. You know, I'm not exactly sure -- you know, again, when it comes to burden, you have to look at the overall scope of production and saying give us a million e-mails off the top, you know, we'd have to review them. That would be expensive. And then we'll come back to you with a list of key words for you to search everything else. That just does not strike me as being within the spirit of

the rules.

THE COURT: All right. Mr. Oliver?

MR. OLIVER: Your Honor, one of the problems we have here is that I don't know what they may have called the project when it was first developed. I don't have the ability to frame key words without having more information.

For all I know, they called it Project Cessna, and if I say, I'd like documents about -- that say something about the design of claim folder, I will have no way to know that it was called Project Cessna.

I hear Mr. Roberts' concern about the PST files. It strikes me that we have a protective order. To the extent we're producing nonresponsive or irrelevant e-mails, that seems to be my problem more than his. It's easy to do a privilege screen.

THE COURT: Well, I think you are making a little light of the burdens here.

Have you asked for a 30(b)(6) deposition of the person most knowledgeable about product development so you could identify key words?

MR. OLIVER: While we have served deposition notices, we can't take any depositions until document discovery is over.

THE COURT: Well, except 30(b)(6) depositions. I didn't go back and check, but that's generally my standard

language, and the reason I do that is to address problems like you have, which you need a certain amount of information in order to come up with relevant language since we don't deal in concepts anymore, we deal in specific words.

When I hear, give me a million documents so I can figure out 30 key words so I can ask for more documents, that does strike me as being not the most efficient approach. It seems to me as though there should be, and I take it from the documents you have gotten, whether it's a small notebook or 800,000, I don't know where the truth is there, you have not come up with 30 key words that you think would be productive.

MR. OLIVER: It's an historical problem. I have current source code and I have what's currently this month given the customers. I don't know anything about what happened when the code was being written in 2002, 2003, 2004.

THE COURT: So what's the time frame you are talking about?

MR. OLIVER: 2002 to the present. And I understand that the code is rewritten, at least in part, every month. But it's my understanding that the development was begun in 2002 in conjunction with CNA.

Now, I hear Guidewire saying that they are

willing to give us all e-mails to and from CNA. I think that would be a logical starting point. Presumably, that means the e-mails that reference the CNA project as well, so we can understand how that first project came together. I think that would be useful.

I'm willing to do a 30(b)(6) on project development, but I'm concerned that I'm going to get someone who can't tell me that it was called Project Cessna or was responsible for only one module rather than the others and that we're going to go around in circles, 30(b)(6) productions.

I'm willing to tailor, or reduce the number of primary custodians for whom we would request the PST files. We intended the idea that they be produced in native format to make life easier for everyone, so that they don't have to be reviewed page by page. There can be a privilege screen, and then the entire native file is produced. We run through it. We look at it to the extent there are further key words that come out of that. We discuss that with opposing counsel.

But the goal here wasn't to have Guidewire look at umpteen million pages of e-mail, but to simplify the process, and that's why I've been saying since day one, we would like these pre-2005 e-mails produced in native format.

THE COURT: All right. Well, this is what we're going to do right now. We're going of to have defendant produce all the materials to and from CNA, e-mails, and then we're going to have defendant identify the one or two more people who have knowledge about product development in 2002 to the present and make them available within the next two weeks.

And if, during the course of that deposition, Mr. Oliver, you believe that this person actually has no relevant information, and that it has been a waste of your time, you call me on the phone and we will do something about it.

Unfortunately, because it's not my courtroom, I can't give you a follow-up date, but if you need a follow-up date, I will make myself available. I'm around during December, at least the first three weeks or so of December, and I will make sure that the document production moves forward so that the scheduling of the case does not have to be affected.

MR. OLIVER: Your Honor, could I request, in addition to e-mails to and from CNA, e-mails referencing CNA?

THE COURT: I would think that would make sense.

Is there any objection you would care to make to me about that?

MR. ROBERTS: No objection, your Honor.

THE COURT: All right.

