IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| ACCENTURE GLOBAL SERVICES GmbH, and ACCENTURE LLP, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| vs. | : | |
| GUIDEWIRE SOFTWARE, INC., | : | |
| Defendant. | : | NO. 07-826 (SLR) |

- - -

Wilmington, Delaware
Thursday, June 11, 2009
3:33 o'clock, p.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, U.S.D.C.J.

- - -

APPEARANCES:

POTTER, ANDERSON & CORROON
BY: DAVID E. MOORE, ESQ.

-and-

Valerie J. Gunning
Official Court Reporter

APPEARANCES (Continued):

MORRISON & FOERSTER LLP
BY: L. SCOTT OLIVER, ESQ.
(Palo Alto, California)

Counsel for Plaintiffs

MORRIS, NICHOLS, ARSHT & TUNNELL
BY: JACK B. BLUMENFELD, ESQ.

-and-

DURIE TANGRI PAGE LEMELEY ROBERTS & KENT
BY: DARALYN J. DURIE, ESQ. and
CLEMENT S. ROBERTS, ESQ.
(San Francisco, California)

Counsel for Defendant

\- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 3:33 p.m.)

MR. BLUMENFELD: Good afternoon.

THE COURT: Good afternoon.

I've got a jury out, so, obviously, if the jury comes back with questions or a verdict, this will be on hold.

All right. Mr. Blumenfeld?

MR. MOORE: Good afternoon, your Honor. On the defense seed, Jack Blumenfeld, Daralyn Durie and Robert from the Durie Tangri firm in San Francisco.

We have a number of issues today, and I understand the plaintiff has some also.

MR. MOORE: Good afternoon, your Honor. David Moore, from Potter Anderson, and with me is Scott Oliver, from Morrison & Foerster.

THE COURT: All right. Let's start with plaintiffs' issues.

MR. OLIVER: Thank you, your Honor.

We have whittled our issues down to one, which is Guidewire's refusal to produce its software product, called Policy Center.

Our requests sought the Guidewire insurance suite or document request. From that, Guidewire has produced only its Claim Center product. We understand that there are four products in there, one of which is Claim Center, one of which is Policy Center.

We had meet-and-confer discussions. Guidewire said it's too late in the case to produce Policy Center. We have recently learned, according to a developer at Guidewire, that the same fundamental software framework is in place for both Claim Center and Policy Center.

Given our patent claims in this case, we think it's at least reasonably likely that Policy Center is relevant and potentially infringing.

As to whether it's too late in the case, there has been essentially no technical deposition discovery take even of the Guidewire developers to date, so that would not require any reminding.

The financial and damages data overlaps significantly. And we simply don't see any reason why we shouldn't receive the product, do our analysis, and then be allowed to question the developers in depositions in July, early August.

THE COURT: All right. Thank you.

MR. OLIVER: That's all. Thank you.

MS. DURIE: Good afternoon, your Honor.

We requested that Accenture provide us with infringement contentions in this case last year in July. Prior to providing those infringement contentions, Accenture asked to take a 30(b)(6) deposition. We provided that witness in December of last year, and he testified at his deposition that Policy Center and Claim Center, the two -- the product presently at issue in the case, and the product that Accenture wishes to add to the case, in fact, share a common platform.

Not only that, but that information had been available on Guidewire's website, and in a press release, since February of last year.

And if I might approach, your Honor, I have a copy of the press release for the Court.

THE COURT: Truly, I don't need to see it.

MS. DURIE: It says, bill center shares a common platform with Guidewire's Claim Center and Policy's Center system.

We have been relying upon Accenture's infringement contentions, which were served in January of this year, following that 30(b)(6) deposition.

In the course of discovery, we have provided realms of documentation to Accenture, including in March of this year, information about both of the products that are at issue in the case.

Accenture has not sought to amend its infringement contentions or add any allegation in the case relating to this new product. We do think it is too late for Accenture to amend its infringement contentions and seek this additional discovery now.

We're two months from the close of discovery. It has been very difficult to schedule depositions in this case. We already have an impacted and congested schedule. It has taken months, literally, months to schedule the two depositions that we have been able to take in the case thus far.

And in light of this history, we do think it would be severely prejudicial at this point to add an entirely new product and set of issues into the case.

THE COURT: All right. Thank you.

MS. DURIE: Thank you.

THE COURT: All right. I guess the question is if all this -- if the information sharing the common platform has been available for months, why should, at the close of discovery, we insert another product into the mix?

MR. OLIVER: Your Honor, the information that we are -- that came to light recently was discovered as part of the preparation for Mr. Castonis' deposition.

THE COURT: I'm sorry. You need to speak up

just a little bit.

MR. OLIVER: Sure. The information that that we discovered recently was discovered as part of the preparation for Mr. Castonis' deposition, an Accenture employee. It was taken about a month ago.

I don't doubt that there were press releases out there saying that there was a common platform, but what I am specifically referring to is the developer's entry on a blog that the same framework powers all of the Guidewire products, the four Guidewire products, that make up the Insurance Suite.

As to whether it's prejudicial and too late, as I said, no -- strike that. Only one technical deposition has been taken of Guidewire developers. All of those remain to be taken, and asking them about two products instead of one, particularly if they share a common framework, or architecture, should be easy to do.

Number two, we would be happy to provide infringement contentions once we've received the product.

And if, in fact, the products do share a common framework, as Ms. Durie just stated, then it strikes me that the infringement contentions are likely to be substantially overlapping, if not entirely overlapping, for the two products.

It is two months until the close of discovery,

but I see no reason why we can't have the product, provide infringement contentions and then move forward with the depositions that would go to both of the products.

In addition, and, finally, we already have the entire document database from Guidewire, so this is not going to require any additional document discovery. The only thing we don't have is the source code for the Policy Center product.

THE COURT: So, basically, what you are asking for is the source code for this other product?

MR. OLIVER: Correct, your Honor.

