IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ACCENTURE GLOBAL SERVICES GmbH, and ACCENTURE LLP, : CIVIL ACTION

Plaintiffs, :

vs. :

GUIDEWIRE SOFTWARE, INC., :

Defendant. : NO. 07-826 (SLR)

- - -

Wilmington, Delaware
Wednesday, November 4, 2009
9:05 o'clock, a.m.

- - -

BEFORE: HONORABLE SUE L. ROBINSON, U.S.D.C.J.

- - -

APPEARANCES:

POTTER, ANDERSON & CORROON
BY: RICHARD L. HORWITZ, ESQ.

-and-

Valerie J. Gunning
Official Court Reporter

APPEARANCES (Continued):

MORRISON & FOERSTER LLP
BY: L. SCOTT OLIVER, ESQ.

-and-

MORRISON & FOERSTER LLP
BY: JAMES P. BENNETT, ESQ.
(San Francisco, California)

Counsel for Plaintiffs

MORRIS, NICHOLS, ARSHT & TUNNELL
BY: JACK B. BLUMENFELD, ESQ. and
JULIA HEANEY, ESQ.

-and-

DUIRE TANGRI LEMLEY ROBERTS & KENT LLP
BY: DARALYN J. DURIE, ESQ. and
CLEMENT S. ROBERTS, ESQ.
(San Francisco, California)

Counsel for Defendant

ALSO PRESENT:

PRISCILLA HUNG,
GUIDEWIRE SOFTWARE

- - -

P R O C E E D I N G S

(Proceedings commenced in the courtroom, beginning at 9:05 a.m.)

MR. BLUMENFELD: Good morning, your Honor.

THE COURT: Good morning.

MR. BLUMENFELD: I don't know why I come up here first. I'm usually the plaintiff, so I apologize for that.

Jack Blumenfeld, Julia Heaney, Daralyn Durie and Clem Roberts for Guidewire, and Priscilla Hung, who is vice president of Guidewire, is in the back.

We have, for better or worse, a fair number of discovery issues today. There's also pending -- I don't know if your Honor has had a chance to look at the briefs -- a motion to amend to assert a statute of limitations defense, which has been fully briefed, and I don't know if your Honor wants to hear that or is prepared to hear it today, but there are, aside from that, there are a number of discovery issues.

THE COURT: All right. Thank you.

MR. HORWITZ: Good morning, your Honor.

THE COURT: Good morning.

MR. HORWITZ: Rich Horwitz, from Potter

Anderson, on behalf of Accenture, and with me today from Morrison & Foerster, Scott Oliver, who your Honor has met before, and Jim Bennett, who has not been admitted pro hac vice yet, but will be. And as Mr. Pooley takes off for Europe to run the international patent world, Mr. Bennett is going to be getting involved in the case.

THE COURT: All right. Thank you very much.

I usually start with plaintiff and any discovery issues plaintiff has.

MR. OLIVER: Your Honor, I believe that all of the discovery issues we have have been resolved.

THE COURT: Good.

MR. OLIVER: So I think I am responding to everything today.

THE COURT: All right. Good. Thank you very much.

All right. Let's go to defendant's counsel.

MS. DURIE: Thank you, your Honor. Good morning.

THE COURT: Good morning.

MS. DURIE: The first issue, your Honor, and I'm hoping that a number of these we'll be able to resolve fairly quickly, but the first issue is, I think, actually a bilateral issue.

Accenture served, after the close of discovery,

supplemental interrogatory responses relating to their infringement contentions and their trade secret disclosures, adding new infringement theories, pointing to different things and Guidewire's product as being accused instrumentalities, or as meeting the claim limitation, and updating its trade secret disclosures.

Accenture has taken the position, that given the conduct of the parties in this case, that is appropriate, because infringement contentions and misappropriation contentions are appropriately the subject of expert discovery, and that they were not in a position to complete that disclosure until the time for expert reports.

We don't necessarily take issue with that proposition, but Accenture has at the same time sought to strike Guidewire's supplemental interrogatory responses with respect to its trade secret contentions, which we served on the last day of discovery. And our view is that this can be handled in an equitable and bilateral way. We are perfectly amenable to accepting the supplemental interrogatory responses that Accenture served a couple of weeks late so long as we likewise are permitted to rely on the supplemental trade secret disclosures that we served roughly contemporaneously.

Now, I understand Accenture's position to be that Guidewire's supplemental trade secret

disclosures fall in a different category, because we previously, when Accenture had asked us to supplement our interrogatory responses earlier, had sent Accenture a letter whereby we had said, sort of at the present time, here are the trade secrets that we intend to go forward with. But I think just as Accenture can argue that it was entitled to rely on that that letter, we would be in a position to argue that we were entitled to rely on their prior interrogatory responses.

So I think the point here is that the conduct of this case was such that the parties informed each other and understood that the final contentions would be reflected in updated interrogatory responses that would be served at the end of the case. That is the way that both parties conducted themselves, and therefore both parties should be permitted to rely on that updated information.

THE COURT: All right. Thank you very much.

MS. DURIE: And I assume, your Honor, that we should sort of address each other, both sides?

THE COURT: That would be helpful; to me, anyway.

MR. OLIVER: Your Honor, there's a qualitative difference between having in expert reports my expert go through the source code and say, the claim limitations are

met in this piece, that piece, A, B and C, and the trade secrets that are misappropriated are found living in the source code at places X, Y and Z, and saying at the end of discovery, we told you there are 35 trade secrets, but actually, it's 120.

With the new trade secrets that were asserted -- and I will point out that in our expert reports and our supplemental contentions that mirror those expert reports, we did not add any trade secrets. In fact, we pared down the list of trade secrets that we're asserting. What Guidewire attempted to do was expand the universe of possible trade secrets, not only say, they live in your code at places A, B and C, but once that we told you were never on the table have been injected back in the case.

I had no opportunity to take discovery of third parties, to show that those trade secrets were, in fact, in the public domain, had been disclosed to third parties with no NDA, et cetera.

It strikes me that if what Guidewire is saying is that we should not be allowed to do supplemental infringement contentions that mirror the expert reports, that should work reciprocally and Guidewire should be bound by its previously disclosed contentions, and it is the report of its expert, Dr. Kuebler in its Exhibit B, where he goes through and maps the trade secrets should be stricken

as well.

That does not make sense. I agree that both parties, in fact, should have the opportunity to have the experts locate the asserted trade secrets and locate the claim elements in the source code, but what Guidewire is attempting to do is to add new trade secrets now, when there has been no opportunity for us to take any discovery on them and that's inappropriate.