MR. ROBERTS: I just would ask that if we're being ordered to do this, that when it come time to determine the total scope of our production and what our burdens are, that it be counted against, you know, whatever total amount of information we'll have to produce.

THE COURT: If you mean you can tell me and I will weigh it the next time someone comes, then that's certainly appropriate.

MR. ROBERTS: Thank you.

MR. OLIVER: Thank you, your Honor.

THE COURT: All right. All right. You have my blessing to call me up for a followup visit.

Is there anything else that we should address at this time?

MR. ROBERTS: Yes, your Honor. We have just one --

THE COURT: All right.

MR. ROBERTS: -- one set of requests, which is we'd like to request answers to a number of our interrogatories.

We still don't have infringement contentions. We don't have an answer on our interrogatory in conception, reduction to practice, patent licensing activity. We've

asked them, among other things, to specify the trade secrets that they contend be taken, and they've told us they can't do that.

We've given them our source code now. They should be able to, at a minimum, I mean, they should have been able to do it with the time they filed the lawsuit, but, at a minimum, they should be able to look at our source code and tell us what trade secrets they contend that we've taken out.

Also efforts to maintain secrecy of those trade secrets, the basis for the contention that the trade secrets have significant commercial value. We've sent them a bunch of interrogatory requests and they have basically not answered them.

MR. OLIVER: I understood actually that we had an agreement that since most of those responses are gated by what trade secrets are relevant, which, in turn is gated by analysis of Guidewire source code, that we would produce that information once we've had an opportunity to review the code.

I told Mr. Roberts I originally expected that would be a one to two-month effort to review the code. 2.3 million lines is substantially larger than I had expected, but I still think it's one to two months before we're able to narrow down the trade secrets to those that

are actually relevant and then respond about the commercial value and the economic reasonable efforts to maintain secrecy and the economic value of those trade secrets as well as contentions.

THE COURT: Well, can we say 30 days from the date you get all the materials referencing CNA? I mean, you now have source code, so that will be I'd say at least 30 days or so.

MR. OLIVER: Having just loaded up the source code for our consultants last Wednesday, I'm a bit concerned that 30 days may be overly ambitious. I would prefer to request 60 days.

THE COURT: Well, this is 30 days from the time you get the CNA -- I mean, is that going to be coming in, like, tomorrow? I don't know.

MR. ROBERTS: Your Honor, I would imagine we could produce it relatively quickly. We're going to have to review it. We'll throw a bunch of people at it.

I guess my point is, at the time -- that's part of the reason we moved to dismiss in the first place, which is at the time we you bring a trade secret claim, you're supposed to understand local Delaware law, this Court has also held, you are supposed to say what trade secrets the other party has misappropriated before you get discovery. We asked them to do that. They couldn't.

In order to keep things moving along and be reasonable, we produced the source code anyway. And what you've heard here today is we need to start from scratch, look all the way through the source code and then figure out what it is we think we've stolen, and we can't do that for a couple of months.

You know, I will address that on the second motion to dismiss if we bring one, but, at a minimum, they should be able to tell us what it is we misappropriated.

THE COURT: Thirty days.

Anything else?

MR. BLUMENFELD: Your Honor, on the second motion to dismiss, last week, Accenture filed an Amended Complaint with trade secrets claim, and we've discussed, before your Honor came in, a briefing schedule, motion briefing schedule.

We would move to dismiss, if we're going to, which I think we are, on December 19th, that Accenture would oppose on January 16th, that we would reply on January 27th. And just as long as we're here, I thought we'd get your Honor's blessing, if that seems okay?

THE COURT: Well, I mean, I, frankly, don't care how you brief it. When I will be able to address it with everything else I have going on remains to be seen. We'll

do our best. But don't hold your breath. All right?

MR. BLUMENFELD: Thank you, your Honor.

THE COURT: All right. Counsel, thank you very much.

(Counsel respond, "Thank you, your Honor.")

(Court recessed at 5:00 p.m.)

- - -