THE COURT: Now, if, in fact, this case is consistent with most of my cases, where damages are bifurcated, and if, in fact, the infringement allegations are consistent because this product apparently shares a common platform, I guess my question is, what is there to be gained by including yet another product in an already dense case?

MR. OLIVER: Well, your Honor, to the extent that a second product also infringes the patents in this case, I think that is relevant and something we're entitled to conduct discovery on.

THE COURT: Well, if it's essentially the same product, it would be covered by an injunction anyway.

MR. OLIVER: Okay. I may not have been clear. That essentially the same product at its foundational level, at the engine level, not the same product at the, what you see on the computer screen level.

THE COURT: Well, I don't know enough about your patent to know where in the scheme of things your infringement allegations go to.

If it, in fact, goes to the common platform, then I'm not confident that adding something more complicated to the case is necessary, especially if damages are bifurcated. And if it's not in what they share in common, I'm not sure why you started out your presentation with, this should be included because they share something in common.

MR. OLIVER: Right.

THE COURT: So illuminate this for me.

MR. OLIVER: Our patent -- we have two patents in the case, the '284 and the '111. The '284 goes primarily to the engine that sits at the heart of the Claim Center product and we now understand the Policy Center product, although that patent also includes certain specific features that would be -- would appear to the screen displays.

The '111 patent goes purely to the screen displays, to the entry of notes into a file.

I don't know, based on the limited information

I have about Policy Center, whether it also would infringe the '111 patent, but it strikes me that it would enable us to tailor an injunction at the conclusion of this case far more effectively if we had the source code to the Policy Center product and were able to prevent, for instance, an infringing product from slipping out because we drafted the injunction based on the limited information we had only on the Claim Center product.

THE COURT: All right. Let's hear from defendant's counsel again.

And although this is coming late in the day, if we are talking about the production of source code before further technical depositions are taken or expert reports are done, aside from everyone's reluctance to give source code to a competitor, is there any real prejudice here?

MS. DURIE: There is, your Honor. It relates not only to our production of the source code, but to the fact that we would then need to obtain infringement contentions with respect to this new product and then tailor our defenses in the case accordingly.

Were it the case that infringement could be determined simply by reference to the fact that these two products share a common platform, then we would have infringement contentions presumably already. We don't. And

it is because notwithstanding that these two products are built on a common platform, they are different, and Accenture's theories of infringement, as a consequence, are going to be different. And this late in the game, we will be prejudiced in terms of our ability to put on a defense to that infringement case.

Now, Accenture indicated that they first learned that these products share a common platform and therefore that they might want to take discovery directed to this new product in preparing for Mr. Castonis' deposition.

Mr. Castonis is an Accenture employee. The blog entry that Accenture's counsel referenced was one of Mr. Castonis own documents that Accenture produced in connection with its document production leading up to that deposition. They had that document in their own files. It simply appears that they had not bothered to review it.

Similarly, Guidewire's witness, in December of last year, testified at his deposition to the information that Accenture says it was relying on, it's relying on in trying to add this new product in the case.

Last December, our witness explained.

The question was: "What do you mean, the platform.

"Answer: We divide are or teams into application teams and a platform team, and the platform team

develops tools and code that is used by all the applications as opposed to the application team, which produce application specific code, meaning specifically for Claim Center or Policy Center."

That is the only information that they are now claiming form the basis of their request, which although they style it as one to produce our source code, it is really a request that they be allowed to amend their infringement contentions now, after the date for amending interrogatory responses and supplementing initial disclosures in order to inject this new theory into the case.

THE COURT: All right. One last opportunity to respond.

MR. OLIVER: Your Honor, I would like to clarify the nature of the documents that we discussed in preparing for Mr. Castonis' deposition.

This is a Guidewire developer's blog entry that was, in fact, in Mr. Castonis files. I don't contest that. We've produced four-and-a-half million pages of documents, more than four-and-a-half million pages of documents in this case. It's true that we have not discovered that until we prepared for Mr. Castonis' deposition. But this is, nonetheless, a Guidewire developer talking about how the framework for the products works.

The coat from Mr. Branson's deposition that we just heard does not actually say as much. It simply says there is this common code and there is uncommon code that sits on top of it. It does not break down the distinction between whether there's a common framework that powers all of the software that Guidewire produces.

Again, I just don't see that there is any prejudice to producing the source company, allowing us to provide infringement contentions on it, and then take the depositions of the developers that we would be conducting regardless.

THE COURT: All right. Let me hang onto that issue for a minute.

MR. OLIVER: Thank you, your Honor.

THE COURT: All right. Let's go on to defendant's issues.

MS. DURIE: Your Honor, there are two issues that I'd like to address, and then I will turn it over to my partner, Mr. Roberts.

The first issue is one where I think it simply might be helpful to the parties to have guidance from the Court.

We had a deposition yesterday of one of the patent prosecutors in this case and asked him questions directed to events that took place during the prosecution.

In the course of that deposition, there was an assertion of work product privilege made to all of the thought processes of the prosecuting attorney.

When we inquired as to whether there was any anticipation of litigation at that time that might support an assertion of work product, counsel for Accenture took the position that they were not required to take a position as to whether there was an anticipation of litigation, but that, in fact, they believed there was not.

It is our view that unless an anticipation of litigation at the time, the work product privilege assertion should not apply. Attorney/client, of course, does not depend upon there being anticipation of litigation, but the work product privilege does.

And I thought that might simply be helpful to get the Court's guidance on that issue, because we are heading into further depositions where I expect the same issues may be raised.

THE COURT: Why don't you give me your second issue as well.

MS. DURIE: Sure.

The second issue, your Honor, has to do with an issue that came up at the last discovery conference. We had asked for documents relating to two individuals, Mr. Biscay and Mr. Nantern. Each of these individuals are senior

executives at Accenture. And while we thought that they might have discoverable information, we also recognized that they were very senior, and that it would not be appropriate to take those depositions unless they had unique knowledge. We did not want to take them simply on the basis of their level of seniority.