And so that qualitative difference, I think, is at the heart of the dispute here.

THE COURT: And the qualitative difference really is in the evidentiary basis that you would need to defend against the new contentions? I mean, source code versus third-party discovery, et cetera?

MR. OLIVER: In some sense, yes. So the source code -- let's say there are three trade secrets and the experts go through the source code, I think that's appropriate. But what I have not had the opportunity to do since July 6th of this year, when Guidewire said, here are the three trade secrets, what I have not had the chance to do is to go and prove whether or not those are trade secrets at all.

I agree that eventually, Guidewire would say, these 35 trade secrets live in the source code somewhere, and here is the documentation showing they're actually

misappropriated and used in your product. Fine. But what I have not had a chance to do is so whether or not those are trade secrets. I had no ability to take primarily third-party discovery and demonstrate that those purported trade secrets were not, in fact, secret, but were publicly known in the public domain, disclosed by Guidewire to third parties. Now that fact discovery is closed, there's no ability for me to do that.

THE COURT: All right. Thank you.

MR. OLIVER: Thank you.

MS. DURIE: I think the distinction between what the trade secret is and the documents that allegedly embody that trade secret is a slippery one. Accenture added hundreds of new documents, allegedly reflecting trade secret misappropriation in its supplemental interrogatory response. All of the trade secrets that we referred to had previously been at issue in the case, but we indicated that we had found additional evidence in the form of documents in completing discovery that suggested misappropriation of these trade secrets as well.

Accenture's only response with respect to prejudice appears to be to argue that it would have taken third-party discovery. In fact, however, Accenture did not take any third-party discovery relating to the trade secret allegations in this case. It didn't take any third-party

discovery with respect to the trade secrets that we specifically had identified.

So there's no reason to think that it would have taken third-party discovery with respect to these additional instances of trade secret misappropriation that we had. It really is the same situation going both ways. I suppose we too could have taken third-party discovery with respect to all of these additional hundreds of documents that Accenture claims embody its trade secrets.

I think the point is each side needed an opportunity to update its disclosures as a result of what we learned in discovery, and that's what happened here.

It's also what happened with respect to Accenture's infringement contentions. Now, again, I'm not contending that that was inappropriate, but I do want to make clear, it's not simply a situation where Accenture pointed at particular pieces of code. Accenture, in its amended infringement contentions, for example, instead of identifying the user interface as being a claim folder, said, not only can a user interface constitute a claim folder, which is one of the claim limitations in the case, but database tables in Guidewire's product could constitute a claim folder as well. That's a different infringement theory. To be sure, we might have wanted to go out and

conduct discovery on that issue, but we recognize the practical reality that the parties need to be able to supplement their interrogatory responses, and that's what happened, your Honor.

THE COURT: Well, speaking of practical realities, is 120 trade secrets a practical reality when it comes to actually going forward and trying these?

MS. DURIE: So that is a good question. I think the answer to that question probably is no, and that we are going to have to identify a subset of those trade secrets for trial.

One of the challenges here is that what happened in this case is that Guidewire and Accenture entered into a relationship back in 2006 that resulted in two Accenture employees signing a nondisclosure agreement and getting extensive training on Guidewire's product, including sort of the receipt of a stack of about a foot of highly confidential technical documents, the most technical documents about Guidewire's product.

The provisions of the nondisclosure agreement prohibited those two employees from disseminating that information or using it in any way. Instead, what happened is, they shared it broadly within Accenture, with the individuals at Accenture who were responsible for developing Accenture's competitive product,

and used that information to identify the features set for their next product and what they needed to add to their product in order to catch up with us.

Now, there are two ways to think about that in the contexts of trade secret misappropriation. One is, what are the particular features from our product that they identified and that added to their product. And that's one category of trade secrets.

The other category of trade secrets is they looked at what was not in Guidewire's product and said, aha, we don't need to worry about that, because they don't have that functionality either.

And so when we say 126 trade secrets, it's not really 126 different things. Many of these things are interrelated. And certainly I understand that when we present this case to the jury, we're going to need to do it in a streamlined fashion.

THE COURT: Well, but maybe it needs to happen before. I mean, if I'm inclined to let you both go forward with supplementations without causing undue prejudice, burdens, expense, et cetera, then it seems to me as though this might be the time that the parties need to say, of these, "trade secrets," we're really concerned about this new dozen or two critical ones.

MS. DURIE: That's fine. And to be clear,

these are all trade secrets that originally had been at issue in the case, so they're not -- they don't come out of the blue.

I think that is reasonable, and, again, this is actually on both sides. Accenture has a fairly lengthy list of trade secrets that it is asserting against Guidewire. I am certainly happy to arrive at an agreement where we will each identify a subset of those trade secrets and pick a number, fewer than X, with which we will proceed to trial. I also anticipate that there likely will be summary judgment motions quite possibly brought by both sides directed to paring down the trade secret case.

THE COURT: Well, what I'm suggesting is that we come up with that number so that if we're going forward through expert discovery now -- is that right?

MS. DURIE: Yes, it is.

THE COURT: I mean, that you make that paring down.

MS. DURIE: That's fine. Can I have one moment to confer with Mr. Roberts about what that number should be? But I'm willing to agree to that right now.

THE COURT: Well, I think what we'll do is, at the end of discussing this, I will let you all talk to each other and see if we can reach an agreement on that number rather than --

MS. DURIE: Fine.

THE COURT: -- my just giving you a number.

MS. DURIE: That's fine.

THE COURT: And --

MR. OLIVER: Your Honor, can I just respond briefly to a couple of the points Ms. Durie made?

THE COURT: All right.

MR. OLIVER: The concern I have is prejudice here. The rebuttal experts reports are due this Thursday.

THE COURT: Well, but you see, you're jumping the gun here, because once you have -- what I was trying to do -- I take it that at this point you both have supplemental issues that are being addressed or not being addressed by the expert report? I mean, is this an issue that you both have -- I thought this was an issue where you both had supplemented your contentions and added new theories that have to be addressed through expert discovery.

Are your experts -- I mean, I don't know. Are your experts all doing that already, or are you at a stalemate with respect to what the experts are supposed to be addressing?

MR. OLIVER: I believe that the experts are addressing only a subset of the universe of trade secrets. So putting aside the patent claims for a moment, on the

trade secret issue, we were told in July, not, here are some of the trade secrets we'll eventually assert. Here are the trade secrets we will assert.

THE COURT: Well, you know, what I'm asking is what your situation is.