We asked for their documents in order to be able to evaluate the need to take their depositions and the Court ordered the production of those documents at the last discovery conference and set a date by which those documents should be produced.

Those documents have not been produced. Accenture's position is that it can't produce those documents because these individuals are resident in France and that there is French law that prohibits their production in the absence of going through the Hague Convention and certain procedures.

This is a new objection that Accenture did not raise at the time of the last discovery conference prior to the entry of the Court's order, and, indeed, it appears that Accenture made no effort to begin undertaking any of these procedures, which, as the Court well knows, can take some period of time, until after the Court entered its order.

Now, the Court has already ordered the

production of these documents, so we're not asking the Court to do anything further in that specific regard. However, our ability to make an individualized showing as to why we would like to depose these gentlemen has been hindered, to say the least, by the fact that we don't have the documents.

And so what I would request the Court is that we be permitted to take their depositions in order to determine what knowledge they have. Specifically, the issue on which we believe they will have knowledge has to do with the design of the functionality of Accenture's products in order to meet competition from Guidewire, and the extent to which there were deliberate efforts at Accenture to incorporate features of the Guidewire product that Accenture learned about through its review of Guidewire confidential information into Accenture's products.

THE COURT: All right. Thank you.

MS. DURIE: Thank you.

THE COURT: All right. Let's hear from Mr. Oliver.

MR. OLIVER: All right. Your Honor, first, with respect to the deposition of the patent prosecutor, that deposition was taken under a subpoena that issued out of the Northern District of Illinois. He's located in Chicago.

It strikes us, first, that this is an issue that should be brought before the courts in Illinois under a motion to compel. Notwithstanding that, we've done some research into the case law about whether work product attaches, and there is, in fact, a case in Illinois called Elkay Manufacturing versus Ebco, 1995 U.S. District Lexis 473, at 34 and 35, and it's just a one-sentence quote I would like to read. It says, because a, quote, patent is a complex legal document that occupies the central role in an infringement action, thus, it is reasonable to conclude that a patent application constitutes attorney work product that may contain the mental impressions of the attorney, close quotes.

And, in fact, as we know, that the '284 patent is, in fact, in litigation, so it is reasonable to follow the Elkay logic on that point. That's number one.

Number two, in fact, the patent prosecutor in this case testified that he, frankly, didn't have any memory of virtually anything, any of these mental impresses that Guidewire was attempting to obtain.

So, number one strikes us this should be an Illinois Court's issue.

Number two, there is apple case law supporting the idea that the patent application is work product.

And, number three, as a practical matter here,

it does not matter, because the patent prosecutor does not have necessity recollection of the events while he was drafting the patent. That is the issue as to '284.

Switching gears to the French blocking statute, this Court ordered that we produce documents from Mr. Nantern and Ms. Biscay on the 27th of April. We began investigating how we would collect those documents. Both of the gentlemen are locate based in Paris.

THE COURT: But they are employees of plaintiff?

MR. OLIVER: They're employees of plaintiff who are based in Paris.

We discovered that we could not simply obtain their hard drives, as we would with an American-based employee, that a French blocking statute gives employees substantial protections over data privacy issues and also overrules any American Court or other foreign Court orders commanding production.

So the procedure that one must follow in France to comply with the French blocking statute is to sign a Hague Convention request --

THE COURT: Then their depositions will have to be taken. I mean, it seems to me that when you are an employee of a plaintiff in an American Court, if you intend, as an employee, to rely on your rights under French law,

then you will have to be put to the trouble of coming or having your deposition taken to determine whether you have any relevant knowledge. I mean, this was supposed to be helpful, but, apparently, it's not.

MR. OLIVER: A couple of responses to that, your Honor.

Number one, the employees did not invoke their rights under French law. We simply had to comply with it.

THE COURT: Well, it does not matter why. All I'm saying is, the document was supposed to save them the trouble of being deposed.

MR. OLIVER: And the documents are actually being collected tomorrow and will be in our office Monday morning.

I grant that this did not happen by the 1st of June, as it was intended to. The Court had to sign two different orders because the French decided that the response period was too short on the first order, so we submitted a second order, which the Court signed on the 26th. And we're getting the documents tomorrow. Well, actually, the documents are being shipped from Paris tomorrow. Will, presumably, be in our office Monday morning.

THE COURT: So if you said that in the first

place, I wouldn't have had to say anything at all.

MR. OLIVER: My apologies, your Honor.

THE COURT: All right. I am a little confused about the deposition.

What kind of questions were being asked of this witness?

MR. OLIVER: As I was not there, I would defer to Ms. Durie on that.

THE COURT: All right.

MS. DURIE: Your Honor, I was not there either, but I have a copy of the transcript.

THE COURT: All right.

MS. DURIE: There were questions being made, for example, with respect to a particular amendment that were being made in the prosecution.

And the question asked, for example, why a particular amendment was made. So there was a particular claim amendment that was made, and the question that was asked was, why was that amendment made.

The objection that was interposed was a work product objection. And after an extremely lengthy colloquy on the record, counsel for Accenture stated as follows:

Our position is work that was done by brings -- Brinks Hofer were the prosecuting attorneys -- in this case, which is actually the patent applications, the work product,

unless the information is in a publicly available document that Mr. Richards can refer to the document, but otherwise work product.

And my colleague said, And your position is that it's attorney work product even if no litigation was contemplated?

Accenture's counsel responded, Patents are filed, you know, in that litigation some day. I'm not representing that litigation was anticipated as of the date of this particular document.

Now, it is true that in some circumstances, it may be the case that litigation is anticipated with respect to a particular patent application. And in that instance, the work product privilege may attach to the actions of the prosecuting attorney. But here, Accenture is not taking the position that there was any anticipation of litigation at the time that this patent prosecution activity took place.

THE COURT: And I take it this is in connection with claims of inequitable conduct?