Have you asserted more through supplementation, more trade secrets --

MR. OLIVER: No.

THE COURT: No?

MR. OLIVER: We've actually pared down our list of the trade secrets we said we would assert.

And so -- and we did, in fact, take third-party discovery. One of the issues I believe on the table today is Farmers Mutual, an insurance company that received a lot of these trade secrets with no NDA. So to say that we have not been working to look at that list of trade secrets and to identify what public domain information renders them not actually trade secrets, that's just not right.

And so now your Honor, after the close of discovery, if Guidewire is enabled to add new trade secrets that were not on that list in July, I don't have any ability to go out and take third-party discovery.

THE COURT: Right. I know you have said that.

So what you are basically saying is, this isn't

a bilateral issue as asserted by the defendant.

MR. OLIVER: Correct.

THE COURT: That's all I wanted to hear.

MR. OLIVER: I'm sorry.

THE COURT: Thank you.

MR. OLIVER: Thank you.

MS. DURIE: May I respond, your Honor?

THE COURT: Yes, you may.

MS. DURIE: It is a bilateral issue. Accenture has added hundreds of documents, and, again, this was actually after the close of discovery, hundreds of documents, new documents, not in its previous contentions, allegedly reflecting trade secret misappropriation. And as I indicated, it has added new infringement theories.

We are fully prepared to have our experts address those new theories and what Accenture contends to be these new instances of trade secret misappropriation.

Accenture has been on notice since we served our supplemental responses on the last day of discovery of our trade secret allegations. They should be, and I think there's no reason they can't be, in a position to serve expert reports addressed to those issues, just as we intend to serve expert reports with respect to the information.

Now, with respect to third-party discovery,

there has not been -- there have not been depositions of third parties.

THE COURT: I'm really not concerned about that. What I'm concerned about is the parity here, about what is happening. New infringement theories based on review of source code, I'm not sure I understand the documents produced after the close of discovery. They're not -- if I understand correctly, the plaintiff is not asserting new trade secret theories, but the documents are new instances, alleged instances of the misappropriation?

MS. DURIE: I think this is a very difficult distinction to try to parse. So one of Accenture's alleged trade secrets is the need for a flexible claims handling system. That's the supposed trade secret.

What Accenture has now down is produced literally hundreds of new documents that it contends reflect examples of trade secret misappropriation relating to trade secrets, such as a need for a flexible claims handling system.

What Guidewire did in formulating its trade secret list was try to be sort of more specific. We have always taken the position, and Accenture has always understood, that our trade secret case is predicated upon their having received internally disseminated and used

documents that two individuals from Accenture received as part of this training. That has always been our trade secret case that was on the table.

And the issue with respect to the way that we updated our disclosures is to say, in reviewing all of your documentation and understanding the way that you use this material, it's apparent to us that you used it not only by isolating specific trade -- specific features of our product and copying them into your product, but you also used it in planning your feature set with respect to what it is that you did not need to add to your product.

THE COURT: So it sounds as though you went about your cases in absolutely the opposite way. That you had the universe of documents and you continued to go through the same universe of documents and say, this is how you've used these documents in violation of our trade secrets whereas, from what I understand you're saying about Accenture, Accenture had the trade secrets identified, but keep adding to the universe of documents to prove their case.

MS. DURIE: I think that's fair, yes. But I think the point is on both sides, we have both understood what their respective trade secret cases are about. And we have both understood that we would supplement, once we have each had an opportunity to go through the relevant

documents, which is really what this boils down to, in order to refine our contentions, that we would supplement our disclosures at the end of the case, and I think that's reflected in the fact that that is what we are planning to do.

MR. OLIVER: Your Honor, may I make one comment?

THE COURT: Sure.

MR. OLIVER: I disagree with that characterization of our understanding, but I think your Honor captured it precisely in saying that what we are adding -- we, Accenture, are adding, are new documents showing that the trade secrets we identified are, in fact, in the product, but we're not adding new theories. And what Guidewire is attempting to do is to add new theories, new asserted trade secrets into the case now when expert reports are due in two days -- one day.

THE COURT: Well, I guess what I'm trying to understand more clearly, the prejudice. If you had this universe of documents and you knew that within the documents, whatever trade secrets Guidewire was going to assert would be asserted based on that universe of documents, then, to some extent, you have explored the extent to which these documents have been shared with others.

I mean, I guess that's why I'm trying to understand the prejudice, whether the trade secret is contained on line 20 of Page 500, or whether it's contained on line 50 of Page 86. I mean, if the documents have been shared, the trade secrets have been shared, haven't they?

MR. OLIVER: There's no doubt that the trade secrets, alleged trade secrets, have been shared. In fact, perhaps the entire universe of trade secrets has been shared.

What we're concerned about is whether they have been used, whether they're incorporated into our product, and whether the ones that are allegedly incorporated into our product are, in fact, trade secrets.

I don't dispute that some stack of documents circulated within Accenture, and that was a mistake. It was sloppy handling, et cetera. But the question that's going to be relevant for trial is whether any of those alleged trade secrets actually migrated into our code.

THE COURT: But that does seem to be an issue for expert discovery if we're talking about taking a description and finding it in a source code. So, again, that does not sound much different than how you described the supplemental infringement analysis.

MR. OLIVER: While that's true, it's that first

part of the analysis -- second part, I suppose. First part, did it migrate into the source code? I agree, that's something the experts can debate relatively easily. But the second question is whether those alleged trade secrets are, in fact, trade secrets. And so I need to find out, did Guidewire disclose them publicly? Did others independently develop them? Did we independently develop them? All of that is discovery that I'm no longer able to take.

So if it were simply a question of, did the alleged trade secret on Page 20 of this stack end up in the source code, that, with those small universe of alleged trade secrets, would be something manageable. But it's the second part, showing that it is not, in fact, a trade secret, that becomes my burden that I have no ability to do now.

THE COURT: And in the initial 30 or 35 trade secrets that were identified in July, how did you go about proving that they weren't trade secrets?

MR. OLIVER: For instance, one of the things we've done, and I believe it's at issue today, is go out to a third-party insurance company, who received from Guidewire, with no NDA, details about trade secrets -- well, alleged trade secret information within the Guidewire product. Similar level of detail to what was disseminated within Accenture.

We've gone out and we've conducted analyst -- reviewed analyst reports about what features the analysts sent back in 2003 were in the respective parties' products.

It's a fairly sizable task even with those 35 trade secrets, and to now have to do that in one day before rebuttal expert reports are due for 120 trade secrets just is impossible.