MS. DURIE: Not only, your Honor. Also simply in connection with claims of invalidity and the relevance of prior art that was cited in the application, so it certainly has relevance to our inequitable conduct claims as well.

THE COURT: Well, in terms of invalidity, I find it really irrelevant. It does not matter whether a lawyer thinks prior art is material or not. It either is or it isn't, and it's not even relevant.

If there are pending claims of inequitable conduct and we're talking about intent to deceive, I suppose a lawyer's thought process into why the amendment was made --

MS. DURIE: There are. And let me be even more specific.

There is, for example, a particular piece of prior art in this case called Schreitmeuler.

It is, I believe, undisputed that Accenture was aware of the Shrietmeuler reference during the prosecution of the patent application and did not submit that reference to the examiner.

That reference was submitted later to the Patent and Trademark Office in connection with a re-examination request directed to the patent.

The Patent Office found a substantial request from the patentability with respect to the Schreitmeuler reference and granted the re-examination.

Now, in our view, that fairly conclusively answers the question as to the materiality of the Schreitmeuler reference and whether a reasonable examiner

would have found it to be material. It raises the question, then, why that reference was not provided by Accenture.

We know that Accenture knew about it, because the same attorneys were involved in prosecuting other patent applications where that reference was disclosed.

We want to be able to ask the prosecuting attorneys why it is that they made a decision not to provide the Schreitmeuler reference to the Patent and Trademark Office. Accenture's position, apparently, is that that is work product.

Now, my issue is less with the particular objections that were interposed in the deposition that was taken yesterday, because Accenture's counsel is correct, the witness apparently remembered absolutely nothing. However, we are going to be taking depositions of other individuals who were involved in the prosecution of this patent prosecution, and as I said, we were simply hoping to get guidance from the Court prior to those depositions to cut off any dispute.

THE COURT: And I don't know where these other depositions are going to be held, but what say you to the query about whether I should be the one giving guidance in this as opposed to the Court in the district in which the deposition was being taken pursuant to subpoena?

MS. DURIE: Federal law applies to the question

of whether there is a work product privilege in this instance, and it is Accenture's counsel who interpose this work product objection.

I think, at a minimum, it would be helpful for us to have guidance from this Court governing the conduct of counsel who are appearing before this Court with respect to this question of privilege.

If, thereafter, we are forced to go obtain relief from other Courts supervising depositions that may be taken in other jurisdictions, so be it.

THE COURT: I am not confident I have addressed this question before, although local counsel seems to recall better of all of my decisions than I do.

So have I addressed this before?

MR. BLUMENFELD: Not that I remember, your Honor, but the only thing I can add to what Ms. Durie said was that, of course, work product is controlled by the Federal Rules of Civil Procedure, and Rule 26, I think, says -- the heading of that section is Preparation For Trial, and it says, if a document is prepared in an anticipation of litigation or for trial, it's work product.

So when you are talking about patent prosecution, unless, as Ms. Durie said, there's contemplation of litigation during prosecution, which

happens sometimes, there really is no bases to invoke that federal rule.

THE COURT: All right. Mr. Oliver, aside from the one -- I mean, that strikes me as the better answer, more consistent with the way I always analyze work product, but I have to say, I have not analyzed this particular question.

And I don't know whether it would be helpful to have --

MS. DURIE: We would be happy, your Honor, to submit briefing to the Court on this issue.

THE COURT: And it does not even have to be briefing. It just has to be your best case.

MS. DURIE: Sure.

THE COURT: I mean, if this Northern District of Illinois case is your best case, then I'm happy to read it and have something opposed to it. But it strikes me that it is relevant information in the first instance, and the only question is whether it's protected from --

MR. OLIVER: Your Honor, there is one other case I'd like to bring to your attention, a Delaware case. Hercules versus Exxon, 434 F. Supp, 136.

THE COURT: That is a venerable case that you can use for countless propositions, but I'm happy to go back and see what it says about this one.

MR. OLIVER: I'd like to use it for this proposition, that work product has been held applicable to documents generated in anticipation of ex parte proceedings in the Patent Office and that a reasonable patent attorney always anticipates the possibility of future litigation involving the patent.

It is possible that during the ex-parte prosecution, certain memorandum or recordings, et cetera, prepared by the attorney may reflects concerns more relevant to future litigation than to the ongoing proceeding.

The problem, I think, your Honor, is that are not entirely consistent about how patent applications in the process of being prepared should be treated, whether work product protection attaches.

And I do have some concern about an order from this Court being applied in, say, Minnesota, where the next deposition will be taken, or Washington, Virginia, where the final deposition of the prosecutors will be taken. Given that there are such varying standards, I grant, of course, that it's a federal question, but different courts have set up different rules.

Nonetheless, I do agree with the language of the cases I've cited, that a reasonable patent attorney always anticipates that there's a possibility of litigation in the patent application that he or she has filed.

THE COURT: Well, given the fact that the Federal Circuit returns cases to me, on the few occasions where I've actually found inequitable conduct, the Federal Circuit has remanded because of the lack of direct evidence of intent to deceive.

So if you are telling me that actually you are not entitled to ask the questions that will get at that -- I mean, I think it is ironic if that is the ultimate result of this kind of a ruling, but it's an interesting question.

I don't know that it's appropriate for me to issue one of my memorandum orders when there isn't necessarily an issue in front of me, is the problem.

So unless you want to include in your two-page letter not only your best case about the substantive issue, but your you bet case about the procedure issue and whether anything I say in this court has any bearing on depositions taken in other courts, that would probably be the only way I could address it.

MS. DURIE: Understood, your Honor.

THE COURT: All right. And we are working -- I'm sorry. We are working on your pending motions and we hope to get them out by the end of the month, at the latest. So if you can get this to me in the next week or so, I will try to wrap everything up.

MS. DURIE: Thank you.

THE COURT: And take care take care of your case.

MR. OLIVER: Thank you, your Honor.