Even if there were a small number of text, ten new trade secrets, I don't think it would be possible for us, in the time remaining, to do any third-party discovery or any analysis of public sources to find out whether those are, in fact, trade secrets.

THE COURT: Well, certainly, you would not be responsible for a large number in a short time. There would have to be adjustments made if I decided this made any sense at all. And the question is whether it makes any sense. So I appreciate your thoughts.

I will go back to defendant's counsel and see whether it does make any sense and whether there's any room for flexibility. If there's no room for flexibility, perhaps that's the answer.

MR. OLIVER: Thank you, your Honor.

MS. DURIE: It's true, your Honor, that the fact that both sides have updated their contentions puts pressure on us to get a lot of work done.

We are confronted with, as I said, hundreds of new documents that Accenture has identified as supposedly embodying the trade secrets. Likewise, we need to look at them and see what they say and determine whether what they say is in the public domain. That is equally true on both sides.

But the suggestion that Accenture would have gone out and conducted all of this other third-party discovery really is not consistent with what happened in this case.

To the extent that Accenture reviews analysts' reports, it can review them, but what has always been at issue here is, you took a whole bunch of information about our product and you looked at the features and functionality and you incorporated it into our product, into Accenture's products. And at that level, they've always understood what was at issue and had the ability to determine whether the information about our product was and was not in the public domain.

This really is, it's just -- we're both in the same position, and I recognize that we're both working very hard to meet the dates that have been set by the Court. And Accenture -- they say expert reports are due, but Accenture has been on notice of what our trade secret theories are since we supplemented our infringement contentions -- I mean

our interrogatory responses on the last day of fact discovery.

Accenture has referred to this third -- this instance of what it characterizes as third-party discovery, which is three declarations that it served upon us after the close of fact discovery, and I do think it's -- we do have an issue with them that we want to raise with the Court. But I don't think -- I mean, I don't think that changes the fact that, again, the parties are fundamentally in the same position. We have each understood, at a high level, what each other's theories were. Each of us went through the relevant documentation over the course of discovery, and in conjunction with our experts, refined those things and disclosed them to the other side.

THE COURT: Why don't we go to this declaration issue now since it's tied in.

MS. DURIE: Very good. And with your Honor's permission, I would like to have my partner, Mr. Roberts, address that issue.

THE COURT: All right.

MR. ROBERTS: Good morning, your Honor. Clem Roberts, for Guidewire software.

As your Honor knows, discovery in this case closed on September 24th. On October 29th, Accenture served us with three declarations. And the declarations fall into

two groups.

The first -- there are three of them, but the first one is from a man named Jeff West. Mr. West was noticed for deposition by Accenture during discovery. The parties had agreed with third parties -- with respect to third-party discovery, that they would contact that third party and then tell the other party what the date of the deposition was.

Accenture never contacted Mr. West. He showed up at the noticed date for his deposition. Accenture wasn't there. He went home. He called us. He said, you know, I showed up. Nobody was there. I'm not doing this anymore.

We communicated that message to Accenture. His deposition was never renoticed, nothing ever happened.

On the 24th, we received a declaration -- sorry. On October 29th, Accenture sent us a declaration in which Mr. West talks about this alleged disclosure of Guidewire confidential information to Farmers Mutual Protective Association, and there are two issues with it. The first obviously is that because Mr. West was not deposed during discovery, we did not have a chance to ask him about these factual issues that he talks about in his declaration.

And the other problem, your Honor, is that the

exhibits attached to Mr. West's declaration were sent to Mr. West in violation of the protective order.

So there are three exhibits. Exhibit A is actually a document, an e-mail that attaches a document that Mr. West wrote while he was an employee of Guidewire and before he became an employee of one of our competitors. And under the protective order, specifically Paragraph 15, Accenture would have been allowed to have shown him that document in deposition, but there is a world of difference between showing him a Guidewire document in deposition and sending it to him over e-mail.

The other two exhibits, Exhibit 2 and Exhibit 3, were actually documents that were produced to us after the close of discovery from Accenture via Farmers Mutual Protective Association.

So Accenture, during discovery, served a subpoena on Farmers. Farmers produced, after the close of discovery, on the 28th, and Accenture gave us those documents. About the same time, we had received about 500 gigabytes of information from Accenture. So there was just a lot of documents coming in.

And the documents that they gave Mr. West from Farmers Mutual are documents that are clearly labeled, among other things, "Guidewire Software Confidential." They're Guidewire materials. And they're materials that

when we produced, we labeled attorneys' eyes only and they took these documents under the supposition that, well, Farmers Mutual didn't label them attorneys' eyes only. And they turned around and also gave them to Mr. West.

And so it's our contention, again, that these documents -- we never had a chance to go back through this third-party discovery and designate these documents as AEO. Accenture knew that they were AEO. They said Guidewire Software Confidential right on their face, and they sent them to a third party who works at one of our competitors to talk about them and discuss them in a way that we think is inappropriate.

The other two declarations are both declarations from Farmers Mutual, and, again, these declarations do two things. The first is, they authenticate the documents, and we don't have a problem with the authentication of the documents. They're Guidewire documents. If they had asked us, we would have stipulated to their authenticity.

But they talk about, in somewhat funny and sort of awkward language, about sort of, appears to have been drafted by Accenture's lawyers, about whether or not there were nondisclosure agreements and what the facts on the ground were. And again, they were never noticed for deposition. We never saw documents from them during

discovery. So the first time we ever saw these documents was after the close of discovery on the 28th, and there has been no opportunity to depose them.

And so our thought, your Honor, is that the remedy should be slightly different in each case. Specifically, we think the remedy for Mr. West's declaration should simply be to strike it, because -- both because of the prejudice of his testimony, not being able to ask him about it, and also because it's simply inappropriate for them to simply get the benefit of violating the protective order by sending him documents that they weren't supposed to send him.

With respect to the other two individuals, I think insofar as what Accenture wants is the authenticity of the documents, we have no objection. But insofar as it's the testimony about the facts on the ground that something needs to be done to resolve that, either striking the declarations or allowing us a brief period to depose these people, the problem is that because they're third parties, motion to compel would have to be brought in another jurisdiction. It would be problematical. So I think probably the easiest thing to do is either strike them or to allow us to submit rebuttal declarations from people who were not identified during discovery.

And that would be my opening statement, your

Honor.

THE COURT: All right. Generally, declarants who have not -- whose declarations have not been tested through discovery won't be considered by the Court, so I guess I'm not sure what you were trying to do with your third-party discovery here.