One final point. As a practical matter, these applications were drafted in the late 1990's. The Brinks Hofer deposition was yesterday.

Mark Richards didn't remember anything. It strikes me as exceedingly unlikely that any of the other prosecutors is going to remember anything from this time period. So, as a practical matter, I'm not sure that this is something on which we really should be investing this amount of time and effort. But, of course, if the Court wants a letter brief, we would be happy to provide it.

THE COURT: Well, I am talking about a two-page letter, one paragraph of your best case about one issue, one paragraph of with your best case about the other. So, hopefully, it is not going to take away from your efforts and resources.

MR. OLIVER: Happy to do so, your Honor. Thank you.

THE COURT: All right. There are still more issues?

MR. ROBERTS: Good afternoon, your Honor. Clem

Roberts, from Durie Tangri.

I'd like to talk very briefly about a couple of interrogatories. You are probably tired of hearing from me about interrogatories.

We were here last time, and your Honor gave us relief and ordered Accenture to answer several interrogatories, and I'm coming back because we feel that Accenture has not answered the interrogatories in the way that your order intended.

The first one is Interrogatory 3. That was, your Honor, we asked for two things. We asked which sales did you lose and why did you lose them.

They answered now by saying, we're contending we would have made all of your sales, and that we're not going to tell you why, but you can look at documents, including the following, and then listed some documents.

The first problem, your Honor, is, we don't think that these documents address all of our sales. They talk about some of them.

And, second, they've hedged their bets by saying at least the following.

So if they are generally content to contend that they would have made all of our sales and rely on those documents in there, that's fine, but then they should take out at least the following language.

And if what we really suspect is, that they're going to contend at trial and later something different, i.e., we would have made some of your sales and put in different evidence, then we would ask the Court to ask them to be more specific.

The other issue with this interrogatory, that some of the documents they relied on are documents that they had previously requested back from us on the grounds of privilege, so they produced these documents. They then said, oops, our mistake. Those documents are privileged. Please give them back to us. And then, in the interrogatory response, they said, we intend to rely on those documents to, you know, to answer this interrogatory.

And we would request a rule that the privilege is waived and the documents should be reproduced.

The next interrogatory, your Honor -- would you prefer to do these seriatim or all at once?

THE COURT: How many are there?

MR. ROBERTS: There are five, your Honor.

THE COURT: I think I need to hear them all at once.

MR. ROBERTS: Okay, your Honor. Thank you. I will try to be brief, though.

The next one is Interrogatory 9, and that one asked them why they contended that their trade secrets were

valuable.

If your Honor remembers, last time we specified we're not asking are for a valuation, we're just asking why it is you say these were the basis of customer demand or key features.

And, again, it's an open-ended problem. They said our investigation is ongoing, we direct you to at least the following documents.

These are documents or information that should be in their custody or control, not things they need discovery from us from. These are why their product is successful, and we would just request specificity.

The next is Interrogatory 14. This one asked about cumulativeness in two parts. It first asked, why do you contend, for example, Schreitmeuler is cumulative, what do you contend it's cumulative of. And why.

Again, it's an open-ended problem. They said at least the following documents render this cumulative.

THE COURT: I take it this is a prior art reference?

MR. ROBERTS: Yes. Ms. Durie was talking to you about Schreitmeuler as the prosecution reference that was not disclosed, and we said, well, why do you contend this is cumulative of things you did disclose? And they said, well, it's cumulative of at least document X and Y,

and then they said because, and they recited the legal standard for cumulativeness.

And so the most important issue is, like I said, figuring out what they said it was cumulative of and having certainty about that so we can ask the patent prosecutors, and they don't later come back and say, oh, we said it was cumulative of X and Y, but now we're going to say it's cumulative of B and Z and P and Q.

We also would like, if your Honor feels inclined, for them to sort of fairly tell us which elements they think are disclosed by Schreitmeuler. You know, which letters they think are disclosed by these prior art references that they did not disclose.

The next is Interrogatory --

THE COURT: You are asking them to disclose which elements are disclosed by the prior art references they didn't disclose?

MR. ROBERTS: Yes. The irony here is actually in their position, your Honor, which is they are contending that Schreitmeuler is cumulative of other prior art, because Schreitmeuler, they say, everything in Schreitmeuler is disclosed by prior art, we did disclose.

So the distinguishing feature of the patent, your Honor, in the notice of allowance, is the structure of the claim folder. And the examiner in the re-exam request

found that Schreitmeuler contained the precise structure that was the reason for allowance. And they are now claiming that that structure, presumably, would not have been material to the examiner, because it was already disclosed in references they had submitted to the examiner.

And that is somewhat circular, because if it had been disclosed in the references they submitted to the examiner, the patent would never have issued, because then it wouldn't have been a distinguishable feature of the prior art. So there is a loop there, but I think the loop lies in their position, not ours.

The next one is Interrogatory 20, your Honor. This, we asked who they had offered the products for sale to. Who did you offer these products for sale to and to whom did you present the product to.

They gave us names of people they made presentations to and people they discussed with, but they did not say anything about offers. They didn't say, here's who we offered it to, and they did not say, there were no offers. Either one of those positions is fine. We would just like to know the offers.

Their answer also said, well, one of the presentations we made was to a third party. That third party is someone we have a confidentiality agreement with,

and so we're not going to tell you who it is.

And our position, your Honor, is that private contractual confidentiality agreements do not trump the Federal Rules of Civil Procedure, especially where we have a protective order in place, and they should be required to tell us who this party is that they made a presentation to.

The last issue here, your Honor, is, they gave us this answer on June 1st and they listed a whole bunch of other companies, and we would like to give them a new set of key words. We have proposed a new set of key words that are specifically directed just to these companies and just to the time period prior to the critical date.

So prior to '99, where they have very few documents, if they would please search for just the names of the companies that they gave us on June 1.

And we have not had a response from them on that.