MR. OLIVER: What we were trying to do, your Honor, is enable our expert to analyze whether or not the trade secrets asserted by Guidewire are, in fact, trade secrets under the theory that experts can look at all sorts of categories of information that might not necessarily be admissible in the Court. And so we provided these declarations to Guidewire simply to give notice that these will be attached to the expert report and our experts will make judgments about whether or not Guidewire, in fact --

THE COURT: Well, that leads to all sorts of problems, though. As I've seen, unfortunately, in a couple of trials lately, is when your expert relies on evidence that has not been tested, isn't admissible, and, therefore, can't be deemed reliable by the Court, how good is your expert's opinion? And then we get into a Daubert issue.

So I guess I'm not real sure where we are on that. It seems to me that if you -- I mean, setting aside

whether Mr. -- whoever Mr. West is, whether he should have seen these documents in the first place, if you want to rely on -- if you want your expert to rely on this evidence, it has to be tested and vetted through discovery.

MR. OLIVER: Your Honor, I heard Mr. Roberts saying that he believes there should be an opportunity to depose these individuals. I'm not opposed to that. It may be that motions to compel will have to be brought in Texas, I believe.

THE COURT: Well, I don't think it's a motion to compel issue. I think, if you want these used, you have to get them to cooperate and be deposed.

It seems to me as though it is inappropriate for you to say, sure, file a motion to compel, and if the Court in Texas, or wherever the Court is, they have to go through the expense of litigation to get -- I mean, it's up to you. You want to use it, you get the depositions arranged. If you can't, then they can't be, as far as I'm concerned.

MR. OLIVER: Okay. May we have additional time now that discovery is closed in order to arrange those depositions?

THE COURT: Well, I mean, I'm trying to go through my docket, which is not easily done, to find out where we are in the schedule. It's an issue that I will take under advisement until all the issues are vetted here,

and then we'll talk about how we bring this discovery to a close so that we can go forward with motions for summary judgment and trial. All right?

MR. OLIVER: Fair enough. Thank you, your Honor.

THE COURT: All right. So that was the second issue.

How many more issues, just to make sure, because we only have, theoretically, 15 or so minutes. So how many more issues do you have? Maybe you'd better start prioritizing.

MS. DURIE: Understood, your Honor. Let me see if I can run through some things fairly quickly.

There are three depositions that we had noticed during discovery, but where the witnesses were even -- couldn't make themselves available until after the close of discovery or where we were forced to file motions to compel in foreign jurisdictions.

One is a deposition of a former Accenture employee that has now taken place. The other two are pending subject to rulings on motions to compel in two different jurisdictions.

Accenture -- all we had wanted was to get an agreement that should we be able to take these depositions, that we will then be able to use the testimony in this case,

notwithstanding the depositions themselves will be taking place after the close of discovery.

Accenture's position is that this Court does not even have jurisdiction, because these depositions are subject to these motions to compel elsewhere. And we're not asking your Honor to rule on whether we can take the depositions, but simply that we be entitled to use them. I'm not even sure whether Accenture disputes that point.

There are a couple of issues relating to document production, and let me see if I can run through them fairly quickly.

The first has to do with custodian data. Accenture produced approximately 65,000 documents without any indication as to the custodians of those documents. We have been asking for that information and have not received it.

It's particularly important, because included within those 65,000 documents are such things as Guidewire confidential documents, and as the Court can imagine, for purposes of our trade secret case, we're keenly interested in which Accenture employees had custody of our confidential information.

Now, Accenture's response is that it does not have any longer that custodian information, although it has not explained why not, and that Guidewire should be required

to go through the 65,000 documents and identify the specific subset of documents for which it wants to receive custodian information.

The problem with that is that a manual review of 65,000 documents is an extremely burdensome task. The way that we do document review is we use custodian information as a filter to identify the documents that are most likely to be of interest based upon in whose possession they were found, because we know who the key players in this case are.

So we really need the custodian information as an initial matter in order to be able to understand take that task.

The next -- I'm going to deal with three document issues just because they're all interrelated.

The next issue has to do with the fact that Accenture produced on September 24th an enormous, I think it's something like I want to say 25 million pages, something like that, of documents, a huge amount of documents, that includes source code for the embodiments of the product that we believe were on sale prior to the critical date and give rise to an on-sale bar.

So there's the source code and object code relating to a sale that Accenture made to St. Paul.

We are not -- I want to be clear, we are not

asking to reopen discovery on that issue, but we do want an opportunity to serve a supplemental expert report on one specific issue, which has to do with allowing an expert to look at that source code that was produced at the end of September, an object code, and the documents relating to those initial implementations of the product for purposes of determining whether there was a work workable version that was actually sold to St. Paul.

And the other sort of document issues that are outstanding, I would hope could be resolved.

We have asked Accenture to produce certain of its ethics policies. Accenture produced some, but not all of them. And Accenture has taken the position -- what Accenture said in this letter in this regard, it said that it had conducted key word searches and had not located these documents, and it says that those documents did not come up in the search means either that they do not exist, or were withheld and logged based on privileged work product.

I don't think Accenture's ethics policies could possibly be privileged or work product. We simply want to know what it is. Is it Accenture's position that these documents do not exist or is Accenture holding these documents on the basis of privilege, because if it's the latter, we would like an opportunity to test that.

And then, finally, there are some specific contracts, contract documents, entered into between Accenture and Reliance, another insurance company, that also form the basis of our on-sale bar defense.

Accenture's position -- we asked for these documents by name. They're referenced in other documents, the specific name of the documents. We asked for these documents by name. Accenture has just now indicated, I think, that it has not been able to locate them. Obviously, to the extent the documents don't exist, they don't exist, but I believe under the discovery rules, we would then be entitled to an affirmative representation by Accenture that the documents --

THE COURT: I don't enjoy the word "entitled," so if you could just find another word.

MS. DURIE: I apologize. I think under the discovery rules, Accenture should be required to provide us with an attestation that the documents have been destroyed if that is, in fact, the case.

Those are the document issues. And I think the only other thing that is in dispute has to do with the statute of limitations motion that Mr. Blumenfeld mentioned at the beginning of the conference.

THE COURT: Well, you might as well go ahead and address that ever so briefly, if you can, whatever

issues you think you want to address today.

MS. DURIE: Very good, your Honor.

We have sought leave to amend our answer and counterclaims to add a statute of limitations defense. We had originally pled a defense of laches, but we had not pled statute of limitations because we did not have a factual basis for doing so.