And then, your Honor, there are two other issues. One is Interrogatory 21. We asked for their contention about why the systems they presented to these companies did not meet the claims of the asserted patents.

This is an on-sale bar issue. If they offered the product for sale to these companies, their next defense is going to be, well, what we offered didn't meet the claims

and, therefore, it's not on sale more than a year prior to the application date.

They cited, in response, only a single two-page document. They relied on 33(d), cited a two-page document that they have not produced to us. And, again, fine. If that's what they want to rely on and that's all they're going to rely on, that's fine. But this strikes us, again, as information within their control, and that the application should be complete.

And then, finally, for the interrogatory, your Honor, is Interrogatory 24. And this asked them to identify the systems that they contend infringe the patent. There are a dozen or more competitors in this space, and this is going to be a case where the availability of noninfringing alternatives, if your Honor allows damages into the case. If you are going to bifurcate it, then I will drop this one, because it really is going to have to do with the availability of noninfringing alternatives. So perhaps I will, with that, I will submit on the interrogatories and let Mr. Robertson respond.

THE COURT: All right. I have basically decided, although I still have not gotten my new scheduling order out -- that should go out today or tomorrow -- to bifurcate damages in virtually all cases, and I'm going to start bifurcating discovery on damages with the help of

the Magistrate Judges, to get what damages information you need for settlement and perhaps for secondary consideration of obviousness.

In any event, so to the extent that any of these discovery problems have to do with damages, it could be that we should cut our losses and not deal with that anymore, although it's late in the game and we need to play fair.

So with respect to that last one, I suspect that --

MR. BLUMENFELD: The first one also.

THE COURT: The first one as well?

MR. BLUMENFELD: For your clarification, your Honor, at least the times we've been on the phone with you, it has been damages and willfulness going together.

THE COURT: Yes. Yes. Damages and wilfulness.

So to the extent any of these have to do with damages, it seems to me as though, in an effort to focus the case and get it to trial on a timely basis, that we should set aside damages and willfulness right now.

Having said that, let's hear from Mr. Oliver.

MR. OLIVER: Okay. I believe I heard Mr. Roberts already agree that Interrogatory 24, the last one he discussed, was poorly focused on damages, and that Interrogatory 3, the first one he discussed, was also

focused on damages. I would agree with that, and so I would like to defer those to a later damages discovery phase.

That takes us, then, in order, in Mr. Roberts' order, to Interrogatory 9, which goes to commercial value for the trade secrets.

As I understood the complaint, and, frankly, this is the first time I've heard it, but as I understood it, it's that we said at least the following documents. I'm happy to remove, at least. Obviously, if we discover more information, we would supplement or otherwise make it known, but these are the documents that we're aware of now. So I'm happy to do that.

Then, Interrogatory 14, which is the cumulativeness interrogatory. I have a little trouble -- let me start first with, again, there was a complaint that we said, at least.

Again, I'm happy to remove at least from the interrogatory.

It appeared that there were other complaints here about which elements were or were not disclosed. It struck me that, as I heard the argument, it seemed to go to the merits of our position, whether, for instance, Shrietmeuler was cumulative or not. And, obviously, the parties are going to disagree with that.

This is a contention interrogatory. We contend that, for instance, the '990 patent is cumulative of the '522, the '169 and '515. That, to my mind, is what Guidewire is asking what our contention is, and we've provided our contention.

So it's not clear to me what else we would do that does not involve arguing about the merits here.

That, then, takes us to interrogatory 20 and 21, which are the, as Mr. Roberts characterized it, the on-sale bar interrogatories. And the problem lies in how he characterized the interrogatory, or both interrogatories, actually.

He described it as, paraphrasing, I want to know who you, Accenture, offered to sell or sold the product to. But that's not what the interrogatories ask. They talk about, identify all customers to whom Accenture offered to sell, et cetera, et cetera, its claims handling product and/or technology prior to May 1998.

Accenture was in the insurance business for decades before the patent application was filed, and so it had claims handling ideas, consulting technology, services, none of which was the product, the CCS software product that is at issue in this case and that is the subject of the patent.

So we have a bit of a -- I don't know if it's a chicken and an egg problem, but there are lots of people to whom Accenture spoke during the 1990's about, among other things in the insurance business, how to improve their claims process. That, though, was not an offer to sell the product that later became the subject of the patent and later of this case.

And so what we've tried to do, responding to the interrogatory, is to point out, number one, that the interrogatory is vague, but, nonetheless, here is a comprehensive list of all the folks to whom we talked in the 1990's about insurance issues among the claims.

So it's difficult for me to see how we would go about -- it's difficult for me to see why we should now have to, on top of the four-and-a-half million pages we have already produced, go back and run another list of keywords with every company we ever talked to, and undoubtedly there are going to be documents that would be responsive to the keywords because, by definition, we talked to these companies about their insurance problems in the 1990's.

That is the first and the second issue. The definition, the products versus claims handing products and/or technology. And that's also the keyword issue.

The third point that Mr. Roberts had was that

there is an undisclosed party.

We do have a contractual obligation not to disclose even in litigation the name of this party until it has given us its approval. We have contacted that company and are in the process of getting its approval to disclose its name. And as I've told Guidewire in correspondence, as soon as we have that approval, we will identify the company.

And my final point was Interrogatory 21 goes to the product, and it's the same problem as we saw in Interrogatory No. 20.

THE COURT: All right. Mr. Roberts?

MR. ROBERTS: Very briefly.

The reason we said the product is because this product had a dozen different names, and every time I say, well, the Astro Salso Tango Claim Center Financial Works product, they say, oh, you know, at that time, it was known as the Consulting Project For Reliance. So there's a core group.

What Accenture's business model is, is they take this core piece of technology, this core idea. And the reason it's called now claims component is because they take it and then they modify it for a new customer. So it changes, it's mutates every single time.

What we need to do is figure out for which of

these proffered implementations of the technology, for lack of a better word, which of them constituted an offer to sell technology that included the limitations of the claim of the patent.