Accenture has argued that we should not be permitted to add that defense, first, under Rule 16, because the deadline for amending the pleadings has passed. It is true that the deadline for amending the pleadings has passed, and that under Rule 16, that means that we need to show good cause for the amendment. But Accenture has agreed that there is good cause to amend the pleadings after that date, which passed back in February, because the first time that Guidewire had any inkling that Accenture had had information about Guidewire's product and analyzed it prior to the critical date for statute of limitations purposes was in a deposition of Michael Castonis that took place well after that date.

Accenture is also arguing that we cannot show good cause for the amendment because we delayed for too long and that we should have sought leave to amend immediately after Mr. Castonis' deposition, or that we should have asked Accenture to provide a 30(b)(6) witness on this topic more

quickly.

The reason that we did not seek to amend immediately after Mr. Castonis' deposition is that all that he really testified to is that he had learned information about Accenture's product -- I mean about Guidewire's product, sufficient to put Accenture on inquiry notice, but we did not know whether Accenture had done anything to follow up on that and make any determination about whether there had been any misappropriation.

We actually served a 30(b)(6) notice directed to the topic of the information that Accenture, the efforts that Accenture made to learn about Guidewire's product. We served that 30(b)(6) notice back on March 11th, actually before Mr. Castonis' deposition.

Accenture made its 30(b)(6) witness, Mr. Delsanto, available on that topic of the efforts that Accenture made to learn about Guidewire's products on September 11th.

We took that 30(b)(6) deposition. What we learned is that Accenture had, indeed, learned about Guidewire's product back, prior to the date for statute of limitations purposes, and had made no further effort to follow up on whether there was misappropriation, and then, in fact, that information formed the basis for Accenture's allegations of trade secret misappropriation against

Guidewire in this case.

Two weeks after that deposition, on September 26th, we sent Accenture a letter, asking them to consent to our adding the statute of limitations defense to the case.

Now, Accenture has argued that it would be prejudiced were we given leave to assert the statute of limitations, but it's hard to imagine how that could be the case.

Laches has been in the case, delay has been in the case from the beginning. But, more important, all of the facts relating to the statute of limitations defense are uniquely within Accenture's possession. The issue here is what did Accenture know and when, and those are the only -- and what did they do to follow up on that knowledge. Those are the only facts that are germane to the statute of limitations.

We are not seeking any additional discovery with respect to this defense. All we are asking is that we be allowed to amend the pleadings to insert it based on what we learned in Mr. Delsanto's deposition.

THE COURT: All right. Thank you.

All right. Do you know where you want to start?

MR. OLIVER: I'm trying to keep all of this straight, your Honor.

Let's deal with the easiest ones first. Ethics policies. We'll produce the ethics policies. That's not at issue.

Contracts between Accenture and Reliance Insurance, we have looked and cannot locate.

The depositions of the two remaining individuals that are happening, or the subject of motions to compel in other jurisdictions. If the Court is willing to allow that evidence to come in now after the close of fact discovery, which I think ties into a number of issues we've been discussing earlier today, Accenture is not opposed to that. If those other jurisdictions allow the depositions to go ahead and this Court allows that evidence to come in, that's fine with us.

Ms. Durie discussed this production by Accenture of 500 gigabytes of information and, again, to the extent that the schedule permits it and the Court allows it, we're not opposed to a supplemental expert report by Guidewire so long as Accenture has an opportunity to do some sort of supplemental rebuttal report.

I will note also that on the 28th, after the close of discovery, Guidewire produced 1600 Java files and 16,000 XML files, and we have been digging through these. It's my understanding that this is also source code. To the extent that Guidewire is producing source code after

the close of fact discovery, I would like an opportunity to have our experts go through that source code, and to the extent it's relevant, do a supplemental expert report on that late production, and to the extent Guidewire then wants to do its own rebuttal reports, I am not opposed to that.

There was then discussion of this question about custodian information. We've never agreed throughout this case to provide custodian information. We've produced four-and-a-half million pages of documents, and what we've done to keep that manageable is remove duplicates. So if Mr. Smith's file has a PowerPoint presentation and Mr. Jones has a PowerPoint presentation, et cetera, et cetera, we remove all of those duplicates and just produce one copy of that PowerPoint presentation. Still end up producing four-and-a-half million pages, but that kept it manageable.

And so the problem that creates now when I'm told there are 65,000 documents that we care about, where you have not given us custodian information, is that the only way I can go through and figure out whether this PowerPoint file existed in five or seven or 30 employees' e-mail archives is to take that and manually search through each of the original productions made by those employees.

If there were a small number of documents --

I mean, I can do that for 10, 20, 50, maybe even a hundred documents, but to do it for 65,000 documents is just, at this point, impossible. I don't think I can do that before trial.

And I'm troubled by the fact that this is coming up now, after the close of fact discovery. I'm hearing Ms. Durie say that we need this in order to assess what documents are relevant, but Guidewire apparently managed to take depositions and identified the relevant documents for the last six months without having any of this information. Discovery is now closed and so it's not clear to me what purpose is served by going through the massive effort, reviewing 65,000 documents by hand.

And, again, I've offered repeatedly to Guidewire to identify some small subset and we would provide custodian information. In fact, Ms. Durie said that they've identified Guidewire documents in that production. Okay. That's fine. I mean, some reasonable number I'm able to do, but 65,000 just isn't possible at this juncture.

And I believe that leaves the last issue, being the statute of limitations. I'm not going to go through the testimony. That's laid out clearly in the briefing. But I would direct the Court to two relevant points in the In-Line case, which is a Judge Thynge decision.

In In-Line, there was a laches argument as well,

but in In-Line, laches had been pled from the beginning, and there was simply an effort late in the case to case to supplement facts going to the laches case, so the laches here I think is a red herring.

What happened in In-Line that's actually relevant, though, is at the end of the case, the defendant tried to add an inequitable conduct allegation, and as Ms. Durie said, with statute of limitations, in theory, inequitable conduct is something uniquely within the plaintiff's knowledge. It's what did you know, when did you know it, what did you do, as she phrased it.

And the In-Line decision actually says, defendants are not requesting leave -- I'm reading at Page 370 in the In-Line decision -- are not requesting leave to supplement their previously pled inequitable conduct allegations concerning inventorship, but they seek, through the guise of supplementation, to add three new distinct factual inequitable conduct theories against which plaintiffs would now have to prepare to defend.

And Judge Thynge goes on to quote a Court out of the Eastern District of Pennsylvania.