Now, Mr. Oliver said, well, they did not, none of them did, but we shouldn't have to take his word for that. The reason we asked broadly is, fine. Tell us what the companies that you presented this technology to are and let's then do a limited document search.

Now, Mr. Oliver says, oh, it would be burdensome. We have, I think, your Honor, if I'm current, less than 300 documents that they produced prior to 2000. There are very few documents from this period, because the servers that they had at that time did not exist. They got changed in 2003. They went from a Lotus Notes system to a Microsoft system. And they have no -- virtually nothing from prior to 2003.

So I don't think it would be a large number of documents, but if it turns out to be a very large number of documents, I am perfectly happy to negotiate with him and try to pare it down to a smaller number of documents. We did this very effectively in the first instance in discovery.

Mr. Oliver's, you know, other point, I think, was about the interrogatory asking for cumulativeness, and

he said, well, this is our contention, our contention is that it's cumulative.

Let me be more specific. The distinguishing feature of the product in the application, the reason it was allowed was because it had a claim folder decomposed into a plurality of levels. The examiner said, everything else in here is shown in the prior art. This is the one thing that makes it new. It decomposed into a plurality of levels.

Schreitmeuler shows a claim folder decomposed into a plurality of levels. We submitted it to the PTO as part of a re-exam request, and the PTO said, yes. It appears to show a claim folder broken down into a plurality of levels. Therefore, a substantial new question, granted re-exam.

Now we understand Accenture to be saying, well, everything in Schreitmeuler, presumably including this claim folder broken down into a plurality of levels, was already in front of the PTO.

The examiner already had the claim folder broken down into a plurality of levels in front of him.

THE COURT: Isn't it more productive, because the way you described this, I mean, is it possible, if, in fact, we're focused on this one element, is it possible to ask the question, where else do you find -- all right.

Unfortunately, I need to take a break and I will need to get my lawyers.

I will be back.

(Short recess taken.)

- - -

(Proceedings resumed after the short recess.)

THE COURT: My civil attorneys, my question was -- you don't need to stand up. Me question was whether, if the focus of the dispute is on the structure of the claim holder, whether the more focused, easier question -- you can stay there -- is whether any of the other prior art references disclose that. I mean, I'm not sure.

MR. ROBERTS: Your Honor, we don't want claim charts from them. All we want is very simple. For this reference, we contend that these limitations are disclosed. One, two, three. For this reference, we contend that these limitations are disclosed by one, two, three.

We don't think it will take much time. It's just saying -- so, for example, they say Schreitmeuler is cumulative of A, B and C. Which one of those three had the claim folder, which one of those three had the engine it?

He's simply telling us these limitations are disclosed by this prior art and those limitations are disclosed by that piece of prior art. It should not take more than 10 or 20 minutes.

THE COURT: Famous last words.

MR. OLIVER: Your Honor, could I respond to that?

THE COURT: Yes.

MR. OLIVER: If what I'm hearing is that the claim folder is really the focus here, I don't know why we don't get an interrogatory that says, tell us where the claim folder decomposed into the plurality of levels is. That's manageable. I can answer that.

THE COURT: All right. Think about that, because that was my question.

(Short recess taken.)

\- - -

(Proceedings resumed after the short recess.)

THE COURT: So the question really is, if the focus of the re-exam and the cumulativeness is this one element, one limitation, that it seems to me that should be the focus of your inquiry as well.

MR. ROBERTS: That's fine, your Honor. If they will agree to do that for this interrogatory, we would be happy to accept that and answer. You know, given the shortness of discovery, propounding a different interrogatory, waiting for days, might be difficult.

THE COURT: All right.

MR. OLIVER: Your Honor --

THE COURT: Yes?

MR. OLIVER: -- if I may, it seems to me that the same logic should go to the same claim product technology interrogatory.

If what's really being asked is to whom did you offer to sell the technology, the technology that became embodied in the '284 patent, why wouldn't we simply respond as to the technology embodied in the '284 patent?

The list we provided was not the folks to whom we said we have this nifty thing that's going to be embodied in the '284 patent. It's a list of everybody we talked to, about their insurance operations during the 1990's. Inevitably, that touched on claims, but not all of them by a long shot were offered the nifty '284 technology.

So it would be a manageable task to say which subset of these actually -- which subset did we actually discuss? The technology that became embodied in the '284 patent versus which subset did you just talk to about claims in general. Hiring more claim adjustors, et cetera, et cetera.

That would be my proposal to resolve the dispute we have over 20 and 21.

MR. ROBERTS: That would be fine with us, your Honor. I think that's what we were after in the first

place.

THE COURT: All right. All right. So those two issues are resolved.

How about Interrogatory 9, with the elimination of the "at least" language? Are we okay with that at this point?

MR. ROBERTS: Yes, your Honor.

THE COURT: With an agreement to supplement. All right.

So, really, we're going to have followup on the deposition issue.

I think the only issue left for me to resolve was the one we started with, which is whether, at this stage of the game, it makes sense to bring into the case a new product.

And I guess I have one final series of questions for plaintiffs' counsel, and that is, with two months left to fact discovery, and with the need for the production, the review by your expert, or whoever is reviewing the source code for you, and the need to amend your infringement contentions and the need for followup on that, how is it that you -- and the need to have depositions start after that, how is it that you plan to get all of that done without prejudice to the defendant and its need to defend against a new product, a new contention?

MR. OLIVER: If we got the source code today -- and, of course, I don't mean today, but soon, I would endeavor to have my experts work around the clock. That's what we are paying them for, after all.

And I imagine that two weeks would be enough. I would shoot for two weeks and say three weeks at the outside, in order to come up with full infringement contentions on the new product.

(Short recess taken.)

- - -

(Proceedings resumed after the short recess.)

MR. OLIVER: So, your Honor, I would be prepared to commit to providing infringement contentions by, say, July 1st, at the latest. After that, we would schedule depositions of the developers. There are certainly plenty of other witnesses with whom we can occupy our time in the interim: Patent prosecutors, sales, marketing, et cetera, et cetera.