THE COURT: Trust me, this is not of interest to me. What I need to find out is how distinctly -- what I would like you to tell me here, in court, is how the statute of limitations defense is distinctly enough different than a

laches delay defense to make it prejudicial in this case regardless of what other Courts have done with other cases with other facts.

MR. OLIVER: There are two primary issues. One, we would have to go back to all of our witnesses and investigate, as the Courts have talked about the cost, the time, the effort, to do that, to investigate who knew what, when.

THE COURT: And you have not done that with respect to the laches defense?

MR. OLIVER: We have in laches, but I think the issues are different. With laches, it's what did you know. With statute of limitations, it's what a reasonable person would have suspected at a certain time.

There's a slightly different standard, and so since I have not gone and interviewed every person in the company about statute of limitations, we would have to go back and do that. But more troublesome is that under the current schedule, I would have to submit a summary judgment motion on statute of limitations on the 9th, which is five days from now.

THE COURT: Well, trust me, if I'm going to allow any of this, we're not going to go on the current schedule, so forget that argument. Obviously, I would not allow any additional discovery to go forward on the current

schedule.

So I guess my real question is, is the kind of burden you would contemplate in terms of the statute of limitations defense versus the laches defense? That's really what I would be focusing on.

MR. OLIVER: While the standards are different, I don't believe that it would be terribly prejudicial for us to respond to a statute of limitations defense if we had the time to do the investigation and to prepare summary judgment briefs on it. I don't think that, frankly, the work required would take a year, but it would take more than five days.

THE COURT: I think we can all agree with that.

MR. OLIVER: Thank you, your Honor.

THE COURT: All right.

MS. DURIE: I heard Accenture say they are not opposed to our submitting a supplemental report with respect to the source code for their early product so long as they get to submit a rebuttal report. That's fine. I don't think it means, though, that we should just open up the world to whatever supplemental reports people might have in mind.

The production that Accenture referenced from us that was late on the 28th, all we did was, we produced documents that previously had been produced in a different

file format. There was nothing new there. It was just a different file format, so that's a different situation.

With respect to this custodian information, what I heard Accenture say --

THE COURT: Actually, I think I'm done. I think you can sit down and tell me and we'll have a discussion. I don't think I want to hear any more. I think I've heard enough, to tell you the truth.

Somehow my staff gives me parts of dockets and not the whole docket.

So when is trial? When is the pretrial currently scheduled?

MR. OLIVER: March 3rd, your Honor, and trial on March 15th.

Your Honor, if it's relevant, the Markman hearing and summary judgment argument is December 17th, and opening summary judgment motions November 9th.

THE COURT: Well, if anything happens, I don't think we're going to do oral argument in December.

I am torn. As local counsel knows anyway, the Court had one of our brown bag lunches with a group of patent attorneys, including some in-house people, who complained about the cost and the scope of discovery in patent cases. So we took it on ourselves, and, of course, because I enjoy process, I got the assignment to do a first

look at how to manage discovery better in this district. And I have spent some time on that.

My concern, however, is this. With all due respect to the folks here and to patent lawyers everywhere, patent lawyers are good at complaining about the requests that are foisted on them, but are not very good at exercising any self-discipline themselves. So you're good at complaining about what other people want from you, but you tend to wants at least the same from the other party.

So my question is whether anything we do will have any effect at all in the real world.

Having said that, I am torn in this case. On the one hand, this close to resolving a case, I want to make sure that if we can accommodate reasonable requests, that we basically get as much accomplished and as much resolved given the expense and burden that you all have gone to in this case, in this litigation.

And the question is, how reasonable is this, and whether there is room to accommodate the requests basically by defendant for more discovery.

Now, it astonishes me that we're still having document production disputes on the eve of summary judgment, and I don't know why that happened. Perhaps it is my fault for not managing this case more closely, but, nevertheless, it seems to me as though we can squeeze a little more time,

kind of put a halt to expert discovery, squeeze a little more time for the final fact discovery and push summary judgment and oral argument off, but it will be with great limitations, because I'm not going to postpone the trial at this point, and I do not believe that the door should open to all sorts of new discovery requests.

So let me go back. With respect to trade -- to the first issue, which is trade secrets, what did we have? Thirty-five trade secrets identified in July? Is that what we had?

MR. OLIVER: Correct, your Honor.

THE COURT: Well, I don't know what the magic number is. It's 35 or less of any additional trade secrets that we would be allowing to go forward under the supplementation.

MS. DURIE: We're fine with 35 trade secrets on each side.

THE COURT: Well, let's start with that and then we'll talk about it and see whether that is do-able.

In that regard, it seems to me that they have to be identified specifically, like, within a day or two.

Accenture will have the opportunity to pursue some discovery, which -- and at the same time, will have the opportunity to explore the possibility of having these declarants made available for deposition.

With respect to Mr. West, it seems to me as though we should see if he's available for deposition, and whatever other issues you have with him can be explored at deposition. If these folks don't show up for deposition, then the declarations are really useless and irrelevant in my world.

With respect to the depositions, or the two depositions that are being explored in other jurisdictions, if they are not resolved by a date certain that will be consistent with what we're doing, then they are irrelevant, too, because if they are not taken by the end of our new fact expiration date, then they are irrelevant.

With respect to the document production, it seems to me as though, if there are -- now, let me make sure I understand. When you are saying with respect to the custodial information missing, are you saying 65,000 documents or 65,000 pages of documents?

MS. DURIE: It is my understanding, your Honor, that there are 65,000 documents that Accenture produced without any custodian information.

THE COURT: All right. Well, you can choose 100 of what you consider. They have to be the Guidewire confidential documents that you are so concerned about. Otherwise, I'm not -- so if there are a hundred Guidewire confidential documents for which the custodial information

is missing, you can submit them to Accenture to see if they can figure it out. All right?

With respect to the supplemental expert reports, I think I'm going to leave you alone for a while to figure that one out and see if you can agree, because I'm not sure where you are at this point, and we have to come up with a date for all of this last-minute fact discovery to be done before we finish up on any expert discovery anyway.

With respect to the ethics policies, I guess that's not an issue anymore.

With respect to the specific contracts, I'm not sure what counsel meant by an "attestation." Is that what I generally require when something is not located and that's just an attestation of how the documents were searched, what kind of a search was actually done? Is that what you mean by that? I don't know. The Reliance/Accenture documents.

MS. DURIE: Right. But what we would simply like to know, your Honor, what was the nature of the search that was done, and to have a statement essentially on the record from Accenture that those documents no longer exist.