THE COURT: And when is fact discovery done?

MR. OLIVER: August 12th, I believe.

MR. ROBERTS: I believe that's right, your Honor.

THE COURT: All right. Let me hear one more time from -- I mean, on the one hand, if this can be done, it does make sense to accomplish as much as you can in one

litigation. So with a deadline, it seems to me that if plaintiff can't make that deadline, then perhaps you don't go forward with that.

MS. DURIE: Your Honor, this is information that they have had at their disposal. It could have been introduced into this case from the beginning. Certainly, at the time they initially served their infringement contentions, when they had the deposition testimony of our witness, who we gave them for this purpose.

Now, here's the practical problem. We get infringement contentions, revised infringement contentions, July 1. We have to sit down now and analyze them. We then have to serve subpoenas or deposition notices on the witnesses that we want to ask questions about.

It has taken us literally months to schedule the deposition in this case. The idea that we're going to do all the discovery that we need to do relating to, you know, commercial success and things like that directed to their embodiment of this new product and the other issues that are going to be brought into the case, we're having whole new accused instrumentality in less than six weeks from the receipt of their infringement contentions really does meaningfully prejudice us. And I think that prejudice has to be weighed against the lack of diligence on their part, which is the reason that we find ourselves in this

situation.

THE COURT: Well, I'm not confident that the one answer in the -- that you describe to me -- it certainly wasn't so specific that it screamed out to me that this was an obvious iteration that should be pursued promptly.

MS. DURIE: Well, here's the thing, your Honor. There are three things.

So, first of all, this information was on our website. I mean, we were not hiding it. They had simply looked at the product description on our website. It was there.

No. 2, it was in their documents. The way that they say that they learned about this was reviewing their own documents, which contained this blog from one of our developers.

A document that was in the possession of one of their lead witnesses, who was the person who got this whole thing started.

So this is information that was known to Accenture. They took a 30(b)(6) deposition for the very purpose of coming up with infringement contentions. That's what this deposition was for.

They were free to ask the witness any questions they wanted. He said to them -- there was a line of questioning about the platform. The witness said in

response to the question about the platform, that there is a platform team, and that the platform team develops tools and code used by all the applications, including Claim Center and Policy Center.

So the witness said Claim Center and Policy Center both use the same platform.

THE COURT: Well, they use the same team. I'm not sure what you said meant.

MS. DURIE: No. It says we divide our teams into application teams and a platform team. The platform team develops tools and code that is used by all the applications. That's why it's called the platform team, because they develop the platform.

THE COURT: It still does not mean to me that when they develop tools and applications does not mean it's the same tools and applications. But perhaps what I need to do is look at the product description and look at the -- in other words, I certainly don't believe it's appropriate for the discovery process to be crowded and to prejudice any party at the end, if a party had enough information to pursue the discovery earlier, which is basically the defendant's story.

On the other hand, it makes sense to me to include products that are similar enough to be tried at the same time. That only makes sense. That's an efficient use

of my resources, rather than have another trial for another day, because no one seems to agree that if one infringes, the other necessarily does.

Now, if you tell me that, then I will say, fine, there's no need to pursue discovery, but if that's not your position, then we have two products.

So I guess what I need to do is perhaps look at the product description on the website and see whether that very public source of information was sufficient to give the plaintiff an appropriate heads-up, and that it's just too little, too late in this case.

MS. DURIE: May I approach and hand this to you?

THE COURT: Yes.

(Ms. Durie handed a document to the Court.)

THE COURT: So Billing Center isn't the focus of the attention. It's the fact that Guidewire's Claim Center and Policy Center systems share a common factor?

MS. DURIE: Correct. Claim Center is the product at issue in the case and as to which they served infringement contentions.

Policy Center is a different product. That information was on our website. They had documents in their possession. The witness testified at the deposition, and I will note, the testimony may not, you know, have

answered -- they didn't ask any followup questions. I mean, this was their opportunity to take discovery so that we would get infringement contentions in a timely fashion, not six weeks before the close of fact discovery.

THE COURT: All right. Mr. Oliver?

MR. OLIVER: Just very briefly, your Honor.

I don't intend to rehash the whole retrospective issue, but Ms. Durie said that this would require identifying new witnesses, which is a bit baffling to me. It's the same patent. It's the '284 patent. We're now led to believe that Policy Center infringes as well as Claim Center.

So that does not cause any change in the witnesses who would be deposed from Accenture. Frankly, it does not cause any change in the witnesses that I intend to depose from Guidewire. It would be the same developers. If, in fact, they have the platform team, I imagine I'd be talking to the same folks on Claim Center as I would on Policy Center.

So six weeks, granted, there's much to be done in six weeks, but this isn't as if we're introducing a whole new cast of characters into the case for deposition.

MS. DURIE: But, your Honor, we are, because I am absolutely entitled to take discovery into their product that they contend embodies the invention, and if they

contend that policy-based systems, like Policy Center, embody the invention, which we don't think they do, but if that is going to be their new contention, then I'm entitled to take discovery into their analogous product to show lack of success for the invention for all the reasons I've been able to take discovery into claims component, which is their product that is the counterpart to our claim system.

So it does inject. Not only do we have substantively to prepare our defense to these new infringement allegations, but we do have to go and take discovery.

THE COURT: I think, under the circumstances, it is too little, too late, and so I'm going to deny the application to proceed with the discovery of the source code for the Policy Center system.

Is there anything else we need to address this afternoon?

MS. DURIE: No, your Honor. Thank you.

THE COURT:

MR. OLIVER: No, your Honor. Thanks.

THE COURT: Thank you very much, counsel.

It's going to take me a while to shut down, so you may leave. Thank you very much for your time.

(Counsel respond, "Thank you, your Honor.")

(Court recessed at 5:08 p.m.)