THE COURT: All right. Well, you have a statement on the record. But if you're asking for one of my affidavits that I require from time to time -- all right.

With respect to the statute of limitations, I don't know what burden this really imposes on the plaintiff for further investigation and whether that can be accommodated under whatever we come up with.

So Mr. Oliver, I don't know whether it depends on what I come up with --

MR. OLIVER: Exactly, your Honor.

THE COURT: All right.

MR. BLUMENFELD: Your Honor, I don't want to appear to be rude. Ms. Heaney and I have an appearance in Chancery Court at 10:30. I'm wondering if we can be excused?

THE COURT: You can be excused.

MR. BLUMENFELD: Thank you.

THE COURT: And I think, actually, I might even have another proceeding at 10:30, but what I'd like to do -- I can't get my computer on here because it's on at my desk, and I need to go and get on my computer to come up with some dates.

While I'm out, I would like you all to discuss timing and the whole expert -- just timing of the limited factual discovery and the completion of expert discovery and summary judgment. And if once you discuss that, then we'll have a discussion on that when I can get my calendar up. So I'm going to leave you alone for a couple minutes. I will

be right back.

(Short recess taken.)

- - -

(Proceedings commence after the short recess.)

THE COURT: All right. I don't know whether you all have had the opportunity to talk, reach agreement. Is that possible or not?

MS. DURIE: I actually think, your Honor, it's eminently possible, but we're not quite done.

THE COURT: Okay.

MS. DURIE: We're trying to work through the schedule and figure out a schedule that would make sense and still get the summary judgment motions heard so that there is a sufficient interval before the pretrial conference.

THE COURT: All right. Well, why don't you all -- I've got a 10:30.

Is everyone here for the 10:30?

MR. HORWITZ: Yes.

THE COURT: Why don't we take the 10:30. Maybe you can move to my jury room, if you want to, or some other place, and I can get back to you.

MR. OLIVER: Your Honor, could we reach agreement and then submit to the Court a proposed schedule?

THE COURT: Yes.

MR. OLIVER: Mr. Bennett and I have an airplane

to catch.

THE COURT: And, frankly, maybe I can take two minutes, although it will take ten to get on my computer, but the bottom line is, summary judgment and oral argument and whether I can fit that in. Other than that, I don't care what you do.

MS. DURIE: I agree that that is the key date. Can we maybe resolve that date now, what the argument date is going to be on the summary judgment motion, and then we'll back it out from there.

MR. HORWITZ: Off the record.

(Discussion held off the record.)

MS. DURIE: I think while we're all here, I just want to make sure we get the hearing set.

THE COURT: My computer is up. It's just going to take me a minute.

MR. HORWITZ: Okay.

THE COURT: I have to, though, that because of the way my first quarter looked where I'm double and triple-booked for trial, the oral argument -- I think what I can give you is when I need briefing done. I'm not sure I can give you an oral argument date, because at this point, it might be on Saturday. I mean --

MS. DURIE: Okay.

THE COURT: And I've got to go through -- I'm

hoping to do that this afternoon, is go through my spring quarter and send out proposals for folks. So let me just give you the amount of time.

So the pretrial is --

MR. OLIVER: March 3rd, I believe.

THE COURT: March 3rd. All right. It sounds as though you probably need more than -- you need more time than 60 days than March 3rd would allow me. In other words, January 4th isn't necessarily going to give you enough time to do fact discovery, expert discovery.

MR. OLIVER: I think that's correct, your Honor. We were kicking around dates of submitting opening summary judgment motions in early January.

THE COURT: So leaving me something, like, 30 days to do this?

MR. OLIVER: We can compress the schedule somewhat, but I'm hearing talk on both sides about a large number of summary judgment motions.

THE COURT: Well, tell me something. I will accommodate this, but it seems to me as though there has to be a limit to the number of -- well, you can file them. You can cost your clients money. But the question is whether I can possibly address multiple motions for summary judgment, undoubtedly with appendices that are so high, that it's virtually impossible for there not to be a genuine issue of

material fact contained in there someplace.

So I think you really have to be considering how we can accommodate each other.

MS. DURIE: Understood.

THE COURT: Now, it could be that I have to limit the number of motions you file or something if you are going to give me 30 days to decide them before our pretrial conference.

MS. DURIE: Understood. I also think we can back it up a little more than 30 days.

THE COURT: All right.

MS. DURIE: Right now, we had a schedule that was -- you know, we were supposed to be filing rebuttal expert reports on Thursday and opening summary judgement briefs on Monday.

We -- like I said we can actually, I suspect, file summary judgment motions actually relatively quickly. So I think it's obviously -- we need the Court to have sufficient time to address the summary judgment motions, and I think whatever that winds up being, we'll just need to accommodate.

THE COURT: Well, there's probably nothing you can do to give me sufficient time to address any of the stack of motions that are now pending for the spring trials.

MR. HORWITZ: Your Honor, one suggestion is,

if once you give us the date when you want them in your hands, perhaps, following up on your comments a few minutes ago, there could be a date some time between now and when we would anticipate the briefing would start, where the parties would be required to tell you what motions they had in mind, and then you can say, once you see those lists, okay, I've seen your lists, I'm going to let you file X number of motions with X number of pages.

THE COURT: Well, you know, I have tried that and that's almost as much work as going through your motions and saying, this is not worth my time.

MR. HORWITZ: Well, I don't mean substantively discussing. I just mean a letter that's one page long that says, here's what we would propose to file if we could file anything we wanted, and then your Honor would just say, okay. You can file two motions. I don't know. Whatever the number would be.

MS. DURIE: I think we have heard you on -- about the need to have the number of reason be reasonable and beyond issues that are improper for summary judgment. If we need to get the motions filed sooner, we will do that, and we will work out the rest of the schedule to cause that to happen.

So I think the question really is when should the Court receive the briefing on the summary judgment

motions, and we will do what we need to do to make that happen.

THE COURT: Well, it seems to me that six weeks before the pretrial is the latest that I can receive the last brief.

MS. DURIE: Okay.

THE COURT: Which is January 20th. Now, that might not be enough time to do what you need to do, in which case --

MS. DURIE: We'll make it work.

THE COURT: All right.

MR. OLIVER: I think we can work out a schedule, your Honor.

THE COURT: All right. I will have to give you an oral argument date, but I can't do that until I work out the rest of my spring calendar.

MS. DURIE: Very good.

THE COURT: All right.

MS. DURIE: Thank you.

MR. OLIVER: Thank you, your Honor.

THE COURT: All right.

(Court recessed at 10:38 a.m.)

- - -